## Case No. 16,649.

### UNITED STATES v. WATKINS.

[3 Cranch, C. C. 441.] [1]

Circuit Court, District of Columbia. July, 1829.

CIRCUIT COURT, D. C.—CRIMINAL JURISDICTION—FRAUDS AGAINST U. S.—INDICTMENT—VENUE OF CRIME—INSTRUCTIONS TO GRAND JURY—PLEADING—PROCEDURE—LIMITATIONS—JURY—VERDICT—NAVY AGENT—PAYMENT OF DRAFTS.

1. The circuit court of the District of Columbia for the county of Washington has jurisdiction of an offence committed in that county against the common law of Maryland, adopted as the law of the United States for that county, by the act of congress of February 27, 1801 [2 Stat. 103], although that offence may consist in the fraudulently obtaining of the money of the United States, by an officer of the United States, by means of false pretences.

2. By the cession of this part of the district to the United States by Maryland, all the state prerogative which Maryland enjoyed under the common law which she had adopted, so far as concerned the ceded territory, passed to the United States. All the power which Maryland had, by virtue of that common-law prerogative, to punish, by indictment, offenders against her sovereignty, and to protect that sovereignty,

[1] [Reported by Hon. William Cranch, Chief Judge.]

as to this district, became vested in the United States. The United States, therefore, have a criminal common-law jurisdiction in this part of the district, and this court has a criminal common-law jurisdiction.

[Cited in U. S. v. Coppersmith, 4 Fed. 205.]

3. Frauds affecting the public at large, or the public revenue. constitute a distinct class of cases, punishable by indictment; although the fraud be not effected by means of false public tokens, or by forgery, or conspiracy, or by any particular sort of means.

4. The principle which, in transactions between individuals. requires, in order to make the fraud indictable as a public offence, that it should be committed by tokens, or false pretences, or forgery, or conspiracy, does not apply to direct frauds upon the public. All frauds affecting the public at large, or an indefinite number of persons who have suffered a common or joint damage, by reason of the fraud, are indictable offences at common law.

5. Every indictment must be "certain to a certain intent in general."

6. Money lawfully in the hands of an officer of the United States, and for which he is accountable. is money of the United States, and may be so charged in an indictment.

7. An indictment charging fraud ought to aver the means by which the fraud was effected.

[Approved in U. S. v. Goggin, 1 Fed. 51.]
[Cited in People v. McKenna, 81 Cal. 160, 22 Pac. 489.]

8. In an indictment for obtaining money by false pretences, the averment must state what was pretended, and that what was pretended was false; and wherein and in what particular it was false.

9. An indictment averring that the defendant, "ostensibly for the public service, but falsely and without authority, caused and procured to be issued from the navy department of the United States" a certain requisition, set forth in the indictment, cannot be supported as an indictment for forgery.

10. An indictment for obtaining money by false pretences, one of which is stated to be an erasure in an account rendered to the defendant, cannot be supported as an indictment for forgery.

11. Fraud is an inference of law from certain facts, and the indictment must aver all the facts which constitute the fraud. Whether an act be done fraudulently or not, is a question of law, so far as the moral character of the act is involved. To aver that an act was fraudulently done is, therefore, so far as the moral character of the act is involved, to aver a matter of law, and not a matter of fact. An averment that an act was done with intent to commit a fraud, is equivalent to an averment that it was done fraudulently.

[Approved in U. S. v. Goggin, 1 Fed. 51.]
[Cited in People v. McKenna, 81 Cal. 160, 22 Pac. 489.]

12. No epithet, or averment of a fraudulent intent, can supply the place of an averment of the fact. or facts, from which the legal inference of fraud is to be drawn.

13. Deceit is an essential ingredient in fraud. No fraud can be committed but by deceitful practices; and the particular deceitful practices, by which the fraud is alleged to have been committed, must be specially set forth. so that the deceit may appear upon the face of the indictment. that the court may judge whether the fraud, which constitutes the crime. can be inferred from the facts stated in the indictment.

14. An indictment is not a good indictment, at common law. for forgery by erasure, unless it use the technical term, "forge or counterfeit."

15. The court may, in its discretion, give an additional charge to the grand jury, although they should not ask it; and. when they do ask it, the court may, perhaps, be bound to give it, if it be such an instruction as can be given without committing the court upon points which might come before them, to be decided on the trial in chief.

16. When an instruction to the grand jury is asked, either by the accused or the prosecutor, it is a matter of discretion with the court to give the instruction or not, considering the extent of the prayer, and all the circumstances under which it is asked.

[Cited in Patrick v. State, 16 Neb. 331, 20 N. W. 121.]

17. If an officer of the government of the United States. not intrusted with public money, get it into his hands by fraud, and appropriate it to his own use, the offence is not an official misdemeanor. but is an offence at common law.

18. A count, describing the deceptive means by which the defendant procured the placing of public money in the hands of a navy agent, and also the means by which the defendant got the money into his own hands, for his own use, from that agent. does not charge two separate offences.

19. If one necessary link in the chain of means to accomplish the fraud, was obtained by deceptive practices, those deceptive practices are as effectual in constituting the offence as if every other link in the chain had been forged by the like deception. The deceitful practices, used in obtaining one of the means of effecting the fraud, infect the whole transaction.

20. If a person in Washington, D. C., by deceitful practices, causes money of the United States to be placed to his credit in New York, and subject.to his draft; and he draws, accordingly, in Washington, and there gets the draft discounted by a broker, and there receives the proceeds of the draft. the fraud is consummated in Washington, if the drawee honors and pays the draft, and thereby ratifies the act of the. broker, in advancing the money; but until the draft is paid the offence is not complete.

21. The time of finding the indictment will appear by the caption, when the record is made up; and, upon demurrer, the judgment must be upon the whole record; and if upon the whole record it should appear to the court that the offence was committed beyond the time limited, judgment must be rendered for the defendant.

[Cited in U. S. v. White, Cases Nos. 16,676, 16,677.]

22. The defendant has a right, upon demurrer, to avail himself of the statute of limitations.

23. The limitation of two years, in the act of April 30, 1790 [1 Stat. 112], is applicable to common-law offences in the District of Columbia.

24. The court may. in a criminal case, suffer the defendant to withdraw his demurrer to the indictment, after argument, and after the court has intimated an opinion that it ought to be overruled, and before judgment entered upon the demurrer.

25. Although a judgment against the defendant upon demurrer, in a case of misdemeanor, is peremptory, yet it is not so if against the United States: for they may send up new bills of indictment. successively, until they have made their case perfect in form.

26. Upon suffering a defendant to withdraw his demurrer. after argument, and after an intimation of the opinion of the court, they may require him to waive his right to move in arrest of judgment for any matter apparent upon the indictment.

27. A party cannot discredit his own witness by testimony as to his general character, but

may give evidence to contradict any important fact to which the witness has testified. A fact is not immaterial if it shows that the party prevaricated in relation to a fact in issue.

28. If the jury bring in a verdict, not answering to the whole matter in issue, the court, without recording it, will inform the jury that they may retire again and reconsider their verdict. If they return a verdict to which neither party objects, it will be recorded.

29. It is no legal objection to a juror that he had been one of the jury in another cause against the same defendant for a different offence; and it seems that the court has no authority to order talesmen to be sworn until the regular panel has been exhausted: and the names of all the attending jurors will be put into the box, and twelve drawn by lot by the clerk. The juror, when called up to be sworn, may be asked whether he has "formed and expressed an opinion upon the guilt or innocence of the defendant upon the indictment in this case;" and before the question is put, the indictment may be read by the clerk in the hearing of all the jurors attending the court. If the question be answered in the negative, the juror may still be challenged for cause; and if challenged for favor, the challenge will be tried by two triors, (appointed by the court,) who are to be sworn upon each challenge; and if they cannot agree, the challenge is not supported, and the juror must be sworn.

[Cited in Patterson v. State, 48 N. J. Law, 390, 4 Atl. 449.]

30. After a juror is sworn, he cannot be challenged; and the court cannot discharge him without the consent of the parties, although he should state to the court matters which would be proper evidence upon a challenge for favor.

31. When a tales is returned, the parties have a right to challenge any of the original panel already sworn in chief, but it must be for a cause arising after the juror was sworn.

32. The circuit court of the District of Columbia has jurisdiction of any common-law offence committed in the county of Washington, by an officer of the government of the United States, of which it would have jurisdiction if committed by a person not an officer of the United States, although such offence should have been committed by means consisting in part of acts done by virtue, or by color, of his office.

33. After the jury has been out a long time without any probability of agreeing, the court may, in a case of misdemeanor, discharge them without the consent of the defendant.

34. If a verdict is so imperfect that no judgment can be given upon it, it must be considered as no verdict; the defendant has not been in jeopardy, and a venire de novo must be awarded.

35. The recording of a verdict does not prevent the court from deciding that it is so imperfect as not to justify a judgment.

36. A verdict which finds only one or two, out of many facts which are all necessary to constitute the offence, and saying nothing of the residue, is not a "partial" verdict in the technical sense of those words.

37. If the jury do not find a general verdict, nor a partial verdict, nor a special verdict, they find no verdict.

38. A verdict, in a criminal case, finding a fact which, if specially pleaded, would be a good defence, is to be considered, and entered, as a general verdict; so also, if it find a fact inconsistent with the guilt of the defendant; but it is otherwise when the facts found neither establish nor are inconsistent with the guilt or the innocence of the defendant.

39. Upon the trial of an indictment for a fraud at common law upon the United States, by an officer of the United States, in getting into his own hands and appropriating to his own use, money of the United States, which he had no right or authority to receive, the fact that he obtained the money in his official capacity is immaterial.

40. The court refused to instruct the grand jury that a certain paper, intended to be offered in evidence to them by the attorney for the United States, was such a paper as could be the subject of forgery at common law, and that certain specified facts and intents amounted to forgery at common law; and that if they found those facts and intents, they ought to find the bill, although it contained the word "forged."

41. Counsel are not permitted to argue to the jury the question of law which has been by both parties, submitted to the court, and by them decided, and the jury instructed thereupon.

42. The only way in which a jury can decide the law of a case is by finding a general verdict.

43. If the instruction given exceed the matter submitted to the court, and involve questions of law not involved in the instruction prayed, the counsel will be permitted to argue, before the jury, the questions of law not involved in the instruction asked and submitted to the court; and if the opposite counsel withdraw their prayer, the court will withdraw its instruction, and leave the question of law to be argued before the jury, reserving the right of the court to instruct the jury on the questions of law after the close of the argument to the jury.

44. Although the 4th auditor had no authority by law, to direct the disposition of the money of the United States in the hands of a navy agent, the payments, by the latter, of the drafts of the former, were not, necessarily, payments, in his own wrong. If the 4th auditor had no authority, the navy agent might, under possible circumstances, be excused for paying his drafts not officially drawn; and such drafts and payments might be a fraud on the United States. The fact, that the government has credited the navy agent for such payments, and charged the same to the drawer, does not exculpate him. The fact, that the money drawn for was ultimately paid by the navy agent in New York or Boston, does not prevent the circuit court of the District of Columbia from having jurisdiction of the cause, if the defendant received the money in Washington by a discount of the draft.

45. If the official character of an officer of the United States be not a necessary ingredient of the offence charged in the indictment, the naming him as such, and the averment that he was such an officer, will not prevent a court of law from taking cognizance of the offence.

The defendant in this case was arrested on the 1st of May, 1829, in Philadelphia, by a warrant issued at the instance of the United States, upon an affidavit made before a justice of the peace in Washington, D. C., by Mr. Amos Kendall, who, on the 23d of March, 1829, was appointed to the office of 4th auditor in the place of the defendant, who was sent for trial to Washington, by a warrant issued by Judge Hopkinson, under the 33d section of the judiciary act of 1789. In the progress of the cause a number of indictments were successively found by the grand jury, and were, in some instances, so blended in argument, that the whole may be considered as one cause and one prosecution. It came before the court first upon demurrer to two indictments.

The first count in the first indictment stat-

ed: "That Tobias Watkins, late of Washington county, gentleman, on the 5th of July, 1827, at Washington county, being then and there the fourth auditor of the treasury of the United States, and being an evil-disposed person, and devising and intending fraudulently and unjustly to obtain and acquire for himself and for his own private use, divers sums of money of the United States, with force and arms, at, &c., on, &c., falsely and fraudulently, wrote and addressed, and caused to be sent to a certain J. K. Paulding, then a navy agent of the United States, at the city of New York, a letter in the words and figures following, to wit: 'Treasury Department, 4th Auditor's Office, 5th July, 1827. Sir: You will receive by the mail of to-morrow, or next day, the treasurer's draft for $500 (five hundred dollars), under the appropriation for "arrearages," in order to meet my draft on you of this date, for that sum. That time might be given for the remittance of the draft, my order is made payable at three days' sight, and will be charged, when paid, to arrearages. It is in favor of S. and M. Allen & Co. I am, sir, very respectfully, your ob'dt. servant, T. Watkins. J. K. Paulding, Esq., Navy Agent, New York.' That on the same day the said T. W. made and executed a draft on the said J. K. Paulding, navy agent as aforesaid, according to the advice of the aforesaid letter, in favor of S. & M. Allen & Co., for $500, at three days' sight, and sold it to C. S. Fowler, and received of him therefor $500, which he kept and disposed of for his own use." That the said T. W. did, on the 6th of July, 1827, "ostensibly for the public service, but falsely and without authority, cause and procure to be issued from the navy department of the United States, a certain requisition to the secretary of the treasury of the United States for the purpose and intent of placing in the hands of the said J. K. Paulding, navy agent as aforesaid, the sum of $1,000 of the moneys of the United States, which requisition is in the words and figures following, to wit," &c., (being in substance a request by Mr. Southard, the secretary of the navy to the secretary of the treasury to issue a warrant to J. K. P., navy agent at New York, for $1,000, to be charged to him, and to be charged to the appropriation for "arrearages prior to 1827," dated July 6, 1827.) "By means of which requisition, the said sum of $1,000 of the moneys of the United States, was placed in the hands of the said J. K. Paulding. That the said T. W. on the 9th of July, 1827, wrote and addressed, and caused to be sent to the said J. K. Paulding, a letter in the words and figures following, namely, (in substance, that instead of $500 he would receive $1,000 under the appropriation for the payment of arrearages,) and on the 25th of July, 1827, drew again on J. K. P. for $500, and sold the draft to Fowler for $500, which he, (T. W.) kept and disposed of for his own use,

and wrote another letter of advice of that date to J. K. P., and directed him to charge it to arrearages. That the said letters and drafts so as aforesaid written and sent and drawn and sold as aforesaid, and the said requisition caused and procured to be issued as aforesaid, were, and each of them was so written, drawn, and sold, and caused and procured to be issued without any authority therefor, and not for or on account of the public service, but for the private gain and benefit of the said Tobias Watkins, and with intent to defraud the said United States, and as false pretences to enable him to obtain to his own use and benefit, the said two sums of $500 each; and that by means of the said several false pretences, the said Tobias Watkins did, at the time and times aforesaid, defraud the said United States of the said two sums of $500 each, and dispose of the same to his own use and benefit, to the great damage of the United States, and against the peace and government thereof."

The second count in the same indictment charges a similar transaction to the amount of $750 in January, 1828, and contains an additional averment, that the draft on J. K. P., in this count mentioned, was paid by him; and that the requisition was procured by the said T. W. "ostensibly for the public service, but falsely and without authority" for $12,889.12, exceeding the sum for which J. K. P. had asked a requisition by the sum of $750; "which sum of $750 was by the false suggestion and procurement of the said Tobias Watkins, added to the amount required by the said Paulding, for the purpose and intent of placing in the hands of said J. K. Paulding, navy agent as aforesaid, the said sum of $750 of the moneys of the United States, to meet the payment of the said draft so made and sold as aforesaid to the said C. S. Fowler, which requisition is in the words and figures following, to wit," &c. The averment of false pretences is exactly like that in the former count.

The second indictment charged a similar transaction with Mr. Harris, a navy agent in Boston, to the amount of $2,000, with similar averments, and that the drafts were paid by Mr. Harris. Two of the drafts were in favor of Thomas Pottinger, and there is an averment that the indorsements of the name of Pottinger were either genuine, for the accommodation of the said Tobias Watkins, or were falsely made by the said Watkins. There is also an averment that Mr. Harris sent his regular quarterly abstract of expenditures, (containing three charges of three drafts of Watkins,) to the said T. W. as 4th auditor, "who was the proper officer to receive the same; and that the said Watkins having received the same, the said Watkins, in pursuance of his said fraudulent intent to deceive and defraud the United States, and to consummate his said fraud, and to cover and conceal the same, that he might thereby be enabled to keep to his own use the moneys

he had obtained by means of the said drafts, and thereby to defraud the United States, did afterwards, to wit," &c. "falsely and fraudulently alter the said abstract by erasing therefrom the words, 'T. Watkins,' 'Draft,' 'Do. of 500.' 'Do. Do. ——,' opposite to the dates September 1st, 10th, and 20th, prefixed to the aforesaid three items in the said abstract, under the head of 'arrearages prior to 1827,' hereinbefore set out, with intent to defraud the United States. And the said letters and drafts, so as aforesaid written and sent and drawn and sold and paid as aforesaid, and the said requisition caused and procured to be issued as aforesaid, were, and each of them was so written, sent, drawn, and sold, and caused and procured to be issued as aforesaid, without any authority therefor, and not for or on account of the public service, but for the private gain and benefit of the said T. W., and that the same were made and done and procured, and also the erasure of the said abstract made and done, with intent to defraud the said United States, and as false pretences, to enable him to obtain and keep to his own use and benefit," &c., as at the conclusion of the first indictment.

Mr. Jones, for defendant, contended that the indictments did not charge any common-law offence. The offence, at most, is the misapplication of public funds to his own use— nothing worse than peculation. At the worst, he is only a public defaulter. The obtaining of money by false pretences, at common law, must be by some means which are likely to affect the public; such as false weights— means which common prudence cannot guard against—means in which the public have a right to place confidence—public false tokens. Nor is it sufficient that the fraud should affect the public. But if false pretences are relied upon, they must be distinctly averred. The pretence must be set out, and averred to be false. These indictments do not set out any pretence that is averred to be false.

Mr. Jones cited Rex v. Lara, Leach, 647; Id. 6 Term R. 565; Rex v. Wheatly, 2 Burrows, 1125; Id., Leach, 489; Id., W. Bl. 273; Rex v. Dunnage, 2 Burrows, 1130; Rex v. Osborn, 3 Burrows, 1697; Rex v. Channell, 2 Strange, 793; Rex v. Bryan, Id. 866; Rex v. Bower, Cowp. 323; East, P. C. 820; Reg. v. Mackarty, 2 Ld. Raym. 1179; Id., 1 Salk. 286; East, P. C. 823; 1 Hawk. P. C. c. 23, § 1; 2 Hawk. P. C. c. 25, §§ 57, 59, pp. 320, 322; 1 Hawk. P. C. c. 30, §§ 28, 29; Russ. Crimes, 1362, 1367; Rex v. Mason, 2 Term R. 581; Rex v. Perrott, 2 Maule & S. 379.

Mr. Coxe, on the same side, contended that this is a charge of an offence against the United States in their national character, and in that character they have no criminal common law; there are no criminal common-law offences against the United States; and this court has no jurisdiction of any common-law offence against the United States in its national character. Our common law here is only the common law as it existed in Maryland on the 27th of February, 1801, when it was adopted as the law of this part of the district. At that time no state court in Maryland could have tried such a case as this, because it is a case of purely federal jurisdiction, it being an offence against the United States in its federal character; and no court of the United States would have had cognizance of the cause, because the United States courts have no common-law criminal jurisdiction. This court has only the jurisdiction of the circuit courts of the United States, and of the state courts in Maryland; and as neither of them could have had jurisdiction of this case, this court has not.

Mr. Coxe cited, upon this point, 6 Dane, Abr. 752; 1 Kent, Comm. Lect. 16, pp. 311, 312, 320, 378; U. S. v. Coolidge, 1 Wheat. [14 U. S.] 415 [Case No. 14,857]; Serg. Const. Law; U. S. v. Worrall [Case No. 16,766]; U. S. v. Hudson, 7 Cranch [11 U. S.] 32; Dup. Jur.; Burr's Trial [Cases Nos. 14,692–14,693], cited in Kent, Comm. But the charge in the indictment is not of an offence at common law. It contains no averment of false pretences. It is not sufficient that it is a fraud upon the government. It must be a fraud committed by means which affect the public. It is not sufficient that the fraud which is the effect of those means should affect the public. 2 East, P. C. 816, 817, § 2; Russ. 1370; 3 Chit. 421, 425; 1 Chit. Cr. Law, 154, 159, 230.

The second indictment cannot be sustained as an indictment for forgery, as is now suggested by the counsel for the prosecution. The words "falsely forged and counterfeited" are necessary in an indictment for forgery, whether at common law or by statute. East, Cr. Law, 985. If it contains two distinct offences, namely, fraud by false pretences, and forgery, it is multifarious, and therefore bad upon demurrer. Rex v. Perrott, 2 Maule & S. 385. Fraud on the revenue does not constitute a distinct class of offences. The question as to common-law offences against the United States in their national character is not a question of jurisdiction; but whether there are such offences. This court has a common-law criminal jurisdiction in such cases only as were cognizable in the state courts of Maryland. The exclusive legislation over this district is only exclusive of all state legislation. This is a peculiar offence, by an officer of the United States against his government. If this court can take cognizance of it, every officer of the government may be subjected to trial in the state courts for his official acts. The money which the defendant obtained was not the money of the United States, but of the navy agent to whom it was charged, and who was accountable for it.

Another objection taken to the second indictment was, that the indorsement of Pottinger is stated alternatively and not positively. 1 Chit. 159. The abstract was not

such a paper as could be the subject of forgery at common law.

Mr. Swann and Mr. Key, for the United States. This court has all the common-law jurisdiction as to offences against the United States which a court in Maryland, on the 27th of February, 1801, had, as to offences against the state. In regard to offences committed in this district, the United States have a common-law criminal jurisdiction; and all offences against the common law as it existed in Maryland on the 27th February, 1801, committed in this county, are offences against the United States; and this court exercises both the federal and state jurisdiction. There is not here any distinction between them. It is here all federal jurisdiction. These indictments are good at common law. They charge that certain things were done as false pretences, and without authority, and with intent to defraud the United States; and that "ostensibly for the public service, but falsely and without authority, he caused to be issued" a certain requisition, &c. The abstract is a public document, and, as such, is a subject of forgery at common law. If it is not forgery it is fraud. But this is a fraud upon the public, and needs not the aid of false pretences. All frauds which affect the public at large, or a great number of persons, are indictable. Russ. 1360, 1361, 1362; 2 East, P. C. 816; Rex v. Wheatly, 2 Burrows, 1125; Channell's Case, 2 Strange, 793; Saund. 81; Jones' Case, 1 Salk. 379; Pinkney's Case, Sess. Cas. 198; Sayer, 146; Bryan's Case, 2 Strange, 866; Lara's Case, 6 Term R. 565; Wilder's Case, 2 Burrows, 1128; Treeve's Case, 2 East, P. C. 813, 821; Rex v. Southerton, 6 East, 134, 136; Rex v. Brisac, 4 East, 164, 172; 1 Russ. 219; Reg. v. Woodward, 11 Mod. 137; Rex v. Minister, etc., of St. Botolph, Bishopsgate, 1 W. Bl. 443; 3 Chit. Pl. 699, 701; Powell's Case, 1 Dall. 47; Rex v. Osborn, 3 Burrows, 1697. The defendant's office of fourth auditor did not give him any authority to receive the money, nor make him a trustee. The indictments may be supported as a fraud upon the public, and effected by false writings. Fraud affecting the public does not require false tokens, or false pretences. It is a distinct head of indictable offences. 3 Chit. 700, 701, 995, 1001; 2 East, P. C. 824; Govers' Case, Sayer, 206; Sweers' Case, 1 Dall. [1 U. S.] 45; 2 East, 840, 855, 989.

The second indictment is a good indictment for forgery at common law. The words "forge and counterfeit" are not necessary. Govers' Case, 2 East, P. C. 824; 3 Chit. 978; Russ. 1377; 2 East, P. C. 862.

CRANCH, Chief Judge, delivered the opinion of the court as follows (THRUSTON, Circuit Judge, dissenting). The substance of the first indictment is: That Tobias Watkins, being fourth auditor of the treasury of the United States, and intending fraudulently to obtain, for his own use, money of the United States, falsely and fraudulently wrote a letter to J. K. Paulding, a navy agent of the United States, advising him of his (T. W.'s) draft on him for $500, to be charged to "arrearages," and that he would receive a treasury draft for the same, to meet it. That T. W. drew such a draft, and sold it to C. S. Fowler for, and received of him, the same amount, and applied it to his own use. That the said T. W. did, ostensibly for the public service, but falsely, and without authority, procure to be issued from the navy department a certain requisition to the secretary of the treasury, for the purpose of placing in the hands of the said J. K. P., navy agent, the sum of $1,000; which requisition is set out in verbis, to be charged to "arrearages prior to 1827"; by means of which requisition the said sum of $1,000 was placed in the hands of the said navy agent. That the said T. W. afterwards wrote another letter to the said navy agent, informing him that the remittance under the appropriation for "arrearages" would be $1,000 instead of $500 as before advised, and afterwards drew another draft on him for $500, which sum he received for it of C. S. Fowler, and applied to his own use; of which draft he also informed the said navy agent by letter. "That the said letters and drafts so as aforesaid written and sent and drawn and sold as aforesaid, and the said requisition caused and procured to be issued as aforesaid, were, and each of them was, so written, sent, drawn, and sold, and caused and procured to be issued as aforesaid, without any authority therefor, and not for or on account of the public service, but for the private gain and benefit of the said T. W., and with intent to defraud the said United States, and as false pretences to enable him to obtain to his own use and benefit the said two sums of $500 each; and that by means of the said several false pretences the said T. W. did, at the time and times aforesaid, defraud the said United States of the said two sums of $500 each, and dispose of the same to his own use and benefit, to the great damage of the United States, and against the peace and government thereof." There is another similar count, upon another similar transaction, for $750, with the like averments.

To this indictment there is a general demurrer and joinder. By the demurrer the facts are admitted, if they amount to an indictable offence at common law, and are well set forth.

The first ground of demurrer relied upon is, that the United States, as a nation, has no common law, in relation to crimes and offences; and, consequently, that there can be no common-law offences against the United States, in its national character; that this offence, if it be an offence, is against the United States in that character, and not as the local sovereign of this district; and, therefore, it is not an indictable of-

fence. It is said that this court can only exercise the jurisdiction of federal courts and of the state courts. That the federal courts could not hold jurisdiction of this cause, because it is not a criminal offence against the United States, who have no criminal common law. And that the state courts could not hold jurisdiction of it, because, if it be an offence at all, it is exclusively an offence against the United States. This argument is certainly, at first view, quite plausible; but to our minds not entirely satisfactory. Is it clear that this offence is of such an exclusive character, that it could be prosecuted only in a court of the United States? If it had been committed in one of the states, say in Maryland, is it clear that it would not have been an offence against that state? The offence charged, we will say, for the sake of argument, is in substance a cheat; that is, an act of fraud, done to the injury of the United States. The state court has jurisdiction of cheats and frauds. Does that jurisdiction depend upon the question, to whose injury the cheat or fraud was committed? Whether it be to the injury of a citizen of Maryland, or of a foreigner, or of another state, or of a foreign sovereign, or of the United States? If a fraud to the injury of the state of Pennsylvania should be committed in Maryland, it could not be tried in Pennsylvania; and shall it be said that it is no crime in Maryland to do an unlawful act to the injury of Pennsylvania? What is there in the circumstances of the transaction, to make it a case of exclusive federal jurisdiction? Is it because the defendant is stated to have been fourth auditor of the treasury of the United States? He is not charged with having done any act in that character, or by color of that office; nor is he charged with the violation of any official duty, nor with having made use of his office, or official character, to perpetrate the fraud. Is it because the person, upon whom the drafts were drawn, was an officer of the United States? That circumstance is perfectly immaterial, and cannot change the nature of the transaction. The foundation and substance of the offence is fraud,—moral fraud, —crimen falsi; the turpitude of which is neither increased nor diminished by the circumstance, that the draft was drawn by one officer of the United States, and accepted by another, neither of them acting in his official character, nor by virtue of his office. Is it because the fraud was committed by means of a requisition from the navy department upon the treasury of the United States? That circumstance does not alter the nature of the offence; it is still a simple cheat or fraud. Is it because the United States is the sufferer by the fraud? The same answer may be given,—the nature of the offence is not thereby altered. We are, therefore, of opinion that there is nothing in the character of the parties, or in the circumstances of the transaction, which would make it a case of exclusive federal jurisdiction; but that if it be, in its nature, a common-law offence, and had been committed in a state, it might have been tried in a state court, as an offence against that state. We think, therefore, that if it be a common-law offence, committed in this county, it is within the jurisdiction of this court, whose common-law jurisdiction is derived from the common law of Maryland, which was, by the cession of Maryland and the acceptance of congress, under the provision in the constitution of the United States, transferred from Maryland to the United States, with that remnant of state sovereignty, which, after the adoption of the federal constitution, was left to Maryland. All the state prerogative which Maryland enjoyed under the common law, which she adopted, so far as concerned the ceded territory, passed to the United States. All the power which Maryland had, by virtue of that common-law prerogative, to punish, by indictment, offenders against her sovereignty, and to protect that sovereignty, became vested in the United States; and authorized them to punish offenders against their sovereignty, and to protect that sovereignty by the same means, so far as regarded the territory ceded. We therefore think that, in regard to offences committed within this part of the district, the United States have a criminal common law, and that this court has a criminal common-law jurisdiction.

The next ground of demurrer is, that fraud is not an indictable offence at common law, unless it be effected by means of some false public token, such as false weights, or measures, or marks; or by means which affect the public generally, unless it be fraud against the king, and the public at large; and, even then, it is not sufficient that the king, or the public at large, is the party injured, but the fraud must be effected by means which are likely to affect the public at large, —means which are generally mischievous, such as adulterating provisions, &c. But to this it was answered, that frauds affecting the public at large, or the public revenue, constitute a distinct class of cases, punishable by indictment, although the fraud be not effected by means of false public tokens, or by forgery, or by conspiracy, or by any particular sort of means; and this position seems to be supported by principle and by precedents.

1. By principle. Why are any acts made punishable by public prosecution? Because they are acts which, in their nature, are injurious to the public interests. The interests to be protected by the government are, the public peace, the public morals, the public property, and the public justice. Why is theft or robbery an offence against the state? Because they lead to a breach of the peace, to violence and bloodshed, in the protection or the recovery of the property

stolen. Why are public lewdness and disorderly houses indictable offences? Because they tend to injure the public morals, they are mischievous to many,—to an indefinite number,—to the public at large. Why are violations of the public · property offences against the state? Because- they immediately affect the public interest,—the interest of an indefinite number, who cannot individually complain,—whose separate interest is not injured, but who, collectively only, are sufferers; and who, collectively only, have the right to seek redress. Why are acts which tend to obstruct the due administration of justice indictable offences? Because they are, in their nature, injurious to the public at large; for the due administration of justice is necessary to the protection of all the other great interests of society. To such cases the rule, vigilantibus non dormientibus jura subveniunt, cannot apply. The public cannot, like an individual, be always on the watch. If they employ agents, those agents may sleep, or, what may be worse, they may wink; and how can the public watch the winker? The public is continually exposed to imposition; and if they trust, it is because they are obliged to trust. Their confidence is not voluntary, like that of an individual, who may transact his own business. The public can act only by agents, and cannot, therefore, be subjected to the rule of watchfulness. The principle, therefore, which, in transactions between individuals, requires, in order to make the fraud indictable as a public offence, that it should be committed by means of tokens, or false pretences, or forgery, or conspiracy, does not apply to direct frauds upon the public.

2. This distinction in principle is illustrated by many precedents, which are collected by the elementary writers upon this subject. East, in his Pleas of the Crown (page 821), prefaces his collection of them by this observation—"So all frauds affecting the crown, and the public at large, are indictable, though arising out of a particular transaction, or contract with the party. This was admitted by the very terms of the objection in the following case." He then proceeds· to give the substance of the indictment in Treeves's Case, from the manuscript notes of Judge Buller, and the other judges. It was for knowingly, wilfully, deceitfully, and maliciously furnishing certain French prisoners, whose names were unknown, then being under the king's protection in Eastwood Hospital, five hundred pounds of unwholesome bread, whereby they became injured in their health, to the great damage of the prisoners, the discredit of the king, the evil example, &c., and against the peace. ˙ The objection was, that it did not appear that what was done was in breach of any contract with the public, or of any moral or civil duty  This objection was overruled, but it did not appear upon what ground; nor is it material, because the case is cited for the principle admitted in the objection; which principle is, that if it had been in fraud of a contract with the public, the indictment would have been good. It may have been supported upon the principle which we have before assumed, that a fraud, which is to the injury of an indefinite number of persons, who have no separate individual cause of complaint, is indictable at common law. Such was the case in 2 Chit. Cr. Law, 559, 560, against a baker, for delivering bread short in weight, under a contract with the guardians of the poor of Norwich, "to the great damage and prejudice of the said poor persons, of and belonging to the said city of Norwich and the liberties thereof, for whose use, sustenance, and support the said loaves of bread were so made and delivered, as aforesaid." Here the immediate injury was done to a sort of public,— a quasi public,—the poor of the city; an indefinite number of persons, who, individually, could not prosecute, unless for separate and individual injury actually received, as in the case of a public nuisance.  Chitty, in his note to this case, says—"This indictment, for nondelivery of bread of sufficient weight, was settled on the decided opinion of a very experienced barrister, that the offence was indictable, on the ground stated in 2 East, P. C. 281 (821);—that all frauds, affecting the public at large, are indictable, though arising out of a particular transaction or contract." The case of Dixon, in 3 Maule & S.· 11, was for furnishing unwholesome bread for the children at the Royal Military Asylum at Chelsea. This was an indictment at common law, and had three ingredients, either of which was sufficient to support it, namely: First, that it was a fraud upon the government, the asylum being a royal institution; second, that it was to the injury of an indefinite number of children, who were supported at the asylum; and, third, that the means used, namely, selling of unwholesome bread, were such as were likely to injure the public at large. No question was made whether it was not an offence at common law. In Powell's Case, 1 Dall. [1 U. S.] 47, the principle is more clearly recognized by the supreme court of Pennsylvania. It was an indictment at common law against a baker employed by the army of the United States, for a cheat in baking two hundred and nineteen barrels of bread, and marking them as weighing eighty-eight pounds each, whereas they weighed only sixty-eight pounds. It was objected that such fraud was not indictable at common law. But "the court said that this was clearly an injury to the public; and the fraud the more easily perpetrated, since it was the custom to take the barrels of bread at the marked weight, without weighing them again. The public, indeed, could not, by common prudence, prevent the fraud; as the defendant himself was the officer of the public, pro hac vice. They were, therefore, of opinion that the offence was indictable." Here it is evident, that the ground upon which the indictment was obtained was, the injury to

the public. So in the case of Rex v. Bembridge, cited in 6 East, 136, "who were indicted for enabling persons to pass their accounts, at the pay-office, in such a way as to enable them to defraud the government; it was objected, that it was only a private matter of account, and not indictable; but the court held otherwise, as it related to the public revenue." In Brown's Case, 3 Chit. Cr. Law, 701, the indictment was against an overseer of the poor of the parish of Twickenham, for fraudulently applying to his own use money received by him for the parishioners, and rendering false accounts, to conceal the fraud, "to the damage and impoverishment of the said parishioners." This was a fraud upon an indefinite number of persons, who could not individually obtain redress. See, also, Martin's Case, 3 Chit. Cr. Law, 704. Other cases of indictments for frauds upon the parish, may be found in Comb. 287; 5 Mod. 179; 2 Camp. 269; 1 Bott. 342; 2 Nol. Poor Laws, 248, 371. Robinson's Case, 3 Chit. Cr. Law, 666, was an indictment against a surveyor of highways, for a fraud upon the parishioners, by appropriating gravel, labor, &c., to his own emolument. So in the Case of Minister, etc., of St. Botolph, 1 W. Bl. 443, the rendering of a false account of moneys collected for the relief of certain sufferers by fire was said to be an indictable offence. This could only be because it was a fraud upon an indefinite number of persons, who had no individual means of redress. So a fraud upon a parish by procuring the marriage of a pauper, so as to charge the parish, is indictable, upon the same principle. Tarrant's Case, 4 Burrows, 2106. So also a fraud by an apprentice in obtaining the public money, by falsely enlisting himself as a freeman. is indictable at common law, because it concerns the public revenue. Jones' Case, 1 Leach, 174.

These cases seem to establish the broad principle stated by East in his Pleas of the Crown, 818, 821, "that all frauds affecting the crown and the public at large," or effected "by any deceitful and illegal practice or token, (short of felony,) which affects, or may affect the public, are indictable offences at common law; and that under the terms 'public,' and 'public at large,' are included indefinite numbers of persons who have suffered a common or joint damage by reason of the fraud, and who have not individually a right to prosecute the offender." In regard, however, to the present indictment, it is not necessary to extend the principle beyond fraud upon the public, if such be sufficiently set forth in the indictment.

The question then occurs, Does this indictment sufficiently set forth a fraud upon the public? By the long established rules of criminal law in this country, every indictment must be "certain to a certain intent in general;" and "nothing material shall be taken by intendment." 2 Hawk. P. C. c. 25, § 60; Bayard v. Malcom, 2 East, 33. In the case of Rex v. Mayor, etc., of Lyme Regis, Doug. 158, Mr. Justice Buller says: "Certainty, to a certain intent in general means what upon a fair and reasonable construction may be called certain, without recurring to possible facts which do not appear; and is what is required in declarations, replications, and indictments, in the charge or accusation, and in returns to writs of mandamus." "The charge must contain such a description of the crime, &c. that without intending anything but what appears, the defendant may know what he is to answer, and what is intended to be proved, in order that the jury may be warranted in their verdict, and the court in the judgment they are to give." Rex v. Horne, Cowp. 682; 1 Chit. Pl. 237. It is true, "that it is a maxim, in pleading, that every thing shall be taken most strongly against the party pleading; or rather, that if the words be equivocal they shall be taken most strongly against the party pleading them; for it is to be intended that every person states his case as favorably to himself as possible; but the language of the pleading is to have a reasonable intendment and construction; and where an expression is capable of different meanings, that shall be taken which will support the declaration, &c., and not the other, which would defeat it." Wyat v. Aland, 1 Salk. 325; Rex v. Stevens, 5 East, 257; Amhurst v. Skynner, 12 East, 270; and Woolnoth v. Meadows, 5 East, 463.

The first question upon this point is, whether, if any fraud is sufficiently set forth in the indictment, it is a fraud upon the public. It has been suggested, in argument, that as the money was charged by the United States to the account of Mr. Paulding, who is responsible for it, it was his money, and not the money of the United States, which was drawn out of his hands by the accused; and that, as Mr. Paulding is liable to the United States, and has given security, they have suffered, and can suffer, no loss; and, therefore, if any fraud was committed, it was a fraud upon Mr. Paulding, and not upon the United States. But to this objection we think it may be answered, that it is not averred, in the indictment, that the money was charged to Mr. Paulding; it is only averred that it was "placed in his hands" "as navy agent;" and there is nothing stated in the indictment to show that it ceased to be public money in his hands. By the 4th section of the act of congress of the 3d of March, 1809 (2 Stat. 535), the navy agents are directed, "whenever practicable, to keep the public moneys in their hands in some incorporated bank, to be designated for the purpose by the president of the United States." This clearly shows that the understanding of the legislature was. that the money, when it came into the hands of the agent, did not cease to be public money; and that if it should be lost without any negligence or fault of the agent, it would not be his loss, but that of the United States; and if the money should have been charged to him

in account, we must suppose that under such circumstances the United States would credit him for the loss.

It has been suggested, on the part of the accused, that he is only liable to the United States in a civil action for the money which he received. But if he is so liable, it must be upon the ground that the money which he received was the money of the United States. If Mr. Paulding was induced to pay these drafts by such artful contrivances or false pretences or tokens as could not be guarded against by ordinary care and prudence, the United States might, very justly, allow him credit for the loss; and as the loss in that case would fall on the United States, it would be a fraud on the public; and how would it be less a fraud upon the public if Mr. Paulding was not so deceived and imposed upon, but paid the drafts, knowing that the accused had no right to draw? It could not have been less a fraud upon the United States if others had participated in it. For these reasons we think that the money drawn by the accused, out of the hands of Mr. Paulding, was the money of the United States; and therefore that the fraud, if any, was a fraud upon the public.

The next question is, whether the fraud be sufficiently set forth in the indictment. An indictment must be at least as certain and precise as a special verdict, in which no material fact can be inferred. This indictment is undoubtedly intended to be for a fraud, and ought to aver the means by which the fraud was effected. This is admitted by the terms of the indictment; for it avers "that by means of the said several false pretences, the said Tobias Watkins did, at the time and times aforesaid, defraud the said United States of the said two sums of five hundred dollars each, and dispose of the same to his own use and benefit, to the great damage of the United States, and against the peace and government thereof." The offence, therefore, which the accused is called upon to answer, is a fraud upon the United States, perpetrated by means of the false pretences previously set forth in the indictment; yet there is not, in the previous part of the indictment, any direct averment of any pretence, either true or false. It is true that there is a preceding averment "that the said letters and drafts, so as aforesaid written and sent and drawn and sold, and caused and procured to be issued as aforesaid, were, and each of them was, so written, sent, drawn, and sold, and caused and procured to be issued as aforesaid, without any authority therefor, and not for or on account of the public service, but for the private gain and benefit of the said Tobias Watkins, and with intent to defraud the United States, and as false pretences, to enable him to obtain to his own use and benefit the said two sums of five hundred dollars each." But it does not state what the pretence was. It does not state that the accused pretended or affirmed any thing to anybody. If there was no pretence there was no

false pretence. Let us analyze this averment, and apply, as was, no doubt, intended, singula singulis. It is: (1) An averment that the letters were written without authority. (2) That they were sent without authority. (3) That the drafts were drawn without authority. (4) That they were sold without authority. (5) That the requisition was obtained without authority. (6) That these things were not done for or on account of the public service, but for the private gain and benefit of the accused, and with intent to defraud the United States. But it is not averred that the accused ever pretended to any one that he had authority to write those letters, or to draw the drafts, or to obtain the requisition, or that they were for the public service, or that they were not for his own use. It is true that it is previously averred, in the indictment, that he did "ostensibly for the public service, but falsely and without authority, cause and procure to be issued from the navy department a certain requisition," &c. But the words "ostensibly for the public service" do not amount to an averment that the accused pretended or affirmed to the secretary of the navy, or to any other officer of the navy department, that the requisition was for the public service. But it is averred that the letters were written and sent, and the drafts were drawn and sold, and the requisition was obtained, "as false pretences." The word "as" means like—not the thing itself, but something like it. But if it were to be construed as an averment that the letters, the drafts, and the requisition were false pretences, and by means of such false pretences the accused defrauded the United States, such an averment in an indictment is not sufficiently certain. The averment must state what was pretended; and that what was pretended was false; and wherein and in what particular it was false. The gist of the crime is the falsehood of the pretence; and it is therefore necessary that it should be made apparent upon the face of the indictment by positive and precise averments. This rule is supported by many authorities. One only will be cited. It is the case of Rex v. Perrott, 2 Maule & S. 379. It is true, that this was an indictment upon the statute of 30 Geo. II. c. 24; but the statute does not require that the pretences should be particularly set out, nor specifically negatived, the words of the statute being merely these: "That all persons who knowingly or designedly, by false pretence or pretences, shall obtain from any person or persons, money, goods, wares, or merchandises, with intent to cheat or defraud any person or persons of the same," "shall be deemed offenders against law and the public peace," and "shall be punished by fine, imprisonment, pillory, whipping, or transportation, &c. But the judgment of the court was only an application of a general rule in regard to all indictments, whether upon a statute or the common law. The indictment averred that the defendant, intending "to cheat and defraud one Bullen of his moneys," &c., "un-

lawfully, wickedly, knowingly, and designedly, did falsely pretend to the said Bullen, that he, the defendant, could obtain a protection for Bullen by favor of the lords of the admiralty, by feeing the clerks, as he had an uncle, a lord of the admiralty, and that it would be no great expense, as he could get it done through favor," &c., "by means of which said several false pretences" the defendant obtained the money, &c. The cause was brought up from the assizes to the king's bench by writ of error; and the error assigned was, that there was no averment to falsify the matters of the several pretences set forth in the indictment, by which it could appear to the court, upon the face of the indictment, that any or either of the pretences alleged was false and untrue. Lord Ellenborough, in delivering his opinion, said: "Every indictment ought to be so framed as to convey to the party charged a certain knowledge of the crime imputed to him." "To state merely the whole of the false pretence, is to state a matter generally combined of some truth as well as falsehood. It hardly ever happens that it is unaccompanied by some truth. Suppose the offence, instead of being comprised within five or six separate matters of pretence. as here, had branched out into twenty or thirty, of which some might be true, and used only as a vehicle of the falsity; are we to understand from this form of charge, that it indicates the whole to be false, and that the defendant is to prepare to defend himself against the whole? That would be contrary to the plain sense of the proceeding, which requires that the fabrication should be applied to the particular thing to be falsified, and not to the whole. And the convenience also of mankind demands, and in furtherance of that convenience it is part of the duty of those who administer justice to require, that the charge should be specific, in order to give notice to the party of what he is to come prepared to defend. and prevent his being distracted amidst the confusion of a multifarious and complicated transaction, parts of which only are meant to be impeached of falsehood." "It has been argued, that perhaps every one of these charges may be false; but the rule, as it has been derived from cases of a mixed nature, where part is true and part false, has introduced a course of separating, by specific averments, all that which is intended to be relied upon as false. The analogy to the crime of perjury is so strict, and justice also suggests the same, that I think it should be specifically announced to the party, by distinct averments, what the precise charge is. It has always been done in indictments for obtaining money by false pretences; and whenever a more general form of indictment has come under consideration, it has not met with countenance; but the court, as in Rex v. Mason, have reprobated it. If it were good, every man might be brought into court without any possibility of knowing how to defend himself." Mr. Justice Le Blanc in the same case said: "The argument is, that alleging that the defendant did falsely pretend," &c., generally, and in a lump is equivalent to an averment that each of those pretences was false. But a number of pretences may consist of some facts which are true, and some false; and it is a necessary rule in framing indictments not only that the offence should be truly described, but that it should be described in such a manner as to give the party indicted notice of the charge. Therefore, when a party is charged with obtaining money under false pretences, the indictment ought to state in what particular such pretences are false. Here it is charged in the first count, that the defendant did falsely pretend "that he could obtain a protection from the lords of the admiralty, by feeing the clerk, as he had an uncle, a lord, and that it would be no great expense." "Now that is a pretence consisting of several facts, part of which may be true. and part false. It may be true that he had an uncle, a lord of the admiralty; and if he had, it does not follow that the rest may not be true; therefore the indictment should have charged what part was false." This case shows that, according to the general rule of certainty applicable to indictments, the particular pretences must be set forth, and it must be averred in what particulars they were false. We are, therefore, of opinion that this cannot be sustained as an indictment for a fraud or cheat by false pretences.

But it has been contended, that it is a good indictment for a forgery at common law. The forgery, it is said, consists in having, "ostensibly for the public service, but falsely, and without authority, caused and procured to be issued from the navy department of the United States," the requisition set forth in the indictment. It is a sufficient answer to this idea to say, that the indictment itself admits it to be a true requisition. and contains no allegation that the defendant forged and counterfeited it.

The second count does not vary, substantially, in point of law, from the first. Upon the whole, the judgment of the court upon this demurrer, must be for the defendant.

The indictment upon the transaction with Mr. Harris, differs, in matter of law, from that upon the transaction with Mr. Paulding. in the following particulars only, namely: (1) That it avers that two of the drafts drawn by the defendant upon Mr. Harris, were drawn in favor of a certain Thomas B. Pottinger, and sold by the defendant with the indorsements thereon of the said Pottinger, to C. S. Fowler. and "that the indorsements of the said Pottinger on the said drafts, were either the genuine indorsements of the said Pottinger, made thereon by him for the accommodation, and at the request of the said Watkins, and without any interest of the said Pottinger therein; or were falsely made thereon by the said Watkins." (2) That it avers that Mr. Harris, being navy agent, on the 30th of September, 1827, at Boston, "made out his

abstract of expenditures, as such navy agent, as required by the rules and orders of the navy department of the United States, for the 3d quarter of that year, ending on the said 30th of September; which abstract contained, among many other charges of expenditures as aforesaid, the following three items and charges, under the head of arrearages prior to 1827:

| 167. | Sept. | 1. | T. Watkins | draft | | $300 |
| 168. | " | 10, | do. | do. of $500 | | 499.50 |
| 169. | " | 22, | do. | do. | | 500 |
| | | | | | $1,299.50 |

—which abstract is set forth in words and figures; and it is further averred that the drafts referred to in the said three items were the drafts before charged to have been drawn in favor of C. S. Fowler. The indictment then proceeds thus: "And the said Harris, having transmitted the said abstract to the said Watkins, as fourth auditor of the treasury of the United States, who was the proper officer to receive the same, the said Watkins, in pursuance of his said fraudulent intent to deceive and defraud the said United States, and to consummate his said fraud, and to cover and conceal the same, that he might thereby be enabled to keep to his own use, the moneys he had obtained by means of the said drafts, and thereby to defraud the United States, did, afterwards, to wit, on the day and year aforesaid, at the county aforesaid, falsely and fraudulently alter the said abstract, by erasing therefrom the words:

> T. Watkins    draft
>     do.       do.   of $500.
>     do.       do.

opposite to the said dates of September 1st, 10th, and 22d, prefixed to the aforesaid three items and charges in the said abstract under the head of "arrearages prior to 1827, hereinbefore set out, with intent to defraud the United States." And there is a subsequent averment, that the letters, drafts, and requisition, "and also the erasure of the said abstract, were made and done with intent to defraud the United States, and as false pretences to enable him to obtain and keep to his own use and benefit, the said several sums of money therein mentioned; and that by means of the said several false pretences, the said Tobias Watkins did, at the time and times aforesaid, defraud the said United States of the said several sums, amounting to the sum of $2,000, and dispose of the same to his own use and benefit, to the great damage of the United States, and against the peace and government thereof."

The averment respecting the indorsement of Mr. Pottinger, seems to be wholly immaterial to the charge contained in this indictment, which, like that in the other indictment, is for obtaining money by false pretences, and there is no false pretence alleged in regard to that indorsement. But if it were material, its alternative form would render it perfectly nugatory. It is an averment that it was made either by Mr. Pottinger, or Mr. Watkins, without fixing it upon either. This averment has no connection with the charge, and may be considered as mere surplusage. The erasure of part of the abstract is charged to have been done by the defendant as a false pretence for obtaining the money for his own use. The indictment itself shows this to be impossible, because it shows that the money was obtained before the erasure was made. But it is also averred, that it was done by the defendant to enable him to keep the money to his own use. But the offence charged is not the keeping the money, but the obtaining it by false pretences. The erasure, however, is also averred to have been made with intent to consummate his said fraud, that is, the fraud in obtaining money by false pretences. But the indictment shows that that fraud, if committed at all, had been consummated before the erasure was made.

It is also averred, that the erasure was made with intent to cover and conceal his said fraud; but the charge in the indictment is for perpetrating, not for covering and concealing, the fraud. This averment, therefore, so far as it regards the charge in the indictment of obtaining money by false pretences, is wholly immaterial and irrelevant, and therefore may, in that respect, be considered as mere surplusage. But it is said, that the averment concerning this erasure, constitutes a substantive and sufficient charge of another offence, namely, a charge of forgery at common law; and that whether the indictment be good or bad as an indictment for obtaining money by false pretences, it is good as an indictment for forgery. It cannot escape our notice, that the only injury to the United States complained of in this indictment is by the fraud committed by false pretences; and that this forgery, if it be one, is only alleged incidentally as one of those pretences. The defendant was not informed by this indictment that he was to come prepared to answer to the crime of forgery. It contains but one count, and that is for obtaining money by false pretences; and if that same count contains also a specific charge of forgery, it is bad for duplicity. No man is bound to answer to two or more criminal offences in one count; and even if they are contained in several counts, and be not of the same nature or class, the court will compel the prosecutor to elect that upon which he intends to put the accused upon his trial (Young v. Rex, 3 Term R. 106); but in no case is he permitted to join several offences in one count. In civil actions, advantage can be taken of duplicity only by special demurrer; but in criminal cases it is fatal on general demurrer. Archb. Cr. Pl. 25; Com. v. Symonds, 2 Mass. 163; U. S. v. Sharpe, 1 Pet. [26 U. S.] 131; State v. Montague, 2 McCord, 287.

The present count undoubtedly contains a clear and distinct, although not a sufficient,

charge of fraud by false pretences. If it contains also a charge of forgery, it is bad for duplicity. It does not, however, seem to us to contain a charge of forgery as a separate offence. What is said of the erasure is merely surplusage. If this indictment cannot be supported as an indictment for forgery, (and we think it cannot,) it is bad as an indictment for obtaining money by false pretences, for the reasons stated respecting the preceding indictment. The judgment upon this demurrer, also, must therefore be for the defendant.

THRUSTON, Circuit Judge, dissented, and said, that on the day that the argument in this case was opened, he had not sat in court, and the state of the weather, his ill health, and the distance of his residence from the court room, had put it out of his power to examine the authorities on the subject as closely as he could have wished; but he believed he had heard the main part of the argument, and had paid very close attention to it; and he had brought his mind to the conclusion, that the demurrer ought to be overruled, and that the indictment was sufficient. In many of the views of his brethren he had concurred; but as to the insufficient averment in the indictment of a fraud at common law, he differed from them. There was not a single charge in it of an act done, that was not set out most specifically to have been done with a fraudulent design. He did not know, he said, what the precise duties of the fourth auditor are. He did not doubt that the fourth auditor might have had a right to demand of the secretary of the navy a requisition, and that the issuing of the requisition might, if properly done, have been a legitimate act, which could not be questioned here. But the design with which the requisition was procured to be issued must be looked at. Subsequent acts, said he, show the design to have been fraudulent; and it is sufficiently set out, in the indictment, that all the acts enumerated in the bill were fraudulent, and were, therefore, false pretences. He did not concur with his brethren in their disquisition as to the signification of the word "as," which, he said, did not merely mean similitude, but properly formed part of the sentence containing the allegation of false pretences. "I think," said he, "that the indictment is sufficient, and that it gives full notice to the party of the charges against him." He did not express his opinion more precisely, for the reasons which he had stated; which was of less importance in this case, as his brethren had pronounced a contrary opinion. If this indictment was not a sufficient one, he concluded by saying he thought it was hardly possible to frame one that would sustain a prosecution for a fraud at common law against the United States.

Wednesday, June 3d. A third indictment was this day presented to the court, to which, also, there was a general demurrer. This indictment charged that the defendant, being fourth auditor of the treasury of the United States, and "intending fraudulently and unjustly to obtain and acquire for himself and for his own private use, the money of the United States," "falsely and fraudulently" wrote a letter to Mr. Paulding, navy agent at New York, informing him that he had drawn on him for $300, to be charged to arrearages prior to 1827, under which head a remittance would be made to him, immediately on the secretary's return to the city; and requesting Mr. Paulding, in the meantime, to pay the draft out of any unexpended balance in his hands, to be replaced on receipt of the treasurer's remittance. That the defendant drew the draft, sold it to Mr. Fowler, received from him the money, and disposed of it for his own use; and that the draft was afterwards paid by Mr. Paulding. That the defendant, "ostensibly for the public service, but falsely, fraudulently, and without authority, caused to be procured and issued from the navy department of the United States a certain requisition to the secretary of the treasury of the United States, for the purpose and intent of placing in the hands of the said J. K. Paulding, navy agent, as aforesaid, the sum of $300 of the moneys of the United States, (which requisition is set out verbatim,) by which the money was placed in the hands of Mr. Paulding; and the indictment charges that the said letter and draft, so as aforesaid written and sent, and drawn and sold as aforesaid, and the said requisition caused and procured to be issued as aforesaid, were, and each of them was, so written and sent, drawn and sold, and caused and procured to be issued as aforesaid, without any authority therefor, and not for or on account of the public service, but for the private gain and benefit of the said Tobias Watkins, and with intent to defraud the said United States, and as false pretences, to enable him to obtain and keep to his own use and benefit the said sum of $300; and that, by means thereof, the said Tobias Watkins did, at the time and times aforesaid, defraud the said United States of the said sum of $300, and dispose of the same to his own use and benefit, to the great damage of the United States, and against the peace and government thereof."

Mr. Key, for the United States, presumed that it would not be thought either unreasonable or disrespectful to the court, that his learned associate (Mr. Swann, the district attorney,) and himself had thought themselves justified and bound to offer an argument on this occasion. That this duty was, in some measure, thrown upon them by the circumstance, that the ground on which the indictments were now held to be insufficient was not touched by the argument offered under the former demurrers, and only now brought to their view, and the

strong conviction they felt that it could be shown to be untenable. They therefore hoped that, if the question presented by the present demurrer was the same, in every respect, with those already settled by the court, the court would reconsider their determination of this question; and, if they had inadvertently decided what was inconsistent with the principles they had themselves laid down, they would retract it. He thought also, that the indictment now in question might possibly be considered by the court as presenting a different question, though he confessed that, to himself, it appeared to present the same. He considered that two questions were now settled, as to this and the other indictments, by the opinion delivered: First, that defrauding the United States was indictable at common law, without the use of false pretences; secondly, that these indictments, as indictments for using false pretences, were not sustainable.

Considering these two points as not to be disputed, now the question for consideration is this—Is this indictment, though insufficient for a fraud effected by false pretences, good, as an indictment at common law, for a fraud on the United States, without false pretences? In other words, does the indictment, being insufficient for false pretences, vitiate it altogether, although there be a sufficient charge in it of a fraud on the United States? He contended that, if the indictment contained a sufficient charge of the latter offence, namely, a fraud upon the United States, which required no false pretences, (as is decided,) and set out, also, a fraud perpetrated by false pretences, which were insufficiently set forth, the indictment must be held good for the offence which was well laid, and the rest would be held surplusage. It is on this ground that the indictments are now decided to be bad; a ground not taken in the argument. He contended that the indictments were sustainable, as containing a charge of a fraud on the United States, which required no false pretences to be set out. The only argument urged against this position was, that a fraud upon the United States, like a fraud upon an individual, was not indictable unless effected by false pretences; and the court has decided this question for us. It was never urged until now, in the court's opinion, that if such a fraud was indictable on account of its affecting the public, though unaccompanied by false pretences, yet that an indictment which sufficiently set forth such a charge, though it need set out no false pretences, would be wholly vitiated by undertaking to set out such pretences, and setting them forth insufficiently. He thought they would be able to satisfy the court, from the clearest authorities, that the insufficient setting forth of such unnecessary matter could not vitiate what was sufficiently charged; that "utile per inutile non vitiatur;" and that, laying aside the averment of the acts being done as false pretences, there was, without it, a clear, definite, and sufficient charge of a fraud upon the United States, indictable, according to the court's opinion, at common law. Here, as he understood the opinion of the court, was the point of difference. Though not necessary to set out the acts done as false pretences, yet, if they are so set out, they must be proved as such; and, if insufficiently set out, the indictment is bad. This is the opinion, and this the ground of it, upon which the decision is made against the indictments. He should endeavor, with all respect to the court, to show that it had been inconsiderately adopted.

As it may, however, be questioned whether the indictment contains, apart from the alleged false pretences, a proper charge of a fraud upon the United States, he would first consider what such an indictment ought to allege, as a sufficient statement of such an offence. The offence is fraud upon the United States, and all that can be necessary to set out in the indictment is, that the party accused intended to defraud the United States; that, in pursuance of that intent, he committed certain specific acts, and that, by those acts, the United States were defrauded. There can be no other necessary ingredient of the offence, according to the court's opinion; for that has determined that the gist of the offence is defrauding the public,—defrauding the public by any acts, whether false pretences or not. Now it cannot be pretended that any of those ingredients are wanting here. It is alleged that the accused, devising and intending to defraud the United States, wrote and sent the letter of advice set out in the indictment, made the draft, and procured the requisition to be issued; and it is distinctly averred that, by these acts, he did defraud the United States of the sum of money mentioned in these instruments. Let the precedents be looked to, of the indictments for frauds on the public, in the cases cited in the argument, and they will be found to sustain this view of the case. None of them are more distinct and particular in their statements and averments,—few of them as much so,—as the indictment now before the court. Here he referred to the indictment in the Case of Jones, the apprentice, in 1 Leach, and of the Chelsea pensioner, and of the overseers of the poor, in East and Chitty; and contended that these cases, and the clear principles of criminal law, showed that nothing else could be necessary in an indictment than to state the intent, the fraud, and the acts by which it was perpetrated. He proceeded, then, to inquire whether, as more than this was done,—as the acts by which the fraud charged to have been effected are called "false pretences," or "as false pretences," (as the court have considered the averment,) with averments of the falsehood of the pretences,—this unnecessary addition to the indictment can be held to avoid it

altogether, admitting it to be settled by the court's opinion that these are not such false pretences, nor so set out as would be sufficient to sustain the indictment, as an indictment for obtaining money by false pretences. That all these parts of the indictment are unnecessary parts, either wholly irrelevant, or immaterial to the indictment, considered as an indictment for fraud on the United States, must be conceded, if he had correctly stated what such an indictment should contain.

The inquiry, then, is as to the effect of introducing unnecessary matter into an indictment which contains a sufficient charge of the offence. According to the court's opinion, it vitiates the whole indictment. The well settled principles of pleading, and the authority of numerous adjudged cases, will be found otherwise. 1 Chit. Pl. 231, 233–235; Archb. Cr. Pl. 16. It is there plainly laid down, that matter wholly irrelevant, if stated, need not be proved; that matter relating to the offence, but not necessary to be stated, if stated must be proved; and that in neither case can the introduction of such matter vitiate the indictment, declaration, or plea, (for there is no difference, as to this inquiry, between civil and criminal cases,) except where the matter thus unnecessarily introduced, shows that the party using it has no cause of action. In that case he agreed that the party, thus showing what defeats himself, makes his count good for nothing. But nothing short of this will have such an effect upon his pleading. It must, as both Chitty and Archbold state it, show that he has no cause of action, and the setting out of such unnecessary matter defectively and informally, is quite a different thing; the passage cited from Archbold, shows that it does not vitiate, and may be considered as surplusage. The cases by which both these writers illustrate the principle they lay down, make this distinction obvious. It is the distinction, well taken,—and which must be familiar with the court,—between a cause of action defectively set forth, and a defective or bad cause of action. It may seem subtile; but the least attention comprehends it. It may be illustrated in the case of an indictment for forgery. You must charge the act done with intent to defraud another. To what extent and in what way the fraud was to affect him, need not be set out. But if you do set it out unnecessarily, and it appears from your own showing, that it could not in any way defraud him, the indictment is bad. Not so if you set it out informally and defectively, so as not to appear whether it could or could not defraud him. The cases are innumerable which sustain this position. In East, P. C. 821, 822, is a case of indictment for a cheat at common law, by false pretences, which were by the court deemed insufficient, so that that ground of the prosecution failed; yet the court, seeing enough in the indictment to constitute a charge for conspiracy, apart

from the false pretences, sustained it on that ground. The next case also was for a cheat by false tokens, and the false tokens were not sufficiently set forth; but the court sustained it as an indictment for forgery at common law, because it contained enough to constitute such a charge. So in Sweer's Case, 1 Dall. [1 U. S.] 45, which was upon an indictment for forgery at common law; but the court, being of opinion that the paper altered was not the subject of forgery at common law, rendered judgment as for a cheat. So in Com. v. Boynton, 2 Mass. 77, the indictment was for forgery under a statute; and not being sustainable on that ground, the court sustained it as for a cheat at common law, and this court and all other courts continually do the same thing. There is a large class of cases of indictments for various offences under particular statutes, and if the special circumstances necessary to bring them within the purview of the statute are insufficiently set out, the uniform and settled practice of this, and every criminal court, is to consider all those parts of the indictment which refer to the statute, and which go to state and aver the offence to be within the statute, as mere surplusage, and to sustain the indictment upon the common-law charge.

The only remaining inquiry is this: Does the statement of the unnecessary matter in this indictment show a defect in any of the ingredients necessary to constitute the charge of a fraud upon the public? The intent to defraud is plainly charged, the actual perpetration of the fraud as plainly, and the acts, by which the fraud was committed, are set forth; namely, the letter, the draft, and the requisition. Are these acts such as could not defraud the United States? This is all that is left to hang an objection upon; and can the court say that these acts cannot defraud the United States? The only ground upon which it could be so pretended, is removed by the opinion delivered, that it was the money of the United States that was obtained by these acts, from Mr. Paulding, and that, if so obtained, it was a fraud upon them.

If such nice criticisms and objections are to be discussed, not only upon the material parts, but upon every unnecessary statement and averment that may be found in indictments, we shall have more than doubled upon us the evils that are already justly complained of. There was enough of this evil without such a practice, in the estimation of Lord Hale, who expresses himself thus upon the subject: "In favor of life, great strictness has been, at all times, required in point of indictments; and the truth is, that it is grown to be a blemish and inconvenience in the law and the administration thereof. More offenders escape by the over-easy ear given to exceptions in indictments, than by their own innocence; and many times gross murders, burglaries, robberies, and other heinous and crying offences escape by these

unseemly niceties, to the reproach of the law, to the shame of the government, to the encouragement of villany, and to the dishonor of God. And it were fit, that by some law, this overgrown curiosity and nicety were reformed, which is now become the disease of the law, and will, I fear, grow mortal without some timely remedy."

Mr. Key admitted, that in his view of this case it presented the questions already decided. But he thought the court's view of these cases would oblige them to consider it differently. The court had insisted that the former indictments were for obtaining money by false pretences. But he did not think that an indictment, charging a fraud upon the public, in obtaining and keeping public money by certain acts specifically set forth, could be so considered because those acts were called false pretences. But the name thus given to those acts, it seemed, had unfortunately overthrown the indictments. Take away the name, and the indictments must have stood. For it has not been pretended in the argument, or in the opinion, that the acts of fraud are not set out with sufficient precision as acts of fraud. All the objection is, that they are not sufficiently set out as false pretences. As the acts of fraud by which the intended offence was effected, they are set out with all the certainty and precision possible. The defendant is said to have written the letter, made the draft, and caused the requisition to be issued, with intent to defraud the United States, and the letter and requisition are set out in words and figures; the letter dated, "Treasury United States, Fourth Auditor's Office," and bearing on its face every official character; the requisition is averred to have been caused to be issued without public authority, ostensibly for the public service, but falsely and fraudulently for his own use. It is plain that nothing more particular could be necessary, or perhaps possible, to say about these acts. The fraud consisted in these acts; in these acts alone; unaccompanied by any other acts or circumstances. Nothing surely need have been said about them, but that the defendant committed them with the fraudulent intent charged. But still these acts were called false pretences, and the indictments are bad. Now it has so happened, that the indictment now before the court does not give to the acts of fraud this unlucky name. In the conclusion of these indictments, where alone this appellation is pretended to be given to the fraudulent acts, there will be found a little variation in the language. The former indictments spoke of these acts "as false pretences," and then said, "by means of which said false pretences" the United States were defrauded. The indictment now before the court speaks of the acts "as false pretences," and adds, that "by means thereof" the United States were defrauded. "By means thereof" is, by means of the acts before set out; and the averment therefore is, that by

the acts set forth the United States were defrauded, and not that the United States were defrauded by means of false pretences; so that this indictment is clear of any averment of false pretences, which was fatal to the others. If it be said that it charges them to have been done and used "as false pretences," then we say, with the court, that "as" means "like"; and that the averment is, that the fraud was committed by means of certain acts, which were not false pretences, but "like" false pretences; so that the former indictments were for frauds by false pretences, and this is for a fraud by acts "like" false pretences, and thus, not having the ill-fated name given to the acts, it is clear of the faults of the other indictments.

Mr. Key also referred to U. S. v. Lindsay [Case No. 15,602], in this court, indicted under the Maryland act of 1723 (chapter 16), for that he, being a shop-keeper, sold liquors to slaves on Sundays, and kept a disorderly house. It was objected that the act of 1723 did not apply, because there was no averment that the traverser was a house-keeper, as required by that act; and that the indictment could not be sustained under the act of 1784, because it was not averred that he was a retailer. But it was contended that, if not good under the statute, it was good at common law, for keeping a disorderly house, and it was so decided by the court.

Mr. Key also cited the following passage from Starkie, Cr. Pl. p. 103—"Next it is to be considered how far it is necessary to particularize, in describing the means of effecting a fraud. And first it may be observed, that if some means be specified, and by those the fraud could have been effected, no objection can be taken on the ground that the description is not sufficiently circumstantial."

Mr. Swann, Dist. Atty., on the same side, complained that the decision of the court had left him in doubt as to the course he ought to pursue in framing new indictments upon the same transactions, and he was glad that this third indictment would afford the court an opportunity of revising its decision. The court, in their opinion, seem to require averments which it may not be in the power of the government to sustain. The court has said, that the cases cited "seem to establish the broad principle stated by East, in his Pleas of the Crown, 818, 821, that all frauds affecting the crown, and the public at large, are indictable offences at common law." All, then, which was necessary in the indictment was, to set forth a fraud upon the public; and the court went into an examination of the indictment, to see whether a fraud upon the public was sufficiently set forth. In this case, then, we must inquire whether the fraud alleged in the indictment is sufficiently set forth. The facts are few. It is alleged, in the first place, that the accused falsely and fraudulently wrote, addressed, and caused to be sent to J. K. Paulding the letter therein stated. In the next place, that he

fraudulently and without authority caused and procured a requisition to be issued, for the money therein stated. And, finally, that he fraudulently drew upon Mr. Paulding for the money, and received and applied it to his own use; and that all this was done to defraud the United States.

As to the first of these allegations, nothing can be added to it. The accused wrote and sent it; and that is all, perhaps, that can be proved upon him.

The second allegation is, that he caused the requisition to be issued fraudulently, and without authority; and it presents the important question, whether, if an officer of the government shall fraudulently cause a requisition to be issued, without authority, upon the public treasury, and contrive to get and apply the money to his own use, he would be indictable at common law. In deciding this question, it would seem to be unnecessary to bring to our assistance the previous letter and the subsequent draft. The question might be rested upon the requisition itself; and upon that ground, and that alone, he should hold any man, who should practise such a fraud, indictable at common law. It is not necessary that the accused should have made any false affirmation to any one respecting the fraud charged. The case in Maule & Selwyn was correctly decided; but it was a case of private fraud, and the indictment was under the statute, and required allegation of false pretences; and therefore is not applicable to this case, which is for a fraud upon the public at common law, and does not require false pretences.

Mr. Coxe, for defendant. All these indictments appear to be based on one erroneous fundamental principle. The true principle, which pervades the whole criminal law, is, that every indictment must contain specific averments of the facts which constitute the crime imputed, in order that the parties accused may be prepared to meet it. The facts stated in the indictment are not, per se, criminal; and the addition of the adverbs "fraudulently" and "falsely" cannot supply the want of the averment of those facts, which make the facts stated in the indictment criminal. The manner in which the fraud was effected must be stated. Rex v. Mason, 2 Term R. 581; Rex v. Holland, 5 Term R. 607; Rex v. Munoz, 2 Strange, 1127. The averment that these things were done without authority, and with intent to defraud the United States, is not sufficient. The manner of the offence must be charged. 2 Hale, P. C. 184. If the averment of false pretences be stricken out, as surplusage, there is no fact alleged which shows that the acts done were criminal.

Mr. Jones, on the same side. There are two reasons for precision in indictments, namely, that the charge should be simple, and reduced to a single point; and that the defendant may know with certainty against what he is to defend himself. This precision is as necessary in an indictment for a fraud upon the public, as for a fraud upon an individual. Every injury to the revenue, or to the public, is not necessarily a fraud. A direct and open breach of trust in a public officer is not an indictable offence at common law. There must be some deceit. It must be by a practice, or token, which may affect the public. East, P. C. 818. It is the machinery of the fraud which makes it indictable. Russ. 1308. It must be by means which affect, or may affect the public, and against which common prudence cannot guard. As great precision is necessary in an indictment at common law as under a statute. The means, the facts that show the fraud, must be set forth; the contrivance, the machinery. Archb. 16–18. If the averments which are said to be mere aggravation be struck out, what is there left? The words "falsely" and "fraudulently," and "with intent," &c., will not supply the want of an averment of the facts necessary to show the deceit. "Without authority." Whose authority?—what authority? "Ostensibly for the public service." How ostensibly? It is no averment of a fact.

It is contended, on the side of the prosecution, that if the indictment states enough to constitute an offence, it is immaterial what else is averred; but if you set out what is not material you must prove it. Govers' Case does not show that you may indict for false pretences and convict for forgery, upon the same count. You can charge only one distinct offence in one count. Too much is as bad as too little. But this indictment does not contain distinct charges of distinct offences. It purports to charge one offence only, and that is for obtaining money by false pretences.

Mr. Jones cited Archb. Cr. Pl. 19, 27, 30; Govers' Case, East, P. C. 824; Id., Sayer, 206; Macarty's Case, East, P. C. 823; Russ. 1361–1370.

Mr. Key, as to the definition of forgery at common law, cited East, P. C. 852, 1022; Starkie, Cr. Law, 103; U. S. v. Castor [Case No. 14,748], in this court, at Alexandria.

CRANCH, Chief Judge, delivered the opinion of the court (THRUSTON, Circuit Judge, dissenting). This is a third indictment at common law, against the late fourth auditor of the treasury of the United States, for a fraud upon the public, in obtaining the money of the United States by means of false pretences. It is said to be, in point of law, exactly like the former indictment, founded upon the transaction with Mr. Paulding, except that, instead of averring, at the conclusion of the charge in the indictment, that the fraud was effected by means of the said several "false pretences," it avers that it was effected "by means thereof," that is, of all the acts which, in the preceding part of the indictment, had been set forth and averred to have been done by the defendant, "as false pretences." The demurrer upon this indict-

ment not having been submitted to the court, with that in the former case, has afforded the counsel of the United States an occasion to question the correctness of the principles and of the conclusions which are stated in the opinion of the court in that case, and has given the court an opportunity, of which it has availed itself, to review its opinion, under the additional light afforded by the able argument of the learned counsel, directed exactly at the opinion itself. We have been the more willing to do this, because, as there is no appeal in these cases, a heavier responsibility is thrown upon this court. We shall proceed, therefore, to a consideration of the points in which the correctness of our former opinion has been questioned, with a hope and a confidence that, if in this examination we shall find that we have committed an error, we shall not be prevented, by any pride of opinion, from acknowledging it with candor, and correcting it with pleasure. We have taken time to examine the authorities to which we have been referred, with a degree of attention, as we hope, in some degree commensurate with the importance of this cause in the estimation of the public, and with its real importance in point of law.

The objection taken, by the counsel of the United States, to the decision of the court in the former case, is, in substance, that the court drew a false conclusion from the premises which they had established.

The argument on the part of the United States is, in substance, this: According to the opinion of the court, every indictment which sufficiently sets forth a fraud on the public, effected by means other than false pretences, is a good indictment at common law. This indictment does sufficiently set forth a fraud upon the public. effected by means other than false pretences. This is, therefore, a good indictment at common law. The conclusion is just if the premises are true. The major proposition may, for the sake of argument, be admitted to be true. But the minor proposition, namely, "that this indictment does sufficiently set forth a fraud upon the public, effected by means other than false pretences," is now, as it was in effect before, denied by the court. It was, therefore, incumbent upon the counsel of the United States to prove it before they could arrive at their conclusion. Have they done so? and how? They take it for granted that they have proved the proposition when they show, that it is alleged in the indictment that "the accused, devising and intending to defraud the United States, wrote and sent the letter of advice set out in the indictment—made the draft and procured the requisition to be issued"—(and we will add, what they omitted, sold the draft, received the money, and applied it to his own use,) "and that it is distinctly averred that by these acts he did defraud the United States of the money mentioned in these indictments."

And the counsel for the United States contend that "all that can be necessary to set out in the indictment is, that the party accused intended to defraud the United States; that in pursuance of that intent he committed certain specific acts; and that by those acts the United States were defrauded." By the expression "set out" the court understood the counsel of the United States as meaning no more than "aver" or "allege;" and the court, therefore, understood them, in effect, to say, that it is only necessary, in an indictment at common law, for a fraud upon the United States, to aver that the defendant did certain acts with intent to defraud the United States, and that by those acts the United States were defrauded; although the same acts, without the averment of a criminal intent, should appear to be innocent. The proposition to be proved is, "that this indictment does sufficiently set forth a fraud upon the public, effected by means other than false pretences." It must sufficiently set forth a fraud. Fraud is an inference of law from certain facts. A fraud, therefore, is not sufficiently set forth in an indictment, unless all the facts are averred which in law constitute the fraud. Whether an act be done fraudulently or not is a question of law, so far as the moral character of the act is involved. To aver that an act is fraudulently done, is, therefore, so far as the guilt or innocence of the act is concerned, to aver a matter of law, and not a matter of fact. An averment that the act was done with intent to commit a fraud, is equivalent to an averment that the act was done fraudulently. No epithets, no averment of fraudulent intent, can supply the place of an averment of the fact or facts from which the legal inference of fraud is to be drawn. Starkie, in his late treatise on Criminal Pleading (page 163), says: "Whether particular circumstances constitute an indictable fraud, is a question of law; and, therefore, according to a fundamental rule of description in indictments, such circumstances must be set out, in order to show that the facts amount to an indictable offence." The case of Rex v. Knight, 1 Salk. 375, was an information against a receiver-general for falsely indorsing certain exchequer bills, and paying them into the exchequer "as if they had been received for customs, and as if they had been truly indorsed; to the deceit and fraud of the king." The statute of 8 & 9 Wm. III. c. 20, § 65, required him "to put his name to the bill." The information only charged that he indorsed it. Lord Chief Justice Holt, in delivering the opinion of the court, said: "The word 'indorse' is not sufficient; for 'indorsavit' imports a writing on the back of a thing, but not putting his name upon it. But it was urged by the king's counsel that it might plainly be understood by the words 'quasi receptæ essent pro custumiis.' I answer this by argument only; and informations are nought for that very cause; for all charges ought certainly to be set out in

pleading. But further it was urged that it is said, 'falso indorsavit in deceptionem domini regis,' and so found by the jury; and, though a fact that appears innocent cannot be made a crime by adverbs of aggravation, as 'falso,' 'fraudulenter,' &c., yet where a fact stands indifferent, as writing, which may be true or false, and is charged to be 'falso,' and the jury find it so, all are then estopped to say the contrary. On the other side it was said, 'in deceptionem' is only matter of conclusion. But here is no charge; it is not enough to say the king is cheated; he must appear to be so." Again, in the same case, as reported in 3 Salk. 186, it is said: "To say, 'falso indorsavit quasi receptæ essent,' is no direct charge of any thing that is criminal. 'Tis true it is said 'in deceptionem domini regis'; but this is only matter of inference and conclusion; whereas the charges contained in every indictment ought to be so certain that the defendant may know what answer to make, and that the court may set the fine in proportion to the offence; and likewise, that if the defendant should be indicted again for the same fact, he may plead 'autrefois convict,' (that is, that he has been before convicted.) 'Tis true that the jury have found that the defendant 'falso indorsavit'; but that will not fix the guilt; for they are only to find the contents of the indictment, and if that will not amount to a crime, the adverb 'falso' will not make it so." So, also, Lord Mansfield, in Rex v. Woodfall, 5 Burrows, 2666, says, "that all the epithets in the information were formal inferences of law from the printing and publishing," and "that the verdict finds only what the law infers from the fact." Again, in page 2669 he says, "if they" (the jury) "meant to say that they did not find it a libel, or did not find the epithets, or did not find any malicious intent, it would not affect the verdict, because none of those things were to be proved or found either way." The language of Starkie, also, (Starkie, Cr. Pl. 85,) is this: "It has been said, that where the fact laid in the indictment appears to be unlawful, it is unnecessary to allege it to have been unlawfully done. In truth the averment is in no case essential, unless it be part of the description of the offence as defined in some statute; for if the fact, as stated, be illegal, it would be superfluous to allege it to be unlawful; if the fact stated be legal, the word 'illicite' cannot render it indictable; and the same observation is applicable to the terms 'wrongfully,' 'unjustly,' 'wickedly,' 'wilfully,' 'corruptly,' 'to the evil example,' 'maliciously,' and such like; which are unnecessary if they are not to be found in the very definition of the offence, either at common law, or in the purview of the statute." So, also, Archbold, in his treatise on Criminal Pleadings (page 23), says, "An indictment for an offence against the statute must, with certainty and precision, charge the defendant to have committed the acts, under the circumstances, and with the intent mentioned in the statute; and if any one of these ingredients in the offence be omitted, the defendant may demur, move in arrest of judgment, or bring a writ of error. The defect will not be aided by verdict, nor will the conclusion, 'contra formam statuti,' cure it."

One of the necessary and essential ingredients of fraud is deceit. Without deceit there can be no fraud, in the legal sense of the word. No fraud can be committed but by deceitful practices; practices calculated to deceive. There may be injuries to the public without deceit, and they may be indictable at common law, but they cannot be frauds. The particular deceitful practices, by means of which the fraud is alleged to have been committed, must be specially set forth; so that the deceit may appear upon the face of the indictment, in order that the court may judge whether the fraud which constitutes the crime can be inferred from the facts stated in the indictment. Whether the deceitful practices consist of false tokens, or fabricated letters, or forged notes, or false pretences, expressed either by words or signs or acts, they must be set forth with proper averments, showing and falsifying the pretended facts which were the means of the deceit.

If, then, the law is, as we have stated it to be, that fraud is an inference of law from certain facts; that every indictment for fraud is bad which does not positively aver all the facts necessary to raise that inference of law; that the expressions "fraudulently and with intent to defraud the United States," and "that the United States were defrauded," are not averments of matters of fact, but of inferences of law; there will be nothing left, according to the idea of the counsel of the United States, as to what is necessary in an indictment for fraud upon the United States, but the averment that certain apparently innocent acts were done by the defendant.

Let us, then, according to the terms of the proposition, exclude from this indictment all the averments respecting false pretences; and let us exclude those allegations which are not averments of matters of fact, but of inferences of law; and the following averments of facts will be all that are left, namely: That Tobias Watkins, on the 8th of October, 1827, being then 4th auditor, &c. at Washington county aforesaid, with force and arms, wrote and addressed and caused to be sent to J. K. Paulding, then a navy agent of the United States at the city of New York, the letter of that date set forth in the indictment; and on the same day drew the draft on the said J. K. Paulding, navy agent, for $300, and sold and delivered it to C. S. Fowler, and received from him $300 therefor, and kept and disposed of the same for his own use; which draft was afterwards paid by the said J. K. Paulding. That the said

T. Watkins did afterwards, on the 6th of November, 1827, at Washington county aforesaid, cause and procure to be issued from the navy department of the United States, the requisition set forth in the indictment, for the purpose of placing in the hands of J. K. Paulding, navy agent as aforesaid, the sum of $300 of the moneys of the United States, which was by that means done. And that these things were so done by the said Tobias Watkins, not for or on account of the public service, but for the private gain and benefit of the said Tobias Watkins, and to enable him to obtain and keep, to his own use and benefit, the said sum of three hundred dollars; and that, by means thereof, the said Tobias Watkins did, at the time and times aforesaid, dispose of the same to his own use and benefit.

These are all the facts remaining in the indictment, upon which the court is called upon to decide whether the indictment is good, as an indictment at common law, for a fraud upon the United States. We look in vain among these facts, for such as show that deceit which is an essential ingredient in fraud. There is no fact averred in relation to the letter, or the draft, or the requisition, which shows any deceitful practice, any attempt to deceive anybody, or to impose upon any agent of the government. Upon that most essential point the facts give us no information. Fraud, even in civil cases, is never to be presumed; and in criminal cases the accused is always presumed to be innocent until the contrary appears. But it has been suggested that the letter, the draft, the requisition, and the receipt and application of the money to his own use, by the defendant, he then being 4th auditor of the treasury department of the United States, do, of themselves, show a fraud. They might, indeed, be evidence contributing to establish a charge of fraud, upon the trial before the jury; but the court is not now to inquire what might be the evidence of fraud. The question is, what are the allegations, not what is the proof; for, however strong the proof might be, the court could not give judgment against the accused, if the offence should not be sufficiently alleged. The simple averment that the defendant wrote the letter is not the averment of any fact which might be inferred from the fact of his writing the letter. So in regard to the averments respecting the draft and the requisition, and the receipt and misapplication of the money; they do not amount to an averment of any inference which might be drawn from either of those acts, or from the combination of the whole. Whatever material inferences of fact might, in the opinion of the counsel for the United States, be drawn from those facts, ought to have been averred as facts; and without such an averment those inferences cannot be taken into consideration by the court in deciding upon the validity of the indictment, for the same reason which would exclude them in the case of a special verdict. Ex-

cluding, therefore, those averments of false pretences, which, by the terms of the proposition, are to be excluded, and those averments which are only averments of inferences of law, and there remains no averment of fact showing that most important of all ingredients of fraud, the deceitful practice by which the fraud was or could be effected. The counsel for the United States, therefore, having failed to support the minor proposition of the syllogism upon which their argument is founded, must, of course, fail in their conclusion.

A great part of the argument of the counsel for the United States, in the present case, was founded upon a misapprehension of the opinion of the court upon the former case. They, in effect, assumed, as one of the grounds of their argument, this proposition: that the court decided the former indictments to be bad, because they were insufficient as indictments for fraud by false pretences, although they contained sufficient averments to make them good as indictments for fraud upon the United States without false pretences. But no such proposition was stated by the court in its opinion. No opinion upon that point was given by the court. On the contrary, the court said: "It cannot escape our notice, that the only injury to the United States, complained of in this indictment, is by fraud committed by false pretences." And again, "The offence, therefore, which the accused is called upon to answer, is a fraud upon the United States, perpetrated by means of the false pretences previously set forth in the indictment." If, indeed, the court had seen, that, independent of the averments respecting false pretences, there were, in the indictments, other sufficient averments of facts showing other deceitful practices by which the fraud was committed, the question might have occurred which is now made, to wit, whether the indictments might not be good notwithstanding the allegation that the fraud was committed by means of certain false pretences imperfectly set out. The court, however, did not see, in the indictments, any allegations of other facts showing other deceitful practices by means of which the fraud (in the language of Starkie, in the passage cited by the counsel for the United States in pages 103, 104,) "could have been effected." That passage was cited to show that it is not necessary to be very particular in setting forth the means by which the fraud was committed. After saying, as before noticed, that, whether particular circumstances constitute an indictable fraud, is a question of law, and therefore must be set out, in order to show that the facts amount to an indictable offence, Mr. Starkie observes, in regard to the question, how far it may be necessary to particularize in describing the means of effecting the fraud, "that if some means be specified, and by those the fraud could have been effected, no objection can be taken on the ground that

the description is not sufficiently circumstantial." The case from which alone he seems to have drawn this conclusion, was that of Young v. Rex, 3 Term R. 98. The fraud, in that case, was effected by means of a false pretence, respecting a certain bet which the defendant had made "with a colonel in the army, then in Bath." Upon a writ of error, one of the errors alleged was, that the name of the colonel was not stated in the indictment. But the objection was overruled by the court, who said, that "perhaps his name was not mentioned, so that he could not have been described in the indictment with greater accuracy." The general principle thus extracted by Mr. Starkie from this lean case of Young v. Rex, is cited to justify the court in saying, that it is only necessary, in an indictment at common law for fraud against the United States, to state that the defendant did certain acts (whether fraudulent in their nature or not) with an intent to defraud the United States, and that they were defrauded thereby. It is evident, however, that Mr. Starkie intended to say, in effect, that the means specified must be means by which it might be apparent to the court that a fraud could be committed; that is, deceptive means, deceitful practices; for without deceit, or the use of deceptive practices, fraud cannot be committed. The court, therefore, not having perceived in the former indictments any facts alleged, (except the false pretences, which are now admitted to have been imperfectly set out,) which showed any deceptive means or deceitful practices by which a fraud upon the United States could be effected, had no occasion to advance the doctrine which the counsel for the United States have supposed was advanced by the court, nor to deny the principle contended for on the part of the prosecution, that "utile per inutile non vitiatur." Whenever the circumstances of a case shall raise the question, whether an indictment for fraud alleged to have been committed by false pretences imperfectly set out, can be supported by evidence of other deceitful practices which may happen to have been set out in the indictment, but not averred to be the means by which the alleged fraud was committed, it will be proper to decide it; and the cases cited by the counsel will deserve great consideration; but as we think that that question is not raised by the circumstances of the present case, it is not necessary to decide it now.

It has been stated in argument, by the counsel for the prosecution, that it has been settled by the opinion of this court upon the former indictments, "that defrauding the United States was indictable at common law without the use of false pretences." The proposition thus extracted, and drawn away from the ideas by which it was accompanied in the opinion which was given, and presented to the view thus baldly, appears to have misled the counsel for the United States, and may tend to mislead others. If the expression, "false pretences," be taken in its most extensive sense, it might, at first view, be doubted whether a fraud could be committed without a false pretence, for falsehood and deceit are the essence of fraud. But the phrase, "false pretences," has become familiar to the lawyer's ear; and ever since the statute of 30 Geo. II. c. 24, which made certain frauds upon individuals indictable which were not indictable by the common law, the phrase has acquired a technical character, and has generally been understood as descriptive of such false pretences as were punishable by that statute, and as would make those frauds indictable which were not so before. It is evident, by the manner in which it was used by this court in its former opinion, that it was so understood by the court, and was used as a description of a particular class of deceitful practices. It is evident also, that the court was considering the question, whether, in an indictment for a direct fraud upon the public, it was necessary that the fraud should appear to have been committed by the same sort of means which would be required to support an indictment at common law for a fraud upon an individual. Thus, after stating one of the grounds of the demurrer, namely, that fraud is not indictable at common law unless effected by means of some false token, such as false weights or measures or marks, &c., the court said: "But to this it was answered, that frauds affecting the public at large, or the public revenue, constitute a distinct class of cases punishable by indictment, although the fraud be not effected by means of false public tokens, or by forgery, or by conspiracy, or by any particular sort of means; and this position seems to be supported by principle and by precedent." Again, the court said: "The principle, therefore, which, in transactions between individuals, requires, in order to make the fraud indictable as a public offence, that it should be committed by means of tokens, or of false pretences, or forgery, or conspiracy, does not apply to direct frauds upon the public." The court then proceeded to illustrate the distinction in principle, between public and private frauds, by many cases of indictable frauds, in which the deceitful practices by which the frauds upon the public were effected did not consist of false tokens, or false pretences, or forgery, or conspiracy; and then observed, that "these cases seem to establish the broad principle stated by East (P. C. 818, 821), that all frauds affecting the crown, and the public at large, or effected by any deceitful or illegal practice or token (short of felony,) which affects, or may affect the public, are indictable offences at common law."

These citations from the former opinion of the court seem to us to show, conclusively, that the court ought not to be understood as saying, that an indictment at common law for a fraud upon the United States, can be supported without the averment of facts which show that the fraud was committed by de-

ceitful practices of some sort or other; although the court did, in effect, say that it was unnecessary to show that the fraud was effected by means of tokens, or of false pretences, or forgery, or conspiracy; because there may be deceitful practices not included in either of those classes.

The counsel for the United States also misunderstood the opinion of the court, in supposing the court to have said, that an indictment which sufficiently sets forth a fraud upon the public, unaccompanied by false pretences, and which would be a good indictment without any averment of false pretences, would be wholly vitiated by undertaking to set out such pretences, and setting them forth insufficiently. Whatever the opinion of the court might be in such case, it certainly was not expressed.

Again, it was stated by the counsel for the United States, that, according to the opinion of this court, the introduction of unnecessary matter into an indictment vitiates the whole indictment. In this respect, also, the opinion of the court was misunderstood. The court gave no such opinion.

It was contended on the part of the United States, that the indictment is sufficient, because "the intent to defraud is plainly charged; the actual perpetration of the fraud as plainly, and the acts by which the fraud was committed, are set forth, the letter, the draft, the requisition;" and it was asked, "Are these acts such as could not defraud the United States?" It has been before observed, that the averment of an intent to defraud, will not supply the want of the averment of facts showing the deceitful practice which constitutes the essence of the fraud. It is not the injury alone, but the injury by means of the deceit, which constitutes the crime. But it is said, that the actual perpetration of the fraud is plainly averred. The simple averment of fraud, or that the United States were defrauded, is only the averment of a matter of law; a legal inference from facts; which facts must, themselves, appear to justify it. The acts, by which the fraud was committed, it is said, are also set forth, namely, the letter, the draft, and the requisition. These may be among the acts by which the injury was done to the United States, but they are not such acts as show the deceitful practices by which the fraud was effected. The only facts, averred respecting those papers, are, that the letter was written and sent; the draft was drawn and sold and paid, and the requisition was procured. These facts, alone, do not show the fraud. Again; it is contended, on the part of the United States, that, "whether these acts did defraud the United States as charged in the indictment, is matter of proof—is exclusively for the jury, and not for the court." Whether the acts were done, is certainly a question for the jury. But whether those acts did defraud the United States, namely, whether they amount to fraud, is unquestionably a matter of law. It is true,

that in finding a general verdict, upon the general issue, in a criminal case, the jury must incidentally decide upon the law as well as the fact, because the question of guilt depends upon both law and fact, which cannot be separated in a general verdict; yet whenever, by the pleadings, or by a special verdict, which the jury have always a right to find if they will, the law is separated from the fact; the law is to be decided by the court alone. As the court said so much, in its former opinion, respecting the degree of certainty required by the rules of the common law, in indictments, it forbears to add any thing upon that point. But the propriety of adhering to the rule has been questioned, and the passage from Hale's History of the Pleas of the Crown (volume 2, p. 193), so often quoted in support of defective indictments, has been again cited upon us. But his complaint of the over-nicety of the practice under the rule, is the strongest evidence of the existence of the rule itself. And the same venerated judge, in another part of his book, in speaking of presumptive evidence (pages 289, 290), says: "It is better that five guilty persons should escape unpunished, than one innocent person should die;" and if his opinion had been required, there can be no doubt that his patriotism would have prompted him to say, that it is better that ten guilty persons should escape punishment, than that any one of those rules of the common law which were adopted for the protection of the personal liberty and safety of the subject or citizen, should be abrogated. Those rules of the common law were not imposed upon the people by an impending arbitrary power, but sprang up spontaneously in the midst of them, according to the exigency of the times. They were rights claimed and enforced by the unconquerable spirit of our sturdy ancestors, who to all the attempts made to deprive them of those rights, answered, with stern resolution, "Leges Angliæ nolumus mutari." Such of our ancestors as were either driven or allured to this country, claimed the common law as their birthright; and of all its provisions, they clung with most pertinacity to those upon which the security of their personal liberty depended.

It was upon the principles of the common law that our Revolution was based and defended; and when the colonies assumed the right of self-government, many, if not all of them, expressly declared that the people were entitled to the privileges and the protection of the common law, and this court would betray the people if it should give them up. Next in importance to certainty in the law, is certainty in the accusation. Mr. Starkie, in his treatise on Criminal Pleadings (page 73), says: "The general rule has long been established that no person can be indicted, but for some specific act or omission; or punished, unless such act or omission be charged in apt and technical terms, with precision and certainty on the face of the record. Before

this important part of the subject is resolved into its elementary divisions, it may be proper briefly to notice the principal reasons, on the ground of which the law exacts a certain particular description of the offence; for these, it is evident, supply the true test by which the sufficiency of any particular charge is to be ascertained. It is necessary, then, to specify, on the face of the indictment, the criminal nature and degree of the offence, which are conclusions of law from the facts; and also the particular facts and circumstances which render the defendant guilty of that offence: (1) In order to identify the charge, lest the grand jury should find a bill for one offence, and the defendant be put upon his trial in chief, for another, without any authority. (2) That the defendant's conviction or acquittal may enure to his subsequent protection, should he be again questioned on the same grounds. The offence, therefore, should be defined by such circumstances as will, in such case, enable him to plead a previous conviction or acquittal of the same offence. (3) To warrant the court in granting or refusing any particular right or indulgence which the defendant claims as incident to the nature of his case. (4) To enable the defendant to prepare for his defence in particular cases, and to plead in all; or if he prefer it, to submit to the court by demurrer, whether the facts alleged (supposing them to be true,) so support the conclusion in law, as to render it necessary for him to make any answer to the charge. (5) And finally and chiefly, to enable the court, looking at the record, after conviction, to decide whether the facts charged are sufficient to support a conviction of the particular crime, and to warrant their judgment; and also in some instances, to guide them in the infliction of a proportionate measure of punishment upon the offender." Such being the rule of the common law, such its foundation, and such its reasons, this court thinks itself, not only warranted, but obliged, to adhere to it, whenever its benefit is claimed.

Upon the whole, the court, after a very deliberate and anxious revision of its former opinion, has seen no cause to modify it in any respect; and perceiving no material difference, in point of law, between the present and the former indictment, we are of opinion that the judgment, upon this demurrer also, should be rendered in favor of the defendant.

THRUSTON, Circuit Judge, dissented. He observed that his indifferent state of health, and the distance of his residence from Washington, had, perhaps, abridged his opportunity of studying the legal points of the case; but he had listened attentively to the ingenious and elaborate argument upon it on the part of the counsel, and also to the opinion, just read, of the majority of the court; and he thought that, though the reasoning of the latter might amount to good abstract law,

it did not apply to the case before them. He thought that if so plain a subject could not be understood by argument, it could receive but little light from books. He had not had an opportunity to look at the indictment for more than a few minutes, and he had formed his opinion, which was based upon a conviction that the indictment ought to be sustained. In determining a legal question, there were two extremes which ought equally to be avoided—there were two evils, the Scylla and the Charybdis;—too much refinement and subtlety on the one hand, was as much to be dreaded as too great a laxity on the other. It was, as had been argued, highly proper that an accused party should know with what offence he was charged, in order that he might be enabled to make his defence. A statement of the crime alleged formed the substance of the indictment. And could any one say that the present indictment left the accused unprepared for defence, or unapprised of the charge against him? He could see no omission. He had read the indictment two or three times, and considered it to be fully sufficient; and as he had dissented from a majority of the court, he thought it better to deliver his opinion now, than to delay the proceedings by taking further time for consideration. He would briefly notice two or three of the points on which the majority of the court thought the indictment not sustainable.

It had been urged, in reference to many of the cases cited, that it was not enough to allege that the king or the public had been cheated; but that it must appear that the cheat had been effected, and by certain means. Well, he asked, did it not appear in the present case that the United States had been cheated? And was it not set forth that it was by the false and fraudulent means used? Here the judge read that part of the indictment charging the false and fraudulent means; and continued by asking, was not that a clear averment of falsehood and fraud? Then as to the false papers being written, &c., by him, as fourth auditor, or in his private capacity; in either case, he imagined the offence was punishable. Supposing the same character to run through all the charges, he could not see why the indictment could be considered as not borne out. If the official character of the party run through the indictment, the offence would not only be a fraud, but also a violation of the dignity and duties of his office. If fraud was not sufficiently averred, he really did not know what words could be employed in charging it.

The judge proceeded to review the course adopted by the accused, to obtain possession of the public money. He draws upon Mr. Faulding, not as an individual, but as a public officer,—a navy agent. He directs the draft to be charged to "arrearages,"—a public fund. He states, also, that on the return of the secretary of the navy to the city, a remittance would be made to cover the draft. All these things showed that the proceed-

ings were to be considered as public, or official. By these deceitful practices he entraps the navy agent, and obtains the public money. The letter further directs the draft to be paid out of any unexpended balance in the navy agent's hands. Was there no fraud, no deceit in that? It was evident that the accused had no right to the money; was this direction, then, innocent, or was it a deceit? The indictment goes on to state that he drew and received the money, and that he applied it to his own use; was that no malversation? If the entrapping of the navy agent, and the application of the public money to his own private purposes, did not constitute fraud, he did not know what fraud was. The denouement of the drama was shown by the requisition. And there the judge begged to observe, that certainly it was not his desire to prejudice the defendant's cause, or to do him injury in any way; he would rather extenuate, as far as his official duty permitted; but he must ask if the averments, as to the requisition, did not show a gross fraud? It was charged that, for his own private gain and emolument, he procured this requisition to be issued, to replace the money he had previously drawn by artifice. And did not the requisition, connected with the other papers, —the letter and the draft,—show a plain and palpable fraud? It was a deceit in going to the secretary of the navy; the deceit, or rather the fraud, might not appear on the face of any one of the papers, taken by itself; but considering the papers in connection with each other, taking them altogether, the fraud was apparent.

The judge went on to repeat his opinon, that, taking into view the official relations of the accused and the navy agent, and the letter and draft; it was manifest that the former drew upon the latter out of the public funds. Did that, then, come up to the doctrine of the court, that the papers themselves were not, on the face of the indictment, sufficient evidence of the fraud charged? He thought they were; and he thought that they had clearly shown a deceit ab initio. Then as to the false pretences, by means of which the fraud was alleged to have been effected, if the documents appeared to be deceptive, he did not know why they should not be considered as such pretences. He thought they all appeared sufficient to sustain the indictment; they all imported a deceit, a false practice, a means to defraud the United States. He referred again to the rule illustrated by Chitty, in respect to the position, that it was not enough to charge that the king had been cheated, but to make it appear that such is the case; and reasoned from it that, as fraud is an inference of law from matters of fact, the facts charged in this indictment were sufficient; and, as they are set out, show sufficiently the deceit on the face of them. Here, then, are not only averments of fraud, but the court are enabled to see and judge of it, from the writings and documents set forth in the indictment. He again reviewed the documents, and drew the conclusion, that, taken in connection, they showed the false and fraudulent purpose, and the deceitful practices. In private cases, the false pretences must be averred specifically and in full. In cases affecting the public it was not so. All that was necessary was to avoid stating the charge loosely, and in general terms, and to show that deceit had been practised. In was his decided opinion, therefore, founded upon the deepest conviction, that the indictment was good, and ought to be sustained. In conclusion he observed, that, in giving that opinion, he had been actuated solely by what he conceived to be a sense of duty to himself, to the laws, and to the country. He was equally anxious for the preservation of the rights of justice, and for the prevention of any encroachments on the privileges of the citizens. He regretted to dissent from the views taken by the majority of the court; but the opinion he held, he trusted, had been properly expressed; he was sure it was conscientiously entertained.

The next indictment brought before the court, by demurrer, was against the defendant, for having falsely and fraudulently altered a certain abstract of account, rendered by Mr. Harris, navy agent at Boston, to the defendant, as fourth auditor, by obliterating the words "T. Watkins's draft," and "do. do.," prefixed to three items of the account, charging the United States with three drafts of the defendant, paid by Mr. Harris.

Mr. Coxe, for defendant, contended that if this indictment charged any offence, it was forgery; for what is "falsely and fraudulently altering a paper," but forgery, if the paper be such as to be a subject of forgery? And yet the grand jury yesterday returned ignoramus to exactly such a bill as this, except that it contained the words "forge and." To alter, is to forge and counterfeit. Archb. Cr. Pl. 189; 3 Chit. 1022; Curwood's Hawk. c. 21, p. 262. But it is not such a paper as can be the subject of forgery at common law. The abstract is only an account of the expenditures of the navy agent, for the quarter ending September 30, 1827. The erasure is only of the words, "T. Watkins's draft," in each of the three items; but the head of expenditures, namely, "arrearages prior to 1827," the dates of the items, and the sums, were left. This erasure could not injure or defraud the United States; and, at common law, there can be no forgery unless it be of a paper, or instrument, by the false making of which some person may be defrauded. Ward's Case, Ld. Raym. 1466; 1 Curwood's Hawk. c. 21, pp. 262, 265.

Mr. Key, for the United States, contra, contended that this was a good indictment at common law for forgery. It is not necessary that the words "forge and counterfeit" should be used. They are not technical words necessary in the description of the offence, like the

words "feloniously" in felony, "traitorously" in treason, "burglariously" in burglary, and "murdravit" in murder. Forgery, at common law, is but a misdemeanor, of the same nature with fraud and cheating; and no technical words are necessary in describing it. 4 Bl. Comm. 307; Rex v. Dawson, 1 Strange, 19; Rex v. Stocker, 1 Salk. 371; Id., 5 Mod. 137; Russ. 1411. Those terms of art are only necessary in capital cases. Any writing, to the prejudice of another man's right, may be the subject of forgery at common law. The intent to defraud is necessary in forgery; and it is sufficient if some person could be defrauded by the alteration of it. The United States could be injured by the erasure, because it prevented the United States from seeing who got this money under the head of arrearages; so that they might follow it into the hands of the person who received it, and to recover it if he received it wrongfully, or misapplied it to his own use. The paper, unaltered, showed the defendant to be the debtor; but the altered paper showed Mr. Harris to be the debtor. Can it be said that the United States could not be injured by this alteration? It is not necessary that the United States should have been actually injured; it is sufficient if they might have been. Archb. Cr. Pl. 191, 194; 3 Chit. 1022.

Mr. Jones, in reply. If the question be doubtful, the circumstance that the counsel for the United States had sent up an indictment containing the words "forge and counterfeit," which was rejected by the grand jury, is a matter of fair argument that the counsel of the United States thought those words necessary in an indictment for forgery; or that this indictment was for a different offence. But it does not charge any offence; or, if it does, it is not sufficiently set forth. "Fraudulently altered" would not be sufficient to charge a forgery. "Falsely," at least, must be added. But the words, "falsely and fraudulently alter," are not a sufficient substitute for "fabricavit" or "contrafecit." Certain terms do of themselves import a crime. Precedents are the best evidence of the law. All the forms of indictment for forgery, at common law, adopt the word "forge;" and the reason is, that it is a word which has acquired, by long usage, a technical sense. There is no difference between felony and misdemeanor, as to the necessity of certainty; and the necessity of describing the offence in technical language is not confined to capital cases. Whenever technical terms are a part of the description of the offence, they must be used. If other terms are substituted, by way of periphrasis, they must comprehend every idea contained in the word for which they are substituted. Rex v. Knight, 1 Salk. 375; Dawson's Case, 1 Strange. 19, is only as to the evidence sufficient to prove a forgery, not as to the allegations in the indictment. An indictment must be more specific than a special verdict. East, P. C. 862, 985; Com. v. My-

call, 2 Mass. 136. This paper is not such as that the alteration of it can be, per se, a forgery. East, P. C. 859; 2 Curwood's Hawk. 263; Ward's Case, Ld. Raym. 1466; East, P. C. 864, note b. The alteration was not in a material part. A public document, the alteration of which is, per se, forgery, must be a paper which purports to proceed from public authority, and to import public confidence. East, P. C. 859. If it be not such a paper, the indictment must set forth such circumstances as show how the United States could be defrauded by the alteration. Ward's Case, Ld. Raym. 1466; Hunter's Case, 2 Leach, 624; East, P. C. 928, 977; Rex v. Collins, Palmer, 367, 373.

Mr. Key, in answer to these cases, cited Rex v. Powell, 1 Leach, 77; Russ. 1440; 4 Bl. Comm. 307.[2]

The Chief Justice having been taken suddenly ill with a fever was obliged to leave the court, which adjourned to Monday, the 15th, and from that day to Tuesday, the 23d of June, when the Chief Justice resumed his seat upon the bench, and on the 24th the opinion of the court was delivered by THRUSTON, Circuit Judge, as follows (CRANCH, Chief Judge, dissenting):

Various objections have been made to the sufficiency of the indictment in this case. It will not be necessary, however, to notice any other than the first, which is, that the crime of forgery is not charged with sufficient technical precision.

It has been contended, by the counsel for the United States, that in none of the enumerated instances stated in the books, in which certain technical words are necessary to be used in the indictment, in the description of the particular crime, is forgery to be found as one; and hence the inference has been drawn that in an indictment for forgery, it is not necessary to state that the instrument was forged or counterfeited. The principal case relied on to strengthen this

---

[2] If any part of a true instrument be altered, the indictment may lay it to be a forgery of the whole instrument. 2 East. P. C. 978, c. 19, § 55; Archb. Cr. Pl. 189–191; 2 Chit. 1038 (465). Quære, whether it be necessary, in an indictment at common law, for forgery by alteration, to use the word "forge." 2 East. P. C. 987; Elsworth's Case, Archb. 189, 191; Rex v. Stevens, 5 East, 259; 2 Chit. 1042; 4 Day's Com. Dig. tit. "Indictment," G 6, p. 689 (542, n.a.). As to certainty and over-nicety, see Rex v. Suddis, 1 East, 314. Lord Kenyon's opinion; 1 Chit. Cr. Pl. 153, 168–170, &c., 227; Morgan v. Sargent, 1 Bos. & P. 59, C. J. Eyre's opinion. When terms of art must be used. 1 Chit. 175, 176 (119), 239 (162). The want of addition is bad on demurrer. 2 Hale, Hist. P. C. 176; Rex v. Haddock, And. 137. If the act charged be not in itself unlawful, all the circumstances which render it unlawful must be set forth. 1 Chit. 228 (154); 2 Chit. 1041 (468), 1042. Form of indictment at common law, for altering a sheriff's warrant to his bailiff. 3 Chit. Cr. Pl. 1047 (474). Form of indictment for forgery by erasement, under the statute of 8 & 9 Wm. III. c. 20, § 36. Rex v. Bigg, 3 P. Wms. 419.

position, is Rex v. Dawson, in 1 Strange, 19. But upon a careful examination of that case, it will be found that the only question was, on the special finding of the jury, whether the facts so found amounted to forgery; and therefore we think it not applicable to the question in the present case. We have felt very sincerely disposed duly to weigh and appreciate the able arguments which have been urged in support of the indictment. Upon a careful examination, however, of all the precedents of indictments for forgery at common law, which we have been able to lay our hands on, not one is to be found where the term "forged" or "counterfeited" has not been used, except in the present instance; and there is a circumstance, even in this instance, very worthy of notice; which is, that the learned counsel for the United States, in framing their indictment in a former recent case against this defendant for the same erasures or alterations of the abstract attached to the present indictment, and which, after having been acted on by the grand jury, was returned, "ignoramus," seemed to think it necessary to use the term, "forged," in addition to all the other terms used in this indictment. This opinion is certainly entitled to respect, and may be well added to the number of precedents before alluded to. In the absence, then, of any adjudged case to the contrary, we think there is much reason to say that where such has been the long, universal, and uninterrupted usage, such usage may be considered as having grown into law.

In further support of the necessity of using the technical term, "forged," or counterfeited, is the case in the Massachusetts Reports (Com. v. Mycall, 2 Mass. 136). That was an indictment for altering a writ, after service, and before the return-day; and the terms used in the indictment, after stating the introductory part, were, "That he" (the accused,) "before the time of trial, did unlawfully erase in and from the said writ the word 'Essex,' and did falsely and unlawfully insert in the room and place thereof, the word 'Worcester,' thereby falsely and unlawfully changing the same writ from a writ directed to the sheriff of the county of Essex, or either of his deputies, or the constable of Harvard within the said county, to a writ directed to the sheriff of the county of Worcester, or either of his deputies, or the constable of Harvard within the said county, with an intent to injure, oppress, wrong, and defraud the said J. R., against the peace," &c. On a motion, in arrest of judgment, on the ground that these terms contain no technical description of forgery, the court say: "If the facts stated in the indictment constitute any crime at common law, it is forgery, but there is not the necessary technical precision in the indictment, to support a conviction of forgery, and judgment must be arrested." Now, what was the term, in that case, which was required to give that indictment legal precision? It seems to us, none other than the word "forged." Are not the terms used in the indictment, in that case, as amply descriptive of the crime of forgery as those used in this case? We think they are. These considerations are strongly corroborated by the observations of the able editor of the late American edition of 4 Comyn, Dig. tit. "Indictment" (G. 6), p. 688, note y.[3]

We are, therefore, brought to this conclusion; that there is a want of technical precision in the indictment, in the case before us, and as it is admitted that it cannot be sustained as an indictment of fraud at common law, the majority of the court are of

---

[3] Speaking of technical terms, or words of art, he says: "Though for many of those terms, sufficient reason can be given, others, there are, which may not be so readily traced to their original, unless we consider them as invented by the lawyers of old, to confine the conduct of a cause to themselves; or as the offspring of chance, made sacred by time and habit: or ascribe them to a zeal for that system and method which ennoble even the meanest art, and give the air of science and wisdom. But from whatever source they spring, it seems proper to preserve them, to avoid, as well the possibility of error, as the disputes that may arise on every innovation. And however untenable upon principles of reason, it is sufficient that they are warranted by precedent; for it was observed, long ago, by Mr. Justice Stanford, upon the question whether any averment by the term licet was sufficient, 'if it was the usual form to allege it by licet, then I would hold with it.' And after instancing certain cases in which the omnipotence of custom over reason was conspicuous, he concludes: 'Wherefore, we ought to adhere to the usual form; but in this case it was not the usual form to allege the election under the word licet, as you may see in the book of entries; wherefore, since the prosecutor was not tied down to any usual form, but was at liberty to take such words as were proper for the matter, and has not done so, we ought not to hold with the words more than will warrant.' And again, upon another occasion, though at the first, an avowry was held bad for want of being averred, yet afterwards, says the reporter, the prothonotaries searched their precedents, and told the justices that the common usage was to make the avowry without averment; with which the justices were satisfied. Mr. Starkie, in his Criminal Pleading (pages 69, 70), has the following judicious observations: 'The law distributes crime into three great classes; treason, felonies, and misdemeanors inferior to felony. Each of these is attended with peculiar incidents, both before and after conviction. It is, therefore, one important office of an indictment to specify, in technical language, the particular genus of crime imputed to the defendant, that he may avail himself of those advantages which the law allows him; that he may be excluded from those which the law withholds; and that the court may be authorized, after conviction, to inflict the appropriate punishment.' A strict adherence to such language may, in some cases, appear too nice and critical, to serve the ends of justice; yet it seems founded upon strong and substantial reasons. For instance, by successive decisions, the legal value and weight of a term or phrase, of art, is ascertained, and should a doubt arise as to its meaning, reference, for the purpose of removing it, may be had to former authorities, whilst every new expression would introduce fresh uncertainty, and the benefit to be derived from precedent, would be wholly lost."

opinion that the judgment on the demurrer must be for the defendant. See, also, in support of the opinion of the court, Burridge's Case, 3 P. Wms. 484, and Cooper's Case, 2 Strange, 1246.

CRANCH, Chief Judge (dissenting). With the highest respect for the weight and authority of the judgment delivered by the majority of the court, I am, nevertheless compelled to dissent from their opinion. This is the fourth indictment against the defendant, to which he has demurred. It is in these words: "District of Columbia, Washington County, ss.: The grand inquest, for the body of Washington county, do, upon their oaths present: That Richard D. Harris, being a navy agent of the United States, at Boston, on the thirtieth day of September, in the year eighteen hundred and twenty-seven, and having, on that day, made out his abstract of expenditures, as such navy agent, as required by the rules and orders of the navy department of the United States, for the third quarter of that year, ending on the said thirtieth day of September, which abstract was headed and entitled, 'Abstract B, of expenditures during the 3d quarter year 1827, ending Sept. 30th, by Richard D. Harris, navy agent, Boston,' and purported to set forth the expenditures disbursed and paid by the said Harris as such navy agent, for and on account of the United States, and contained, among other charges of expenditures as aforesaid, the following three items and charges under the head of 'Arrearages prior to 1827:

'167. Sept. 1   T. Watkins's draft, $300.00
168.  " 10   do.  do.  of $500, 499.50
160.  " 22   do.  do.      500.00 $1,299.50 $1,299.50'

—which said abstract was in the words and figures following; (here was inserted the abstract,) which said drafts, so stated and referred to in the said three items and charges, were drafts drawn by said Watkins on the said Harris, navy agent as aforesaid, and dated on the fourteenth day of August, and the fourth day of September, and the nineteenth day of September, respectively, the year last aforesaid, in favor of Charles S. Fowler, and sold and delivered by said Watkins to said Fowler; and the said Harris, having transmitted the said abstract to the said Watkins, as 4th auditor of the treasury of the United States, who was the proper officer to receive the same; and the said Watkins, having received the same, the said Watkins afterwards, to wit, on the first day of November, in the year last aforesaid, at the county aforesaid falsely and fraudulently,[4] altered the said abstract, by erasing therefrom the words

            'T. Watkin's draft.
            do.     do.
            do.     do.'

[4] The indictment which the grand jury had previously returned "ignoramus" was precisely like this, excepting that it had the words "forged and" before the word "altered."

opposite to the said dates of September 1st, 10th, and 22d, prefixed to the aforesaid three items and charges in the said abstract under the head of 'arrearages prior to 1827,' hereinbefore set out, with intent to defraud the United States, to the great damage of the United States, and against the peace and government thereof. Thomas Swann, Attorney United States."

It is contended, on the part of the defendant, that this indictment, if it describes any offence, must be considered either as an indictment for a fraud or a forgery; that, as an indictment for a fraud, it is bad, because there is no averment of an injury actually done; that as an indictment for forgery it is also bad for several reasons: (1) Because the offence is not set forth in the usual technical language descriptive of the crime of forgery, so that the grand jury might be aware of the nature of the offence with which they were charging the defendant. (2) Because the paper altered is not such a paper, per se, as can be the subject of forgery by alteration. (3) Because it does not appear by any circumstances stated in the indictment, that the United States could be injured by the alteration.

1. Under the first objection, it was contended that the word "forged" was a technical term, as necessary, in the description of forgery at common law, as the terms "felonice" in felony, "burglariter" in burglary, and "proditorie" in treason. But this position does not seem to me to be supported by the authorities. There has been no case cited in which it has been so ruled. On the contrary, the elementary writers, when they enumerate the crimes which must be described by certain terms of art, or technical phrases, do not include forgery in their list of crimes, nor the word "forged" in their list of terms. But when they come to define forgery, they call it "the false making, or alteration of such writings as, either at common law or by statute, are its objects, with intent to defraud another." 3 Chit. Cr. Law, 1022. And East, P. C. 852, says: "Forgery at common law denotes a false making, (which includes every alteration of, or addition to, a true instrument,) a making, malo animo, of any written instrument, for the purpose of fraud and deceit." "This definition," he says, "results from all the authorities, ancient and modern, taken together." Hawk. P. C. bk. 2, c. 25, § 57, after stating the cases in which no periphrasis, or circumlocution, will supply those words of art which the law has appropriated for the description of the offence, namely, murder, larceny, mayhem, felony, burglary, and treason, says, "that in other cases it is generally a good rule in indictments, as well as appeals, that the special manner of the whole fact ought to be set out with such certainty, that it may judicially appear to the court that the indictors have not gone on insufficient grounds." It is true that the indictments for forgery generally use the term "forge," espe-

cially where the forgery consists in the false making of the writing; and the statutes having used that word in describing the crime, it became necessary to use it in indictments under those statutes, as part of the description of the offence. But when the forgery has been committed by alteration of an instrument by erasure only, the word "forge" does not seem to be properly applicable to, or descriptive of, the act done. There is a precedent in 3 Chit. Cr. Law, 1047, in which the words are "falsely alter," by deceitfully and falsely inserting and forging the name J. A., and "by deceitfully and falsely adding" s to the word bailiff. In the present indictment the word "forge" could not, with propriety, be introduced, unless the indictment were to charge the defendant with forging the whole abstract. It is said, indeed, that "if any part of a true instrument be altered, the indictment may lay it to be a forgery of the whole instrument" (2 East, P. C. 978), and proof of altering a part will support the indictment. "It is more usual, however, and perhaps more prudent," says Archbold (Cr. Pl. 191), "at least in one set of counts, to charge it as an alteration merely, and to allege the alteration specially." See, also, Harrison's Case, 2 East, P. C. 980, 988, to the same effect. The case of Mycall, cited from 2 Mass. 136, was shortly this: A magistrate of Worcester county issued a writ of attachment, directed to the sheriff of Essex county, and to the constable of Harvard within the same county, whereas Harvard was in Worcester county, and not in Essex. The writ having been returned served by a constable of Harvard, the magistrate, before the trial, erased "Essex" and inserted "Worcester." The indictment charged that the defendant did unlawfully erase the word "Essex," and did falsely and unlawfully insert, in the place thereof, the word "Worcester;" thereby unlawfully and falsely changing the same from &c. to &c., with intent to injure and defraud J. R., against the peace &c. After a verdict of guilty, and a motion in arrest of judgment, the court stopped the defendant's counsel, who was about to argue the point, and said: "If the facts stated in the indictment constitute a crime at common law, it is forgery; but there is not the necessary technical precision in the indictment to support a conviction of forgery, and judgment must be arrested." The attorney-general had before stated to the court that it was not the intention of the grand jury to charge the defendant with forgery. It will be observed, in that case, that the court did not specify in what particulars the indictment wanted precision; they did not say that the word "forge" was necessary; nor is it so said in any other case which has come to my knowledge. But in the case of Rex v. Stevens, 5 East, 259, Lord Ellenborough, in delivering the opinion of the court, said: "Every indictment or information ought to contain a complete description of such facts and circumstances as constitute the crime, without inconsistency

or repugnancy; and, except in particular cases where precise technical expressions are required to be used, there is no rule that other words shall be employed than such as are in ordinary use." Forgery at common law is but a misdemeanor, and ranks with cheating and fraud, both as to the moral turpitude of the offence, and the degree of punishment. It is a branch of the crimen falsi, and differs principally from any other kind of indictable fraud in this: that it requires the use of a particular sort of means to effect the fraud, and is complete whether the intended injury be effected or not. There seems to be no reason why it should not be sufficient in an indictment for this, as for any other misdemeanor, to state all the facts which, in law, constitute the crime. I have not been able to find any precedent of an indictment at common law, for a forgery committed by erasure merely. I am therefore not satisfied that a forgery, at common law, by erasure only, may not be sufficiently set forth, without using the word "forge" or the word "counterfeit." [5]

After the judges had delivered their opinions, Mr. Key, for the United States, made a motion, which, at the request of the court, he reduced to writing, as follows: "The court having delivered their opinion, on the demurrer, that the indictment in the above case is defective in not charging the alleged false and fraudulent alteration of the abstract by the technical term 'forged,' the counsel for the United States produced to the court an indictment returned 'ignoramus' by the grand jury, which is a literal copy of the indictment upon which the judgment of the court had been just delivered, with the exception that it contained the words 'forged and' in addition to the terms in the indictment now decided on. And the counsel for the United States producing a new bill of indictment similar to the one now decided on, except that the technical term 'forged' is used in addition to the words charging the offence; and stating that they were about to send the same to the grand jury, prayed the court to send for the grand jury and instruct them to the following effect: 'That the facts and intent found, in the indictment just decided on by the grand jury, as therein stated, constitute, in law, the offence of forgery at common law; and that the grand jury, if they find, in a bill of indictment, all the facts and intents necessary to constitute a legal offence, are bound to call the offence, in the indictment, by its necessary legal and technical name."

Mr. Key contended that the court has a right to instruct either the grand or the petit jury upon the law of the case, either on

---

[5] Upon the back of the original MS. of this opinion is the following indorsement, in the handwriting of the chief justice:—"Upon reflection, and seeing some other cases where technical words are required, such as 'scold' and 'barrator,' I am led to doubt whether this opinion is correct. W. Cr. 20th July, 1829."

behalf of the government or of the prisoner. The grand jurors are not lawyers; they may reject proper testimony, or receive improper. Such instruction may be required by either party; and without such a right justice cannot be done. If the grand jury ask instruction as to matter of law, the court never refuses to give it; not because it is asked, but because it is wanted. If it appear, by any other means than asking, that they want the instruction, the court will give it. It appears in Dalton's Sheriff (page 515) that the grand jury may be brought into court and hear the witnesses in open court, where the court can instruct them. Suppose the evidence be all in writing, and the grand jury reject it—or suppose they return an insensible indictment; the court will instruct them. The jury, indeed, may possibly disregard the instruction of the court as to matter of law, but this is no reason why the court should not instruct them. The right to ask instruction to the grand jury is reciprocal. It belongs to both parties; and this is a case in which, if in any, it ought to be asked and granted. 2 Holt, P. C. 157. In 1 Burr's Trial, 157, the motion to instruct the grand jury was made by Mr. Burr, debated, opposed, but granted by Chief Justice Marshall. So it has been always usual, in the general charge to the grand jury at the beginning of the term, to give them information as to the law of such cases as may be likely to come before them.

This is a case in which·it is necessary to instruct them. The fact that they rejected the bill which contained the word "forged," and found the same bill without that word, shows that the reason why they rejected the first, was, that they thought the second bill did not charge forgery. But the facts contained in it did amount to forgery, and they ought to have found the first bill. It is evident, then, that they mistook the law. The grand jury ·have found all the facts which constitute the crime of forgery, and yet the prisoner escapes because a particular technical word is omitted! Is it fit that·a culprit should escape on such a ground? Suppose the grand jury should find that the prisoner killed a man with malice aforethought, but should refuse to insert the word murdered, in the indictment, the court would send them back and instruct them that the facts found amount to murder, and that they ought so to find. It would be a disgrace to the court that should refuse so to instruct them. The abstract was such a writing as might be the subject of forgery, and this he understands to be the opinion of this court, or they would suffer him to argue this motion. If a grand jury should refuse to find a bill ·for treason, although they should have found all the facts which constitute treason, he would, if he were prosecutor, move the court to discharge them, and have another grand jury immediately summoned, and should think it his duty to send up an-

other indictment for treason. No grand jury can conscientiously reject a bill from feelings of tenderness, when the facts are clearly proved which constitute the offence. What will be the appearance of our records, if these two indictments should remain upon them, as the matter now rests?

Mr. Jones, for defendant. We are continually doomed to be assailed with novel and irregular projects. The regular course is to send up the bill and the evidence, and the grand jury proceeds to consider the case, ex parte.

The court in charging the grand jury does not anticipate the questions which may be involved in the issue to be tried. The instruction is wholly ex parte. Neither the accused, nor the government has a right to call upon the court to instruct the grand jury upon the merits of the charge. The court will not, in their charge, instruct the grand jury upon the whole facts of the individual case, and commit itself and prejudice the cause ex parte. It is only upon general principles which are clear, that the court will charge a grand jury. This is a glaring invasion of the regular practice in· this and all other courts in this country, and in England. There is no case where the court has charged the grand jury upon the particular circumstances .of the individual case. The case of admissibility of evidence is a very different matter, and depends on a different principle. The old practice mentioned in Dalton's Sheriff is obsolete. Grand juries are never called to the bar to hear the evidence. Hale only says that the grand jury is to return the bill "a true bill;" or "ignoramus," they cannot say that the killing was se defendendo, 2 Hale, Hist. P. C. 157–159. In Burr's Case the instructions prayed went only to the admissibility of evidence, and were mere abstract propositions of law. The chief justice did not give the instructions as prayed, but only as to the admissibility of the evidence, and said, that it must be given to the grand jury in general terms; and that it must be different from instructions to the petit jury. Robinson's Report of Burr's Trial [Case No. 14,693]. Such a proposition as this was never made to the worst of English judges in the worst of times. It is not necessary, as contended by the counsel of the United States.

The charge by the United States against the grand jury is, that they mistook the law, in refusing to find the indictment which charged forgery, eo nomine; and the proof is, that they found the other indictment, which does not, in-terms, charge a forgery. The United States acquiesced in the return of ignoramus upon the first, by sending up the second. The time to object was when the first indorsement was returned, and before they sent up the second. If the jury was of opinion that the offence was not. under all the circumstances, forgery, they did right to reject it; and they found the second indict-

ment because it did not charge forgery, but some other offence. They had a right so to suppose. We will not now argue upon the merits of the instruction prayed. The present question is only preliminary; namely, whether the court will give any instruction at all. It is a motion ex parte. The prisoner is not yet before the court, for he is not now charged judicially, before this court, with any offence, and therefore has no right to appear; and if any thing is said by us in his behalf upon this motion, it is ex gratiâ, and as amici curiæ. To go into the merits of the instruction would be to forestall the trial, and anticipate the opinion of the court. Upon the merits of the question, the court is not committed. It does not follow that the jury mistook the law because they found one of the indictments, and rejected the other. He does not mean to discuss the merits of the instruction; but, in order to constitute any offence does it not require some inferences of fact from the facts stated in the indictment, which inferences can only be made by the jury.

It is conceded by the United States, that the altered instrument must be a paper by which the United States might be defrauded; but whether it be such a paper is a fact which must be found by the jury, and they have supposed circumstances in which it might happen that they might be defrauded by it; but those circumstances ought to be stated in the indictment. One indictment rejected by the grand jury puts an end to the prosecution of that offence for that term, and the court will not suffer a new indictment to be sent up to the grand jury, at the same term, if the rejected indictment was a good one. There is no instance in which the court has instructed the jury to find a bill which they rejected, after it has been returned and recorded. 4 Bl. Comm. 308; 1 Chit. 314, 315; 3 Hen. VII. c. 1.

Mr. Coxe, on the same side, contended that by giving the instruction the court prejudicate the whole case, and deprive the defendant of the benefit of a demurrer, by deciding, upon an ex parte hearing, that the indictment was good in law as an indictment for forgery. That the grand jury did not misunderstand the law. They supposed the first was an indictment for forgery, and therefore refused to find it. They supposed the second was not an indictment for forgery, and therefore they found it. In these opinions they have been sustained by the judgment which the court has pronounced upon the second indictment.

Mr. Swann, attorney for the United States, in reply, contended that the court had the same power over the grand, as over the petit jury, and the same right to instruct them as to the law of any case before them. Suppose some great and unexpected crime should be committed during the sitting of the court, not noticed in the general charge, could not the court instruct them as to the law of the case, in a supplemental charge? If they should find a bill for murder, without the word "murdravit," the court would instruct them to insert that word in the indictment, and this may be done at the instance of the United States attorney. So in the present case, the grand jury have found all the facts which amount to forgery; and as the court has decided that the word "forged" is necessary, they will order the grand jury so to find it.

CRANCH, Chief Judge, delivered the opinion of the court (THRUSTON, Circuit Judge, dissenting) upon the motion to instruct the grand jury. The counsel for the United States have moved the court to instruct the grand jury, "that the facts and intents, found by them in the indictment, which was decided by the court to be insufficient because it did not use the word 'forged' or 'counterfeited,' constitute in law, the offence of forgery at common law; and that if they find, in a bill of indictment, all the facts and intents necessary to constitute a legal offence, they are bound to call the offence, in the indictment, by its legal and technical name." The circumstances which have led to this motion are these: In the early part of this term an indictment was found against the present defendant, for a fraud upon the United States, by means of false pretences, in a transaction with Mr. Harris, a navy agent at Boston. That indictment was, upon demurrer, adjudged insufficient, for want of proper averments in regard to the pretences used. Among those pretences was an allegation of the same facts, relative to the alteration of the abstract B., which, with the addition of the words "forge and," before the word "alter," constituted another bill, which was afterwards sent up to the grand jury, and returned "ignoramus." This bill being thus returned, and filed in the court, the counsel for the United States sent up to the grand jury another bill exactly like it, but leaving out the words "forge and," before the word "alter," which the grand jury returned "a true bill;" the only difference between the two bills being, that the former charged that the defendant did "falsely and fraudulently forge and alter" the abstract; and the latter, that the defendant did "falsely and fraudulently alter" the abstract. Both averred the intent to defraud the United States. This latter indictment the court adjudged to be insufficient, because it did not use the word "forge," or the word "counterfeit."

It is stated, in argument, by the counsel for the United States, that when the bill, which used the word "forge," was sent up to the grand jury, the indictment for defrauding the United States by false pretences, which the court had, upon demurrer, adjudged to be insufficient, was also sent up, in order to show the grand jury that they had already found all the facts stated in the

indictment for forgery, although they had not used the word "forge." The grand jury, after consultation, informed the attorney of the United States that they could not find the bill with the word "forge" in it, and wished to know whether they might strike it out: to which he replied that they could not alter the bill, but must find or reject it as it was. That, in his opinion, the facts stated in the indictment amounted to forgery at common law, and would justify them in finding the bill as it was sent to them; and, that if they were not satisfied with this opinion, they had better ask the advice of the court. They said they were willing to find the bill without the word "forge." To which the attorney replied, that if they did not agree to find the bill as it was, he would send them another exactly like it, but omitting that word, and the court would decide whether the facts amounted to forgery. The grand jury, without asking the advice of the court, returned the bill, containing the word "forge," ignoramus; upon which the other bill, which omitted that word, was sent up, and the grand jury returned it "a true bill." Upon long argument and great deliberation, the court, upon demurrer, decided that it did not charge the offence with sufficient legal precision, because it did not aver, in express terms, that the defendant "forged," or "counterfeited," the abstract. But the court did not give any opinion upon the question, whether the facts stated in the indictment did, in law, constitute the offence of forgery at common law. Whereupon the counsel of the United States made the motion to instruct the grand jury, which is now the subject of consideration, and which, at the request of the court, they reduced to writing, in the following terms, namely— (Here the chief justice read the motion in the words before stated, and proceeded—) It will be perceived that this is, in effect, a motion to the court to send back to the grand jury an indictment, which the same grand jury had, some days before, at the same term, returned "ignoramus," with an instruction that, if they should find the facts stated in it to be true, they should return it a true bill. Such a motion is certainly unprecedented in this court, and no case has been found, even in the acts of the most arbitrary of the English judges, in the worst of times, which could justify the court in giving the instruction asked, in the particular circumstances of this case. On the contrary, in 3 Harg. St. Trials, 152, it appears that Chief Justice Scroggs, Chief Justice North, Mr. Justice Jones, and Mr. Baron Weston, were impeached by the house of commons, in 32 Car. II; and one of the charges against them was, that they had discharged the grand jury before they had finished their business, because they had asked the court to present their petition to the king, praying him to call a parliament. Yet the counsel for the United States contend, that if this court should be of opinion that the grand jury refused to find that bill, from an unwillingness to convict the accused of the crime of forgery, the court ought to discharge this grand jury, and hold the party bound to answer to another, which should be immediately summoned.

The opinion of the chief justice of the supreme court of the United States, in the case of Colonel Burr, has been cited in support of this motion. But the motion in this case is far more extensive than the motion in that; and the instruction now asked goes far beyond that which was actually given by the chief justice. There, the instructions prayed were confined to the admissibility and competence of evidence in general. Here, they extend to all the particular facts charged in the bill, as constituting an offence. To give this instruction, therefore, is to prejudge the whole question, which would arise upon a demurrer to the indictment. There, the opinion actually given, extended only to papers of a certain description, which might, possibly, be offered as evidence to the grand jury. 1 Robertson's Report of Burr's Trial, p. 202. Here, it is not confined to the admissibility or competency of the evidence, but takes in the whole merits of the case, upon the particular facts alleged in the bill. There, the motion was originally made immediately after the chief justice had delivered his general charge to the grand jury, at the opening of the court, and before any bill had been sent up; and the instruction was given while the bills were pending before the grand jury. Here, the instruction is prayed after the grand jury have acted upon the case, and returned the bill ignoramus. There is, therefore, no similarity whatever in the circumstances of the two cases, except that the prayer for instruction did not, in either case, come from the grand jury themselves.

There is no doubt that this court may, in its discretion, give an additional charge to the grand jury, although they should not ask it; and, when they do ask it, the court, perhaps, may be bound to give it, if it be such an instruction as can be given without committing the court upon points which might come before them on the trial in chief. This is the utmost extent of the dictum of the chief justice, in the trial of Colonel Burr; for he there said—"That it was usual, and the best course, for the court to charge the jury generally, at the commencement of the term, and to give their opinion upon incidental points as they arose, when the grand jury should apply to them for information; that it was manifestly improper to commit the opinion of the court on points which might come before them, to be decided on the trial in chief; that he had generally confined his charges to a few general points, without launching into many details. One reason was, that some of the detailed points might never arise during the session of the grand jury, and any instructions on them would, of course, be unnecessary; another was, that some of these points might be

extremely difficult to be decided, and would require an argument of counsel, because there was no judge or man who would not often find the solitary meditations of his closet very much assisted by the discussions of others; that he would have had no difficulty, however, in expanding his charge, if he had been particularly requested to do it, if he could have anticipated any necessity for it; and that he would have no difficulty in giving his opinions, at this time, on certain points on which he could obtain a discussion by counsel, provided he did not thereby commit his opinion on the trial in chief." 1 Burr's Trial, p. 174.

When an instruction to a grand jury is asked, either by the accused or the prosecutor, it is a matter of discretion with the court to give the instruction or not; and, in exercising that discretion, they will take into consideration all the circumstances under which the instruction is prayed, and the extent of the prayer. The counsel for the United States, however, have contended, that whenever the court shall perceive that the grand jury have erred in matter of law, by rejecting a bill which they ought to have found, and it is presumed that their doctrine includes also the finding a bill which they ought to have rejected, the court ought to instruct them as to the law, if asked so to do by either party. But to what purpose should the court instruct them after they have acted upon the case, and found or rejected the bill, unless a new bill should be sent to them for the same offence, by means of which they could correct their mistake? This is now proposed by the counsel for the United States to be done, by sending up to the same grand jury a new bill, exactly like that which they have rejected. This is, in effect, to return them the same bill. But this is contrary to the well-established immemorial usage of courts in England and in this country. The usage is stated by Sir W. Blackstone; who says, that when the bill is returned "ignoramus," or "not found," the party is discharged without further answer; but a fresh bill may afterwards be referred to a subsequent grand jury. Vol. 4, pp. 305, 308. It is also stated by Archbold (Cr. Pl. 34), by Chitty (1 Cr. Law, 325), and by other elementary writers; and, after a diligent search, we have found no case, nor dictum, to the contrary. Nor have we found any case in which it has been decided by a court, either in this country or in England, that the grand jury should be discharged because they had found or rejected a bill, contrary to the instruction of the court, and a new grand jury, for that reason. summoned to attend at the same term. The usage is supported by the same principles which support the trial by jury; for of what value would the trial by jury be, as the "palladium" of personal liberty, unless the jury should be independent, and could give their verdict, especially in criminal cases, freely and according to the dictates of their consciences? Sir William Blackstone says, that the trial by jury is the grand bulwark of an Englishman's liberties. "The an-

tiquity and excellence of this trial, for settling of civil property," he says, "has been before explained at large; and it will hold much stronger in criminal cases, since, in times of difficulty and danger, more is to be apprehended from the violence and partiality of judges appointed by the crown, in suits between the king and the subject, than in disputes between one individual and another, to settle the metes and boundaries of private property. Our law has, therefore, wisely placed this strong and twofold barrier, of a presentment and a trial by jury, between the liberties of the people and the prerogative of the crown." "The founders of the English law have, with excellent forecast, contrived that no man shall be called to answer to the king for any capital crime. unless upon the preparatory accusation of twelve or more of his fellow-subjects, the grand jury; and that the truth of every accusation, whether preferred in the shape of indictment. information, or appeal, should be afterwards confirmed by the unanimous suffrage of twelve of his equals and neighbors, indifferently chosen, and superior to all suspicion. So that the liberties of England cannot but subsist so long as this palladium remains sacred and inviolate, not only from all open attacks, (which none. will be so hardy as to make,) but also from all secret machinations which may sap and undermine it, by introducing new and arbitrary methods of trial, by justices of the peace, commissioners of the revenue. and courts of conscience. And however convenient these may appear at first, (as doubtless all arbitrary powers, well executed, are the most convenient,) yet, let it be again remembered, that delays and little inconveniences. in the forms of justice, are the price that all free nations must pay for their liberty in more substantial matters; that these inroads upon this sacred bulwark of the nation are fundamentally opposite to the spirit of our constitution; and that, though begun in trifles, the precedent may gradually increase and spread, to the utter disuse of juries in questions of the most momentous concern." And Sir Matthew Hale (2 Hale, Hist. P. C. 160) says—"But, in my opinion, fines set upon grand juries by justices of the peace, oyer and terminer, or jail-delivery, for concealments or non-presentments, in any other manner" than by another inquest, under the statute of 3 Hen. VII. c. 1, "are not warrantable by law; and although the late practice hath been for justices to set fines arbitrarily, yea, not only upon grand inquests, but also upon the petit jury, in criminal cases, if they find not according to their directions, it weighs not much with me, for these reasons: (1) Because I have seen arbitrary practice still going from one thing to another. The fine set upon grand inquests began; then they set fines upon the petit juries, for not finding according to the directions of the court; then, afterwards, the judges of nisi prius proceeded to fine juries in civil causes, if they gave not their verdict according to direction, even in

points of fact. (2) My second reason is, because the statute of 3 Hen. VII., c. 1, prescribes a way for their finding, which would not have been if they had been arbitrarily subjected to a fine before. (3) It is of very ill consequence; for the privilege of an Englishman is, that his life shall not be drawn in danger, without due presentment or indictment; and this would be but a slender screen or safeguard, if every justice of peace, or commissioner of oyer and terminer, or jail-delivery, may make the grand jury present what he pleases, or otherwise fine them."

The principal value of a grand jury, as a protection to the personal liberty of the citizen or subject, consists in the independence of the jurors. That independence, in order to be valuable at all, must be such as to prompt and enable them to oppose or to disregard what they may deem the arbitrary and illegal instructions of the court; and to render that independence available, the right of a grand jury to find or reject a bill, without assigning any reason therefor, and thereby to take upon themselves the decision of both law and fact, must be maintained inviolate, however true it may be, in theory, that ad.quæstionem juris non respondent juratores. And the same principle is applicable, with equal force, to the right of the petit jury to find a general verdict, in criminal cases. So strongly has this principle been adhered to by the people of England, that not a case, it is believed, can be found among the decisions of the most arbitrary judges, in the most turbulent times, in which a new trial has been granted in a criminal cause, because the verdict of acquittal was against the plainest evidence, and the most positive instruction of the court in matter of law. Hawkins (bk. 2, c. 47, §§ 11, 12) says: "It hath been adjudged that if a jury acquit a prisoner of an indictment of felony, against manifest evidence, the court may, before the verdict is recorded, but not after, order them to go out again and reconsider the matter; but this is, by many, thought hard, and seems not, of late years, to have been so frequently practised as formerly." "However, it is settled, that the court cannot set aside a verdict which acquits a defendant of a prosecution properly criminal, (as it seems they may a verdict that convicts him,) for having been given contrary to evidence, and the directions of the judge." If a verdict of acquittal, found upon consideration of the evidence on both sides, is thus peremptory and intangible, à fortiori, should the return of "ignoramus," by a grand•jury, upon consideration of the evidence on the part of the prosecution alone, be equally sacred; at least during that term. This rule, which we think as well settled as that in respect to the verdict of the petit jury, seems to us to render it improper that we should now give the instruction which is asked by the counsel for the United States. But there are other reasons why we should not give it, some of which have been before intimated. One is, that the instruction extends to the whole case as stated in the bill, and is, in effect, an instruction that the bill, if found, will be a sufficient indictment, in law, to charge the defendant with the crime of forgery at common law; thereby forestalling the opinion of the court upon all questions of law which might arise on demurrer. Such a commitment of the opinion of the court, upon points which may arise in a subsequent stage of the prosecution, we consider (to use the language of the chief justice of the United States) to be "manifestly improper."

Upon this subject Lord Coke, in his 3d Inst. p. 29, has the following observations: "And to the end that the trial may be more indifferent, seeing that the safety of the prisoner consisteth in the indifferency of the court, the judges ought not to deliver their opinion beforehand, of any criminal case that may come before them judicially." "And therefore the judges ought not to deliver their opinions beforehand upon a case put and proofs urged on one side, in the absence of the party accused." "For how can they be indifferent, who have delivered their opinions beforehand without hearing of the party, when a small addition or subtraction may alter the case? And how doth it stand with their oath who are sworn that they should well and lawfully serve our lord the king and his people, in the office of a justice, and that they should do equal law and execution of right to all his subjects." And again, in the next page he says: "The king's learned counsel should not, in the absence of the party accused, upon any case put, or matter showed by them, privately preoccupate the opinion of the judges." But upon a point so clearly supported by the principles of natural justice, it is needless to state authorities. Another reason why the court should not give the instruction, is, that it is a very debatable question whether the facts stated in the bill which is now proposed to be sent up, or rather sent back, to the grand jury, do, in law, constitute the offence of forgery, at common law. Much may be said, and much has been said, on both sides. The court did not find itself obliged to decide that question upon the former argument, and therefore declined. For the same reason it declines now. These reasons for not giving the instruction, it will be perceived, are equally valid, whether the grand jury did or did not, act under a mistake of the law. That question, the court does not undertake to decide in this stage of the prosecution, for the reasons before stated. For the same reasons the court deems it to be its duty to refuse to instruct the grand jury as prayed by the counsel for the United States. See 1 Chit. Cr. Law, 696. Judges not to give their opinion prematurely.

THRUSTON, Circuit Judge, dissented from the opinion of the court, as follows: This is a motion on the part of the counsel of the United States to instruct the grand jury in the following terms: (Here the judge read the motion in the terms before mentioned.) The

prosecution presents very extraordinary incidents which have occurred in the various efforts of the prosecutors to reduce their charges to legal forms, so as to present some specific charge which may put the accused on his trial before a jury of his peers. Among the numerous bills of indictment which have been preferred, and found by the grand jury, not one has had sufficient technical precision to stand the test of the touchstone of the law. They have been found, in the opinion of the court too inartificially drawn up, and therefore, not sufficient to compel the accused to deny the charges, and submit to trial. They have been all, therefore, upon demurrer, deemed insufficient and invalid. But, notwithstanding, I have seen in every one of those indictments sufficient evidence of crime imputed to the accused, although their forms have been defective. I have seen substantial evidence of gross frauds against the public, and, (as at present advised,) of forgery at common law. Two distinct charges have been attempted to be preferred against the accused; the one for fraud, the other for forgery. The one for fraud has been divided into, I think, three independent grounds of accusation; for fraud committed in transactions with certain navy agents at different times. So that though there are as many as three grave charges against the accused, supported by such facts and intents, found by the grand jury, as satisfy the court that the accused ought to be put to answer them, yet, in some six or seven weeks spent in disquisitions on technical niceties, we have not advanced one inch, but are brought by the ambages of the law, after a six weeks' tour through fields and wastes of thorny subtleties, to the point from which we started; and yet it is remarkable that all those indictments have been deliberately prepared by two distinguished and learned counsellors; and although, to my conception, they exhibited to the accused, in every instance, according to common sense, and common understanding, manifest and clear information of the crimes imputed to him, so as to enable him to know how to defend himself; which is, I believe, the only essential matter required by the law as regards certainty and precision in indictments; yet they were deficient in legal intendment; the averments were wanting, or wanting in the right place, or were inartificially made, a fatal "as," in one instance infected the averment, and defeated the charge of false pretences. In a second indictment for fraud at common law merely, without false pretences, I had the misfortune to differ from the two other judges; and after all that I have heard, I am still at a loss to discern in what it was deficient; but it has been so ruled, and I bow with deference to the judgment of the court. In the next indictment for forgery, where I was one of the majority of the court, the indictment failed because the word "forged" was wanting. Now, at this moment, after further reflection, I am

not clear that I was right in deeming this word so essential in a charge of forgery, that it cannot be dispensed with and supplied by what may be supposed equivalent words. But I considered it one of those, of which there are a number well settled, that no paraphrase will do where there are no equivalent words, as there are none for that very classical and elegant word, "murdravit," in an indictment for murder. I have heard from very good authority, that learned lawyers have differed in opinion as to the judgment of the court on this indictment; some maintaining the word "forged," in an indictment for forgery, to be indispensable; others holding to the contrary. I said I was not clear that I was right in the opinion I gave as to the word "forged," and what judge can be clear in such niceties? I thought, however, I was right as the law now stands, and so I gave my opinion. And as to distinct and clear perceptions of law, on points of special pleading, or indeed, almost any other points, founded on common law, and the decision of courts, and not on statutory enactments, (laying aside those great departments of the law which define the general rights of persons and things, and are, perhaps, reasonably definite and settled,) few judges will have the boldness to assert that they are fortunate enough to entertain them. Advance into the intricate fields of practice, of special pleading, of the innumerable cases growing out of nisi prius trials, and what perplexities occur? And where is the law, in these latter branches to be found? In thousands of books daily issuing from the press, in reports, treatises, and elementary writers, of which we have bales and boxes flowing in from England, and from the state courts of twenty-four states, from the supreme court, from the circuit courts of the United States, which far surpass all human power to read and understand; and if they could be read and understood, they are beyond the means of any judge to procure. There is not a term of the court in which I am not surprised with some new book brought forward as authority, I never heard of before; they have supplanted the good old authorities and reporters which I was familiar with in my younger days, and which one seldom hears cited now. These multiplied instruments of puzzling and perplexing a court, in the hands of ingenious counsel, afford, I trust, an apology for judges who hesitate or doubt on difficult cases, inasmuch as, from the very nature and character of language in general, the indefinite meaning of words, and more especially from the discrepancy that necessarily must exist between any case pending before a court, and any other adjudged case, in circumstances and incidents; it is a very difficult matter to discern when a precedent appears to it, and when not. It may truly be said, therefore, that nothing is more uncertain than the law; if it were not so, how do those frequent reversals occur in the appellate courts, of the decisions of the most learned judges? Among

the most renowned jurisconsults in the United States, was a reverend gentleman who was considered as the most learned man of his day, as well as the most eminent lawyer, and whose name is to be found among the distinguished patriots who asserted our independence, and signed its charter; and since this gentleman became a judge or chancellor of Virginia, his opinion on law matters was deemed infallible, yet no judge ever had the misfortune to meet with more reversals of his decrees, so that he was at length driven to publish a book in vindication of his opinions. A rare book, but which I once met with, and was greatly amused with his acrimonious strictures on the appellate court. If such be the fate of so great a man, shall we not be excused, if we have been mistaken? and more particularly as we have crude points growing out of the most intricate branch of the law, namely, special pleadings? Now if two learned counsellors have not been able to frame one single indictment, (out of a number, some six or seven,) which has stood judicial scrutiny, it affords a proof that this department of the law is exceedingly unsettled and doubtful, and yet, let any man, not learned in the law, take any one of these indictments, and be asked if he does not clearly discern the nature of the accusation, and if it does not afford a satisfactory notice to the accused, of the offence with which he is charged, and I think he would answer affirmatively—the common sense and legal sense are at variance. Then, if I had the power, I would do away with all this artificial logic and reduce pleading and all judicial proceedings to more plainness and simplicity. Now, suppose instead of all the forms, averments and intents required, it seems, in an indictment for forgery, that now subsist, such an indictment as the following, merely by way of example were substituted: A. B. you are indicted for forgery in making certain alterations, with a fraudulent intent to defraud the United States, in a certain abstract returned by —— Harris, navy agent, and which abstract is in the following words (here insert it,) which alterations are as follows, you erased the words, &c., &c. Now will any man say he would not have sufficient notice, from such a statement, to enable him to defend himself? Take a civil case, trover for instance, instead of those foolish fictions and falsehoods of the loss of the horse by the plaintiff, and the finding him by the defendant, the plaintiff were to file his declaration in the following words: I have sued you for a horse (here describing him,) which you have in your possession, and which I claim to be mine. Or a note of hand; I have sued you on a note of hand, a copy of which here following, (insert a copy of the note.) And so, or some such simple but clear exposition, of the cause of action in every case. Shall I be deemed to have travelled out of the line of my judicial functions in suggesting these evils of our present system, and the advantages of some legislative correction of them? They have been for a long time forcibly pressed on my mind and I have been tempted, from the six or eight weeks' discussion of the subject, in the case of Mr. Watkins, to give vent to them. We have the example of a very eminent lawyer in England, who has taken up the matter there, and suggested many beneficial clauses in the laws; but he took care to withhold his good until he had made his fortune, and reaped the golden harvest of the existing vicious system. Let not these few cursory observations subject me to the criticisms of the gentlemen of the long robe. I pretend not to be able to suggest a corrective of the evils of such deep root and long standing. I hope some abler hand will do this. I know they are evils of great magnitude, and vast injury to society. It would not avail now to add more on this topic, and it is time to take up the consideration of the question before us.

We are asked to instruct the grand jury, "that the facts and intents," in the indictment (which the court adjudged not sufficient as an indictment for forgery for want of the words "forged," and "counterfeited" as one of those,) amount to the crime of forgery at common law; "and that the grand jury if they find in a bill of indictment all the facts and intents necessary to constitute a legal offence, are bound to call the offence in the indictment, by its necessary legal and technical name." It is with much solicitude that I enter on the examination of this proposition, because it is one of those cases in which we have few lights to guide us; that is of rare occurrence and precedents are hardly to be met with. The first point to be considered is, do the facts and intents, found by the grand jury in the two indictments, the one which was returned by the grand jury "ignoramus," where the word "forged" was inserted; and the second returned "a true bill" where that word was wanting, but which were identical in every other respect, amount in law, to forgery at common law? Now this point was fully argued on the demurrer to the indictment; but the court having adjudged it lost for the want of the word "forged," refused to give an opinion on any other point. I was, myself, willing, at that time, to have given an opinion; nor did I see any just ground to refuse to do so; but I acquiesced in the judgment of a majority of the court.

I now pronounce my opinion, that the facts and intents, so found, do amount to forgery at common law. In 2 East, P. C. p. 859, the writer says it was never doubted that forgery, at common law, extended to the falsification of records and other instruments of a public nature; and, after a review of the opinions of the most respectable authorities, as to what private instruments there may be forgery of, at common law, concludes the paragraph (page 861) with these words—"but the following case has now settled the rule," that the counterfeiting of any writing with a

fraudulent intent, whereby another may be injured, is forgery at common law. The case alluded to is Ward's Case, reported in 2 Ld. Raym. 1461. It was not contended, in the argument, that the abstract set out in the indictment, of (as) a public instrument, was not one of which forgery might be committed; it was declared only that it was (not) a public instrument. It behooves us, then, to consider the character of this paper. A navy agent is a public officer, into whose hands large sums are confided, to be disbursed for the public service. An abstract is, as far as I understand it, a condensed statement of those disbursements, returned to the proper accounting officers of the treasury department, and there filed, as the account of the agent of those disbursements; the public is a party to it; it informs them how the money, intrusted to the agent, has been employed; and, if this be so, why is it not an instrument of a public nature? But admit the paper not to have been a public paper, but a private one; suppose it to have concerned the interests of the navy agent only. A material alteration of an instrument of this sort, according to Ward's Case, would be forgery at common law; and then the alteration might, perhaps, have been alleged to injure the agent, because it would have the effect of preventing his obtaining a credit with the government for the moneys paid to the drafts of the accused. Whether the government would, or will, give the agent credit for those moneys or not, is immaterial. The agent may, certainly, it appears to me, be prejudiced by this alteration. But however that may be, it is of no importance if the instrument be of a public character; of which, it seems to me, there can be no doubt.

It remains to be considered, whether or not the public may be injured or prejudiced by this alteration. And surely they may be, and, indeed, have been injured by it. Has not their money been withdrawn from public purposes, its true destination, and gotten into the hands of an individual, for private purposes? This is unquestionable. Now this took place in 1827, and was not detected until 1829. Why? Because the items, charging that money to the accused, were obliterated. They could not, therefore, have the means of calling their agent to account for it. Then, whatever may have been their ulterior views, as to making the agent responsible for this misapplication of public funds in his hands, they have been deprived of the means of doing so for a year and a half. If the accused be responsible, they have equally been deprived of the means of calling him to account. If this be no detriment, or prejudice, then the public not only may have been, but actually have been, prejudiced by this alteration, or falsification of the abstract. In fact, their money is gone, and it is no argument that the navy agent is responsible for it. If my check on the bank is forged, is it less a fraud, on me, that if the money be paid on such forged check, I may recover

it of the bank? Then the instrument is one susceptible of forgery, and the public may be prejudiced, and the alteration of it in a material part is forgery. Now for the averments and intents. The alteration is charged to have been falsely and fraudulently made, with intent to defraud the United States. Here there is charged falsification, or alteration of a public instrument, in a material part, with sufficient averments and intents, and this constitutes forgery; and the charge in the indictment, as laid, amounts to forgery, but the technical words, "forged" or "counterfeited," are wanting; and although the charge in the indictment amount to forgery, yet is the indictment not good for want of those, or one, at least, of those technical words.

The only, but indeed the most difficult and momentous question, which now remains to be considered is: Shall this court instruct the grand jury, that they should supply or insert those words; or, in the words of the instruction, call the offence in the indictment by its necessary, legal, and technical name? We have been warned that this proposition leads us into almost untrodden ground. That the provinces of the court and grand juries are so distinct, that we must not, unadvised, invade their sanctuary. That supplemental charges are rarely made, and only on genuine and abstract topics. That we are now called on to give a specific instruction in a particular case. I confess I am in great perplexity, from the novelty, as well as the great importance of the proposition. But all that is left for us, in the dearth of precedents, is to try the question by the touchstone of reason, with such lights as the few cases cited afford; of which, perhaps, the strongest are reflected by the observations of the enlightened chief judge in Burr's Trial, and to which I shall confine myself. Instructions to grand juries, after their retirements, are of very rare occurrence, from the nature and character of their institution. The court can never be informed that the grand jury desires their advice, unless they themselves suggest it. And, as indictments are generally prepared by learned counsel, few cases occur, of informality or inaccuracy, in the technical part of the instrument. It can rarely happen that an application can be made to the court, to supply any formal defect in the bill, after it is returned into court. Hence, perhaps, the want of precedents. Instruction to petit jurors, at the instance of either party, is of every day's occurrence; and, on principle, it is not easy to discern the difference between an instruction to a petit and a grand jury, except what grows out of the organization and the peculiar character of each of those tribunals. In trials before the court, by petit juries, the judges hear all the evidence and the case set out in the declaration. They have it all before them, and never refuse to instruct, if required by either party, on the

law of the case; leaving the facts exclusively to the consideration of the jury. But they hear nothing of the investigations before the grand juries; and, until the bill or presentment is returned, are utterly ignorant of what the jury are about. Then if a party, whose case is before the grand jury, or the attorney for the United States, were to ask the court for instructions upon the facts, could the court grant instructions? Shall the party accused, against whom a bill is filed, ask the court to instruct the jury that certain facts, stated in the instructions prayed for, do not constitute, in law, larceny, or forgery, or robbery, or whatever charge the accused apprehends may be laid against him before the grand jury? Or, on the other, (hand,) shall the prosecutor ask the opposite, that such do amount to such or such an offence? Clearly, for obvious reasons, the court would reject such an application. They have not heard the testimony, and, therefore, cannot discern that the instruction prayed is founded on the facts of the case; nor that the grand jury desire information; and the court will not, unadvisedly, commit themselves on propositions connected with particular cases. The character and credit of the judge might be in jeopardy by such a proceeding. Hence it may well be asserted, as a general rule, that a court will not give supplemental charges to a grand jury, especially touching a case before them. But, as to supplemental general charges, I do not see why a judge may not have the grand jury brought into court at any time, to supply an omission in his charge before their retirement. Suppose a judge had omitted to animadvert upon some particular statutory offence, which he is, by the same statute, required especially to call the grand jury's attention to, shall he not be permitted to supply this omission in a supplemental charge? Suppose he had omitted to notice some particularly prominent mischief, which required the corrective notice of the grand jury, shall he not, also, give a supplemental charge in this case? It seems to be as untenable a general proposition, that a court or judge ought not to make general supplemental charges, as that no circumstances can occur in which they can instruct and charge in particular cases; but instances of either character are exceedingly rare, and, therefore, the want of precedents is considered as equivalent to a want of power. But as rare as precedents are, we have a notable one in the report of Burr's Trial. Let us examine carefully the reasoning of the judge in that case; and, as whatever law opinion he has pronounced, ought, deservedly, to be of the highest authority, I shall take it for my guide, as far as it is applicable to the case before the court.

I have not been able to find what charges the chief justice had prepared to give the grand jury, as it does not appear in the volumes submitted by the counsel to the court, namely, 1 Robertson's Report of Burr's Trial. But the chief justice says, in page 175, that he had drawn a charge, and submitted it to Mr. Hay; nor does it appear, that I can find, that he ever gave his charge to the grand jury; but there does not seem to be any doubt that he would have given it, if subsequent events had made it necessary. From this proceeding, then, I understand that the chief justice was prepared to charge or instruct the grand jury, on a particular case before them, and before a bill was found, on points of law bearing on that case. I do not know, either, whether the prepared charge embraced all the points submitted to the court by Mr. Burr; but it is a fair presumption that it did, as the chief justice made no exception to any of them. In page 74, the chief justice says—"It was manifestly improper to commit the opinion of the court, on points which might come before them to be decided on the trial in chief." Not improper to charge or instruct, but to commit the opinion of the court. And, in page 175, he says—"He would have no difficulty, at this time, in giving his opinions on certain points, on which he could obtain a discussion by the counsel," with a proviso, "still, that he did not thereby commit his opinion on the trial in chief." Then the chief justice had no hesitation to charge the grand jury, in a particular case before them, on certain points; and if the points are those stated in Burr's seven propositions,—and we have no reasons to suppose otherwise,—we see what they are. Now let us examine those, and see whether the instruction prayed for from this court would be more a committal of our opinions on the trial in chief, than those would have been in that case. If the instructions embraced those seven propositions,—and it is very reasonable to suppose they did, as they alone were prayed for of the court, and it is not to be presumed that the chief justice would volunteer instructions,—can any man read them and say, that, if not all, most of them might be the subject of contest on the trial in chief? Mr. Hay, in his objections to them, intimates that they may be subjects of discussion which might consume much time; then they were not all self-evident propositions; and, if so, I cannot observe why they might not, if given in charge to the grand jury, be as much a committal as any other matter of law, for every one of those points might be disputed, and some of them successfully; for I can hardly suppose them all true, under all possible circumstances and modifications. But, perhaps, the chief justice's prepared instructions did not embrace all, or any of these points. But he certainly prepared and offered to give instructions. Could the chief justice mean, by not committing his opinion, that the instruction embraced only self-evident propositions? There are not many such in law, nor could an instruction be well needed on a self-evident point; but

the: could not be self-evident points, because the chief justice says (page 175) he would have no hesitation in giving his opinions, at this time, on certain points on which he could obtain a discussion by counsel, provided, &c.; therefore they were not self-evident, but disputable points, and he would be sure to meet them again on the trial in chief. What, then, is a committal of opinion? Does it mean an opinion given on a point, which cannot recur on the trial in chief? I should be glad to be informed what sort of point of law this could be. If the chief justice would not have met these points again, on the trial in chief, after this declaration of non-committal, I can only say that the counsel would have conducted their client's cause with very little astuteness, and that is not to be presumed. Nor can I hardly imagine a point, on which instruction can be given to a grand jury in a matter of law, touching a case before them, which may not be contested, and the opinion of the court required on the trial in chief. But it was urged by the defendant's counsel, who did not deny that instructions were given, that they were confined to the competency or admissibility of evidence; and what points are more disputed, or more difficult, often, of solution, than the competency of evidence? If a judge can instruct a jury on this point, I do not see why he may not on any other.

One word more, on the limitation which the chief justice establishes to instructions to be given to a grand jury; it is, "that thereby he did not commit his opinion on the trial in chief." As far as I can understand this limitation, it means this, that he will not anticipate opinions in this stage of the proceedings, which he may, afterwards, on more full and solemn argument and consideration, be exposed to the necessity of revoking on the trial in chief. There is good reason in this; and if I could discern what points such might be, I should not hesitate to approve this limitation, and to be governed by it. At all events, however difficult it may be to characterize or generalize instructions, that may or may not be given, we shall, before we conclude, examine the instructions prayed in the case before us, and see how far a judge would commit his opinions on giving them; and I think I shall be able to show that no instruction could be well asked for, in which less hazard of committal could be incurred. Then it is manifest that, in the opinion of the chief justice, there is no impropriety in giving opinions or instructions to the grand jury in particular cases, then under examination by them; and, as to this, the chief justice uses strong language. He says, that he would have no difficulty in giving his opinions at this time. Now let us see what difference there was in the case before the chief justice, when instructions were asked from him, and the one before this court, in which instructions are asked from us. In that case, instructions were asked

and agreed to be given before any bill was found; the instructions, then, must have had an influence on the grand jury,—they must have been led by them. But, in the case before this court, the jury have acted untrammelled, by their own light. They have found the bill. We are not asked to tell them what they might, and what they might not lawfully do; we are only requested to inform them of the effect, in law, of what they have already done, and merely to supply a matter of form; to give a legal name, in the language of the instruction prayed, to what they have done. Now, if the day shall ever come, (which may God avert from us,) when courts might be supposed corruptly to favor prosecutions on the part of the government, there might be some danger of their interfering with grand juries, while the party charged was under examination before them; because they might artfully lead them to find bills against innocent persons, and on frivolous accusations. When the bill is found, the jury have performed their office; the act is entirely theirs; they have not been directed, instructed, or influenced by the court.

I have already given my opinion as to the legal import and effect of the facts and intents found in the indictment before us. I have said that, in my judgment, they amount to forgery; and of this opinion, I believe, were the other judges, or, at least, I so understood them, although they refrained from pronouncing it. This point has been solemnly argued on demurrer; the character of the abstract was examined; it was denied, by the counsel for the accused, to be a public paper, and, therefore, not susceptible of forgery; and if it were, it was denied that, by the alteration of it, the United States could be prejudiced. These points having been fully discussed, we were called upon to give an opinion on them. Now, as to these main points, no instruction is prayed for; we are only asked to instruct the jury that the bill found by them charges forgery. They are not, therefore, to do any thing more; not to act again on these points. The only thing they would be required to do, would be to supply a matter of form,—to call the thing by its right name. Now, in instructing the jury to do this, it is impossible we can commit our opinions; because the counsel for the accused can never urge that this word "forged," if inserted in the indictment, can vitiate it. On the contrary, they argued that the indictment was bad without it. The question can never occur again, on the import and effect of this technical phrase.

It was argued, by the counsel for the accused, that if the court should instruct the jury to insert the necessary technical words, it would be impeaching the integrity of the jury; inasmuch as it would be an insinuation that the jury had found the essence of the crime, but had refused to give it a name. God forbid that I should impeach the integrity of the jury. I would much rather applaud their diffidence, their reluctance to de-

cide doubtful points of law,—points which have admitted of very long and able attempts of learned counsel at the bar, whether the facts and intents found amounted to forgery or not; and of this the jury might well doubt, and, therefore, might well hesitate to find the first indictment, where forgery was charged in all the forms of law. Without violating every principle of that comity, of that respectful consideration due from one tribunal of the same court to another, no other interpretation can be put on their doings in regard to these two bills. But we are not driven to the necessity of resorting even to common courtesy for this interpretation; we have evidence of it. The attorney for the United States informs us, "that when the first indictment was before the grand jury, they asked him whether they might strike out the word 'forge,' and find the facts and intents alone. The attorney said no; he would prefer laying before the grand jury a new indictment, in the same words, without the technical word 'forge,' and the court might then decide whether the facts and intents set forth in the bill amounted to forgery or not." These are the very words of the attorney. Now, as far as motives can be proved, does not this statement of the attorney come as near positive proof as may be, that the jury were influenced by doubts as to the legal character of the offence, growing out of the facts and intents found. He informs them they might so find the bill, and "the court might decide on the effect of the finding;" they therefore found the facts and intents. Had the jury been influenced by improper motives, by any unwarrantable lenity towards the accused, they would hardly have discussed this matter with the attorney for the United States. No other construction can be put upon their doings, than that they very laudably refrained from committing themselves on a doubtful point of law. But the attorney told them "the court might decide;" and thereupon they found the facts and intents. Decide what? Why, the law, of which the jury were doubtful. Decide, for what purpose? To inform the minds of the jury? If so, it is a submission, through the attorney, of the law of the case to the court; and the court ought, therefore, to decide it, and inform the jury of that decision. This, then, is tantamount to asking an instruction; not, to be sure, through their foreman, but through their law adviser, the attorney for the United States.

But suppose the attorney had permitted the jury to strike out the word "forged" in the first bill, and they had returned it a true bill, —and this, perhaps, would have been the most simple course of proceeding; would not the court, under the general authority given to them, when grand juries return presentments and bills into court, to "alter matter of form, not matter of substance," have been bound, on inspecting the bill and finding that the facts and intents found amounted to forgery, to inform the jury of the fact, and that

the word "forged" was a formal technical word, necessary to give a legal name to the offence? It seems so to me. Suppose, in Burr's Case, the jury had found all the facts and intents necessary to constitute treason, and the chief justice, on inspecting the bill returned into court, had found the technical word proditorie wanting, would he not have been in the line of his duty in saying to the jury,—"Gentlemen, you have returned a good bill for treason, except in one word; you have omitted the word proditorie, (or treacherously, in English.) It is a word sanctioned by immemorial use, and, therefore, indispensable in an indictment for treason; be pleased to insert it. You have found the substance, but omitted a form." I see no objection to such a proceeding. If this be the case, can the scruples of the attorney, as to the jury's striking out the word "forged," in the first indictment, and submitting a second to them, of the identical tenor of the first, without this word, alter the case?

From the foregoing observations and reasoning, (if these remarks may be dignified with such a name,) I am led to the following conclusions. That we have the highest authority for saying that the court may give general supplemental instructions to a grand jury; that they may go further and instruct them on points of law touching cases under examination before the grand jury and before the bill is returned by them; and, à fortiori, on matters of law growing out of the indictment itself when found by the grand jury, that the only limit is, that the court will not, in the exercise of this discretionary power, (not that they may not) commit their opinion on the trial in chief. That in instructing the jury that the word "forged" was a necessary form in an indictment for forgery, after they had found the essence of the offence, could not commit the opinion of the court on the trial in chief, because it could never be the subject of future debate, inasmuch as the counsel for the accused themselves, maintained that this word was necessary to give effect to an indictment. That as to the essence of the offence found in the indictment in question, it is incumbent to inform the jury that it is forgery, or there must be a failure of justice, inasmuch as we have undoubted evidence of an offence having been committed, or, at least, the strongest probable cause for believing that it has been committed; and unless we act on the case in the manner required of us, the offender, so far from being punished, if guilty, cannot even be brought to trial. That if, by this refusal of the court to do what is required, there be a failure of justice, it is the strongest evidence that the court cannot be right. That it is a solecism to suppose an offence of great moral turpitude, and of dangerous example, and evil to the community, can be perpetrated, and yet that the laws afford no means of bringing the guilty to atone for his offence. That it is of the utmost importance to the well being of

society that whilst courts are protecting with jealous care the personal rights of individuals, they forget not their duty to the people and the rights of the community; and, finally, that as I am of opinion that the facts and intents found in the indictment amount to the crime of forgery at common law, it is incumbent upon me under the circumstances of the case, and for the reasons assigned above, to tell the jury so, and that they ought therefore to give validity to their act, and sanction and vigor to the law, "by calling the offence in the indictment," (to pursue the language of the instruction,) "by its necessary, legal, and technical name."

The result of these opinions was, that the motion to instruct the grand jury was overruled. Before that motion was made, namely, before the 25th of June, the grand jury had found three other indictments against this defendant, upon three separate transactions:

(1) The first was upon a transaction for $750 with Mr. J. K. Paulding, navy agent at New York. It avers that the defendant, T. W., was 4th auditor of the treasury of the United States, and as such required by law to receive all accounts accruing in the navy department, or relative thereto; to keep all accounts of the receipts and expenditures of the public moneys of the United States in regard to that department, and of all debts due to the United States, or moneys advanced relative to the said department; to receive from the second comptroller the accounts relative to the said department, which had been finally adjusted, and to prepare such accounts with their vouchers and certificates, and to record all warrants drawn by the secretary of the navy, the examination of the accounts of which is by law assigned to the said 4th auditor; and to make such reports on the business of the said 4th auditor as the secretary of the navy should deem necessary and require for the services of that department. It further avers that Samuel L. Southard was secretary of the navy of the United States, and as such had authority to issue requisitions to the secretary of the treasury of the United States, countersigned by the second comptroller and registered by the 4th auditor, for moneys appropriated by law for the use of the navy department; whereupon the secretary of the treasury was authorized by law to grant his warrants on the treasurer of the United States for the amounts, and according to the sums of the said requisitions. That J. K. Paulding was a navy agent, residing in the city of New York, and was required by law to render his accounts to the 4th auditor. That on the 2d of March, 1827, an act of congress (4 Stat. 206) was passed, making appropriations for the support of the navy of the United States, in which the sum of $20,000 was appropriated "for arrearages prior to the first day of January, 1827." That the defendant, so being 4th auditor as aforesaid, and being an evil-disposed person, and devising and intending fraudulently and unjustly to obtain and acquire for himself and for his own private use the money of the United States, with force and arms, on the 16th of January, 1828, at Washington county, in the District of Columbia, falsely and fraudulently wrote and addressed, and caused to be sent to the said J. K. Paulding, navy agent as aforesaid, in the city and state of New York, a letter in the words and figures following, to wit (here was inserted the letter of the 16th of January, 1828, which was inserted in the first indictment which was quashed on demurrer). It then avers that the defendant drew the draft on J. K. P., navy agent in New York, for $750, in favor of C. S. Fowler, at one day's sight, and sold it to Mr. Fowler, and received therefor the sum of $750, and kept and disposed of the same for his own use. That on the 16th of January, 1828, Mr. Paulding, as navy agent, wrote and sent to Mr. Southard, the following letter:

"Navy Agent's Office,
"New York, 16th January, 1828.

"Sir: Be pleased to direct a warrant to issue in my favor for the sum of $12,139.12, to be charged to the following appropriations, viz.:

| Pay Aft | | $ 1,942 | |
|---|---|---|---|
| " Shore stations | | 1,058 | 25 |
| " Civil establishment | | 643 | 32 |
| " Repairs | | 2,488 | 54 |
| " Medicines | | 1,000 | |
| " Increase | | 2,904 | 90 |
| " Slocps of war | | 2,102 | 11 |
| | | $12,139 | 12 |

—Required for the purposes expressed in the list herewith inclosed. I have the honor to be, very respectfully, your obedient servant,
"J. K. Paulding."

"Hon. Samuel L. Southard, Secretary of the Navy Department, Washington."

—Which letter was received by Mr. Southard, at Washington, on the 19th of January, 1828. That the said T. W., "being then and there 4th auditor of the treasury department of the United States as aforesaid, and being an evil-disposed person, and devising and intending fraudulently and unjustly to acquire for himself, and for his own private use, the money of the United States, and well knowing the premises, with force and arms, on the said nineteenth day of January, which was in the year of our Lord one thousand eight hundred and twenty-eight, as aforesaid, at the county of Washington aforesaid, did falsely, fraudulently, deceitfully, knowingly, and designedly, apply to the said Samuel L. Southard, then being secretary of the navy of the United States as aforesaid, to add to the said sum of twelve thousand one hundred and thirty-nine dollars and twelve cents, for which the said J. K. Paulding had requested a warrant to be issued as aforesaid, the sum of seven hundred and fifty dollars, and did then and there pretend to the said Samuel L. Southard, secretary of the navy of the United

States as aforesaid, that the said sum of seven hundred and fifty dollars, was required for the use and service of the navy of the United States, for the payment of claims settled and adjusted under the appropriation for arrearages due by the navy department prior to the first day of January, which was in the year of our Lord one thousand eight hundred and twenty-seven, and to cause the same to be placed in the hands of the said J. K. Paulding, navy agent as aforesaid, for the purpose aforesaid, at the same time, and together with the said sum of twelve thousand and one hundred and thirty-nine dollars and twelve cents. for which the said J. K. Paulding had required a warrant to be issued as aforesaid; and he, the said Tobias Watkins, did then and there unlawfully, fraudulently, deceitfully, knowingly, and designedly, cause and procure to be issued by the said Samuel L. Southard. then being secretary of the navy of the United States as aforesaid, a requisition to the treasurer of the United States for the additional sum of seven hundred and fifty dollars, and did cause and procure the said sum of seven hundred and fifty dollars · to be added to the said requisition of twelve thousand one hundred and thirty-nine dollars and twelve cents, which he, the said J. K. Paulding had requested to be issued as aforesaid, and thereby caused the sum of twelve thousand eight hundred and eighty-nine dollars and twelve cents to be included in the said requisition, instead of the said sum of twelve thousand one hundred and thirty-nine dollars and twelve cents. so required to be so issued by the said J. K. Paulding as aforesaid; which said requisition, so caused and procured to be issued as aforesaid, is in the words and figures following" (here was inserted the requisition verbatim, including the sum of $750, under the head of "Arrearages prior to 1827"), "which said sum of twelve thousand eight hundred and eighty-nine dollars and twelve cents, in the said requisition mentioned, was, in conformity thereto, by warrant from under the hand of the secretary of the treasury of the United States, drawn out of the treasury thereof, and placed in the hands of the said J. K. Paulding, navy agent as aforesaid, the said sum of twelve thousand eight hundred and eighty-nine dollars and twelve cents, then and there being the property of the United States, with intent to defraud the United States out of the said sum of seven hundred and fifty dollars, in the said requisition mentioned and included as aforesaid, and by means thereof, and of the warrant of the secretary of the treasury issued thereon in manner aforesaid, drawn from the treasury of the United States; whereas, in truth and in fact, he, the said Tobias Watkins, at the time of making the said false pretences, well knew that the said sum of seven hundred and fifty dollars, in the said requisition included, was not required for the use and service of the navy

of the United States, and that it was not necessary to draw the same from the treasury of the United States, for the payment of claims settled and adjusted under the appropriation for arrearages due by the navy department of the United States prior to the first day of January, which was in the year one thousand eight hundred and twenty seven, nor to place the same in the hands of the said J. K. Paulding, navy agent as aforesaid, for the purpose aforesaid; and whereas, in truth and in fact, he, the said Tobias Watkins, at the time of making the said false pretences as aforesaid, did not intend that the said sum of seven hundred and fifty dollars in the said requisition included, and, by means thereof. in manner aforesaid, drawn from the treasury of the United States, should be applied to the use and service of the navy of the United States, nor to claims settled and adjusted under the appropriation for arrearages due by the navy department prior to the first day of January, which was in the year one thousand eight hundred and twenty-seven, nor that the same should be placed in the hands of the said J. K. Paulding, navy agent as aforesaid, for the purposes aforesaid; but then and there intended fraudulently to defraud the United States of the same, and to convert the said sum of seven hundred and fifty dollars to his own use and benefit, and did thereby defraud the said United States of the said sum of seven hundred and fifty dollars, to the great damage of the United States, to the evil example of all others in like cases offending, and against the peace and government of the United States. Thomas Swann, Attorney U. S."

(2) The 2d of the said three indictments was upon a transaction with Mr. Paulding for $300, and had two counts. The first count states that the defendant, on the eighth of October. 1827, being 4th auditor, &c., and intending fraudulently and unjustly to obtain and acquire to himself from J. K. Paulding, navy agent at New York, the sum of $300 of the moneys of the United States in the hands of the said J. K. Paulding, "unlawfully. fraudulently, and deceitfully" wrote ·and caused to be sent to the said J. K. Paulding, navy agent at New York, the following letter, purporting to be dated and written from the office of the 4th auditor, &c. "Treasury Department, 4th Auditor's Office, 8th October, 1827. Sir: I have this day drawn on you in favor of Charles S. Fowler for three hundred dollars, which you will please to charge to 'Arrearages prior to 1827;' under which head a remittance will be made to you immediately on the secretary's return to the city. In the mean time be pleased to pay the draft out of any unexpended balance in your hands, to be replaced on receipt of the treasurer's remittance. I am, sir, very respectfully your obedient servant. T. Watkins." It then avers that the defendant drew the draft, sold it to C. S.

Fowler, received the sum of $300 and converted it to his own use; and that the draft was afterwards paid by J. K. Paulding out of the moneys of the United States in his hands. "And the jurors aforesaid, upon their oath aforesaid, do find that the said letter thus written and dated, and addressed and sent from the said treasury department and the office of the 4th auditor thereof, purported to be and was fraudulently intended by said Watkins, to appear as an official letter of said Watkins, and was so written, dated, addressed, and sent to deceive the said Paulding by such appearance, and to induce him to pay the draft aforesaid, out of the moneys of the United States in his hands; and the said Paulding was so deceived, and did, in consequence of such deceit, so pay the same out of the said moneys of the United States in his hands. And the jurors aforesaid, upon their oath aforesaid, do find that the letter aforesaid, so written, dated, addressed, and sent as aforesaid, purported to be, and was fraudulently intended by said Watkins to appear, and did appear, as an official letter of the said Watkins, and as representing that the said sum of money, therein mentioned, was to be paid for the public service of the United States, and that the draft, therein mentioned, was drawn on account of the public service of the United States, and to deceive the said Paulding by such appearance and to induce him to pay the same out of the moneys of the United States in his hands; and the said Paulding was thereby so deceived, and did pay the same out of the said moneys of the United States in his hands. And the jurors aforesaid, upon their oath aforesaid, do find, that, at the time of writing, addressing, and sending said letter, and of making said draft, the public service of the United States did not require the payment of the said sum of money in the said letter and draft mentioned, and the said Watkins well knew the same not to be so required, and that said Watkins had no authority to draw for the said sum of money, or to write the said letter of advice on account of the public service of the United States, as an official letter of him, the said Watkins, 4th auditor as aforesaid, and well knew he had no such authority; and that said Watkins wrote and dated, and addressed and sent the said letter, and made the said draft, ostensibly for the public service as aforesaid, but falsely and fraudulently for his own use and benefit, and to deceive the said Paulding as aforesaid, and to defraud the United States; and that by means of the said letter and draft, so written, dated, addressed, and sent as aforesaid, he, the said Watkins, did unlawfully, fraudulently, and deceitfully, obtain to and for his own use and benefit, the said sum of three hundred dollars of the moneys of the United States, from, and out of, the hands of the said Paulding, navy agent as aforesaid, to the great deceit, fraud, and damage of the Unit-

ed States, and against the peace and government of the United States." The second count stated, that the defendant, then fourth auditor, &c., intending to deceive and defraud the United States of the sum of $300 of the moneys of the United States, on the 8th of October, 1827, having informed J. K. Paulding, navy agent at New York, by letter of that date, and dated "Treasury Department, Fourth Auditor's Office," that he had drawn on him in favor of C. S. Fowler for $300, to be charged to "arrearages prior to 1827," and that, under that head a remittance would be made to him immediately on the return of the secretary of the navy to the city, and desiring the said J. K. Paulding to pay the draft out of any unexpended balance in his hands, to be replaced on his receipt of the treasurer's remittance, made the said draft and sold it to C. S. Fowler, and received from him therefor, the sum of $300, and applied the same to his own use; which draft was afterwards paid by the said J. K. Paulding out of the moneys of the United States in his hands. "And the jurors aforesaid, on their oath aforesaid, present that the said letter was written, and addressed, and sent, as aforesaid, fraudulently, and with the intent to impose on the said Paulding the belief that the said draft was made on account of, and intended to be applied to the public service of the United States, and to induce him to pay the same, and with intent to defraud the United States. And that the said draft was fraudulently made and sold as aforesaid, with the intent that the same should be paid by said Paulding, under such belief and inducement as aforesaid, out of the moneys of the United States in his hands as aforesaid; and with the intent thus to obtain and apply to his own use the said sum of three hundred dollars of the moneys of the United States, and with intent to defraud the United States. And the jurors aforesaid, upon their oath aforesaid, present, that by means of the said letter so written, addressed, and sent, the said Paulding was imposed on to believe that the said draft was made on account of, and intended to be applied to, the public service of the United States, and was thereby induced to pay the same out of the moneys of the United States in his hands, and did, under such belief and inducement, pay the same out of the said moneys of the United States in his hands. And the said Watkins did, by said imposition and deceit, thus used and practised upon the said Paulding, and by the said letter so written, addressed, and sent as aforesaid, defraud the United States of the said sum of three hundred dollars, to the great wrong of the United States, and against the peace and government thereof. Thomas Swann, Attorney U. S."

(3) The third of the said three indictments was upon a transaction of $2,000 with Mr. Hambleton, a purser in the navy of the United States at the navy-yard in Pensacola. This

indictment states that the defendant was fourth auditor of the treasury of the United States, and recites his duties; that Samuel L. Southard was secretary of the navy, and had authority to issue requisitions to the secretary of the treasury for moneys appropriated for the service of the navy of the United States, whereupon the secretary of the treasury had authority to grant his warrants on the treasury of the United States, for the amount of such requisitions. That Samuel Hambleton was a purser in the navy of the United States, residing at the navy-yard of the United States, at Pensacola. That the defendant, being fourth auditor, &c., "and intending fraudulently and unjustly to acquire for himself, and for his own private use, the money of the United States, and well knowing the premises, with force and arms, on the 6th of March, 1827, at the county of Washington aforesaid, did falsely, fraudulently, deceitfully, knowingly, and designedly write, address, and cause to be delivered to the said Samuel L. Southard, secretary of the navy, as aforesaid, a letter, in the words following, to wit: "Fourth Auditor's Office, 6th March, 1827. Sir,—I will thank you to cause a requisition to be issued in favor of Purser S. Hambleton, for $2,000, under the head of 'Pay Afloat,' made payable to my order, at the request of Mr. Hambleton, for the purpose of paying his drafts on me to that amount. I am, sir, respectfully, your obedient servant, T. Watkins. The Secretary of the Navy."

It is then averred that, confiding in the said letter, and believing that the said purser had requested such a requisition to be issued for $2,000, and that that sum was required for the use and service of the United States, Mr. Southard, as secretary of the navy, issued the requisition, as requested. That the said sum of $2,000, in conformity with the said requisition, was, by warrant from the secretary of the treasury, drawn out of the treasury of the United States, and placed in the hands of the defendant; "Whereas, in truth and in fact, the said T. Watkins, at the time he wrote his letter aforesaid to the said Samuel L. Southard, secretary of the navy, as aforesaid," "had not been requested by the said S. Hambleton, purser, as aforesaid, to cause any requisition to be issued in favor of him," "payable to the order of him, the said T. Watkins, as aforesaid, for the said sum of $2,000; nor had the said S. Hambleton drawn any drafts upon him, the said T. Watkins, for the said $2,000; and whereas, in fact and in truth, the said Tobias Watkins, at the time he wrote his letter, as aforesaid, did not intend that the said sum of $2,000 should be applied to the use of him, the said S. Hambleton, purser, as aforesaid, or to the use or service of the navy of the United States, or to the payment of any such drafts, as aforesaid, but then and there intended to defraud the United States of the same, and to convert the said sum of money to his own proper use and benefit; and

did, by means of the pretences aforesaid, defraud the said United States of the said sum of $2,000, and did thereby then and there convert and appropriate the said sum to his own proper use and benefit, to the great damage of the United States, to the evil example of all others in like cases offending, and against the peace and government of the United States."

There was a second count in this indictment, containing the same preliminary allegations as in the first count, and averring that the defendant, "intending fraudulently and unjustly to acquire for himself, and for his own private use, the money of the United States, and well knowing the premises, with force and arms, on the said sixth day of March, 1827, aforesaid, at the county aforesaid, did falsely, fraudulently, deceitfully, knowingly, and designedly apply to the said Samuel L. Southard, then being secretary of the navy of the United States, as aforesaid, to cause a requisition to be issued on account of the said S. Hambleton, purser, as aforesaid, for the sum of $2,000, under the head of 'Pay Afloat,' to be paid to him, the said Watkins; and did then and there pretend to the said Samuel L. Southard, secretary of the navy of the United States, as aforesaid, that the said sum was required for the use and service of the United States; and did then and there pretend that the said S. Hambleton, purser, as aforesaid, had drawn drafts upon him, the said Tobias Watkins, to the amount of the said $2,000, and that he, the said S. Hambleton, had requested the said requisition to be issued, for the purpose of meeting and paying his said drafts. And the said Samuel L. Southard, confiding in the statement and representation so made to him by the said Tobias Watkins, as aforesaid, and believing the said sum of $2,000 was required for the use and service of the United States, and that the said S. Hambleton had drawn drafts upon him, the said Tobias Watkins, to the amount of the said $2,000, and that he, the said S. Hambleton, had requested a requisition to be issued," &c., required a letter to be written by the said Watkins to him, the said Mr. Southard, secretary of the navy, &c., which letter (namely, the letter of March 6, 1827, set forth in the first count,) was written, &c., and caused the said requisition to be issued, &c.; whereupon the secretary of the treasury issued his warrant to the treasurer, &c., for the said sum of $2,000, in favor of the defendant, whereby the said sum was drawn out of the treasury of the United States, and placed in the hands of the defendant. "Whereas, in truth and in fact, the said sum of money, in the said requisition mentioned, was not required for the use and service of the United States; and the said Watkins, at the time he applied to the said Samuel L. Southard, to cause the requisition to be issued, as aforesaid, that is to say, on the said sixth day of March, 1827, well knew that the same was not so required for the use

and service of the United States; and that the said Watkins had not been requested by the said Samuel Hambleton to apply to the said Southard, secretary, as aforesaid, for any such requisition to be issued, as aforesaid; nor had the said S. Hambleton, purser, as aforesaid, drawn drafts upon him, the said Watkins, to the amount of $2,000; nor had the said Hambleton requested the said requisition to be issued, for the purpose of meeting and paying such drafts. And whereas, in truth and in fact, the said Tobias Watkins, at the time he made his said application for the requisition aforesaid, and wrote and delivered the letter, as aforesaid, did not intend that the said $2,000 should be applied to the use of him, the said S. Hambleton, purser, as aforesaid, nor to the use or service of the navy of the United States, or to pay any such drafts of the said Hambleton; but then and there intended to defraud the United States of the same, and to convert the said sum of money to his own proper use and benefit; and did, by means of the false and deceitful means aforesaid, defraud the said United States of the said sum of $2,000, and did then and there convert and appropriate the same to his own proper use and benefit; to the great damage of the United States, &c. Thomas Swann, Attorney, United States."

To each of these three indictments the defendant's counsel filed a general demurrer.

Mr. R. S. Coxe, for defendant, observed that the objections which he should take would go to the gist of the transaction, and to the whole merits of the case. His first objection was, that this court has no jurisdiction of the case, whether sitting as a state court, under the adopted laws of Maryland, or, as a federal court, exercising the powers and jurisdiction of the other circuit courts of the United States. In these indictments, every thing is alleged to have been done officially, and the offences charged are charged as official misdemeanors. In the former cases, the acts done were not charged as having been done officially. These are cases of one officer of the United States imposing upon another officer of the United States, and obtaining the money of the United States. They are entirely and exclusively offences against the United States, as the government of the Union, in its federal and national character. The offence would have been the same, if it had been committed in any one of the states, instead of this district. It is a charge of violating his official duty, and employing his official powers and means to improper and private purposes. It is only a violation of his official duty; a breach of contract between him and his government. 2 Bl. Comm. (Chit. Ed.) 108; Co. Litt. pp. 234a, 232b, § 378. The United States has no common law. No state court can punish an officer of the United States for a violation of his duty, nor prevent or punish the destruction of the property of the United States, by any person. The constitution of the United States provides for impeachment of the officers of the United States, and defines treason. And congress has defined by law all the offences which can be committed against the United States, and provided for their punishment. Those offences must be in regard to those things of which the United States have jurisdiction; and those offences can be tried and punished only in the courts of the United States,—courts of purely federal jurisdiction. Congress has made the office of fourth auditor, and has defined its duties; and has exclusive jurisdiction over the whole subject-matter of these indictments. A man could not be punished in a state court, under any statute of a state, or under the common law of any state, for burning a navy-yard of the United States; nor could he be punished by the courts of the United States, because there is no statute of the United States to punish such burning. McCulloch v. Maryland, 4 Wheat. [17 U. S.] 411, 416. The constitution must give congress jurisdiction over the subject, and congress must legislate upon it, before the courts of the United States can exercise jurisdiction over the offence, (or, rather, over the act done.) Whatever congress have the power of prohibiting, and have not prohibited, is lawful, and cannot be made penal by a state law. The federal jurisdiction, if it exists at all, is exclusive. The United States has a right and the power to protect itself, and to punish its officers for malversation in office. Gibbon v. Ogden, 9 Wheat. [22 U. S.] 17, 209; Houston v. Moore, 5 Wheat. [18 U. S.] 22. The negotiation with Great Britain, respecting the suppression of the slave trade, failed upon the ground that the United States could not give power to the courts of another nation to punish the violation of the laws of the United States. The judicial power must be co-extensive with the legislative; and e converso. The state courts cannot decide what are the duties of an officer of the United States. Why do these indictments aver the duties of the officer? Because the act done was a violation of official duty. Because, in order to show an offence, it was necessary to aver that the act was done officially. This court, then, if sitting as a state court, could not decide these points. If this indictment had been found in a state court, and the defendant had contended that he had a right, by virtue of his office, to do the act, and the state court had decided against that right, the cause might have been removed to the federal court under the 25th section of the judiciary act of 1789. Cohen's Case was brought before the supreme court of the United States, because he claimed a right to sell the lottery ticket under an act of congress. The defendant, in the present case, was arrested in Pennsylvania by the warrant of a district judge, because he was charged with an offence against the United States. See the judiciary act of 1789 (section 33). This is one of the cases expressly stated by Mr. Justice Story in U. S. v. Coolidge [Case No. 14,857], as being within the exclusive cognizance of the federal courts. In the former opinion of

this court, this was said to be an indictable fraud, because it was a fraud upon the United States—upon the public. But in a Maryland court it would not be a fraud on that public;—that public would be the state of Maryland—not the United States;—it would, therefore, not be an indictable fraud in Maryland. It could not be sustained in a state court by virtue of a law merely municipal, because it is an offence against the United States only. The judicial tribunals of one country will not enforce the municipal laws of another, especially the criminal laws; and in this respect the state tribunals and the United States tribunals are as distinct as the tribunals of different nations. They are, in truth, distinct sovereignties. In a prosecution under the state law, the executive of that state alone has the power to pardon. 1 Kent, Comm. 301, 313.

The constitution of Maryland was abridged by the constitution of the United States, and when congress adopted the common law of Maryland, it took it as it was modified by the constitution and laws of the United States. The common law of Maryland never extended to offences against the United States. The Militia Case, 5 Wheat. [18 U. S.] 17. By the constitution of the United States, the judicial power of the United States shall extend to all cases of law and equity arising under the constitution and laws of the United States, and such jurisdiction, at least in criminal cases, is exclusive. Martin v. Hunter, 1 Wheat. [14 U. S.] 329–331, 333. Cohen's Case, 6 Wheat. [19 U. S.] 381.

The treasury, and the offices and officers of the United States, are the creatures of the constitution and laws of the United States, and the right of legislation respecting them is exclusive. The laws of the United States can only be executed by the courts of the United States. McCulloch v. Maryland, 4 Wheat. [17 U. S.] 401; Gibbon v. Ogden, 9 Wheat. [22 U. S.] 196, 197, 209; Com. v. Thompson, 1 Va. Cas. 319; U. S. v. Smith, 1 South. [4 N. J. Law] 33; 1 Kent, Comm. 312, lect. 16.

What difference is made by the power of exclusive legislation over this district, given by the constitution of the United States, art. 1, § 8? If this court could not, either as a state court, or as a court of the United States, take cognizance of this case. how can it by the junction of the two jurisdictions? This clause of the constitution operates no change; it only authorizes legislation. Neither the Maryland act of cession of December 23. 1788, nor the act of acceptance of July 16, 1790, nor the act of February 27, 1801, changed the law. The laws of Maryland were to remain in force; no new offence was to be created by the change of jurisdiction; nothing was added to the list of crimes punishable by the laws of Maryland. This offence, then, was not an offence against the state of Maryland, nor punishable by that law. This court, in its former opinion, has not decided this point, for the court expressly said that the defendant was not, in that indictment, charged with any official misconduct. Again, the public, to be defrauded, must be the public in whose court the indictment is pending.

The second objection is, that the offence was not consummated in this county. All the facts which constitute the offence must have been committed within the jurisdiction of the court before which the trial is to be had. Such is the rule of the common law. Here the indictments charge that J. K. Paulding was a navy agent at the city of New York; that the intent was to get the money of the United States out of the hands of that navy agent in New York. The crime consists of two distinct facts—the intent, and the obtaining the money; the means are not of themselves unlawful unless accompanied by the intent, and an actual injury. But time and place are material, and must be alleged. If the offence be commenced in one county and consummated in another, the venue cannot at common law be laid in either county, and the offender cannot be convicted. Archb. 11; 1 Chit. Cr. Law, 177, 178; 2 Cur. Hawk. 255, 325.

The third objection is, that the pretences are not well set forth. In this respect, Mr. Coxe contended that these indictments were liable to the same objections which the court decided to be fatal to the former indictments upon the same transactions; and as to the transaction of $2,000 with Mr. Hambleton, it appeared, upon the face of the indictment, that more than two years had expired before the indictment was found. Starkie, 58, 64, 67, 71; 6 Dane, Abr. 154, § 22; Goding v. Ferris, 2 H. Bl. 14; 2 Laws U. S. p. 99, April 30, 1790, § 31; 1 Chit. Cr. Law, 151, 223. In the first and third of these indictments the false pretence alleged is a mere naked lie, which is not an indictable offence at common law. 1 Cur. Hawk. 318, note. It is not averred that the sum of $750, drawn from Mr. Paulding, was obtained by any false pretence. The pretence is only averred to be with intent to place the money in the hands of Paulding,—not to draw it out. Then as to the $300 transaction, there is no distinct offence charged—no averment of any false pretence. The intent averred is to obtain money from Paulding, not from the United States. The only averments are, that he wrote the letter and drew the draft.

Mr. Key and Mr. Swann, contra, took nearly the same ground as in the former cases. They contended that the charge is not for misfeasance, or nonfeasance in office. His official station only furnished him the means of perpetrating the fraud. The offence would have been the same if he had not been in office. This is as much a common-law offence as if one of the high officers of the government should commit murder, or larceny, or assault and battery. The averment of his official character was only to show how the deceit was effected.

As to the objection that the money was paid in New York, and therefore the offence was

not complete here, the payment of the money by Mr. Paulding to Mr. Fowler is not a necessary ingredient in the offence. The whole fraud was committed here. The pretence, the letter, the draft, the requisition, the receipt of the money by the defendant, were all done by him here. He could not be tried in New York, for he had committed no offence there. The only reason for averring that the money was paid by Paulding was to show that the fraud had been effectual. 1 Chit. 190–193; U. S. v. Wright [Case No. 16,773], in this court, April, 1822.

As to the objection to the false pretence, that it was a naked lie—a naked lie, in a fraud upon the public, is sufficient. "False pretences" are not necessary words in the indictment. Falsehood is enough. A falsehood is a false pretence. Imposition is sufficient. Jones' Case, Leach, 204; 2 East, P. C. 838. As to Hambleton's Case, it does not appear on the face of the indictment, when the indictment was found, although the act is said to have been committed on the 6th of March, 1827. But the day is immaterial, and the limitation cannot be taken advantage of by demurrer. It must be pleaded; for the United States may reply that the defendant fled from justice, which they cannot do upon demurrer. This objection would not be good upon a motion in arrest of judgment. U. S. v. Porter [Case No. 16,072], in this court, at December term, 1812; Archb. 14; 7 Wm. III. c. 3; Starkie, 64; 5 East, 259; 1 Chit. 223; Lee v. Clarke, 2 East, 333; Loyd v. Williams, 3 Wils. 258; 1 Chit. 283–285. The proviso in the act of April 30, 1790, § 32 (1 Stat. 119), is only applicable to offences created by the statutes of the United States; for the United States had no criminal common law, and there could be no common-law misdemeanors against the United States to which the limitation could apply.

Mr. Jones, in reply. By the act of congress of the 27th of February, 1801 (2 Stat. 103), the laws of Maryland were to remain in force here as they existed in Maryland on that day, and were to be administered here exactly as, and no otherwise than, they could have been administered by the courts in Maryland; and there can be no common-law offence here which would not have been a common-law offence in Maryland. This court is only a court of the District of Columbia, with the superadded jurisdiction of a circuit court of the United States. As a circuit court of the United States they cannot exercise jurisdiction of these offences, because they are not created by an act of congress; and as a court of the District of Columbia, they can only exercise the jurisdiction which a state court could exercise. Then, what is the nature and essence of the offences charged in these indictments? It is true that in some senses, all offences committed within this district, are offences against the United States. The United States is the territorial sovereign of this district; and every offence must be either against a statute of the United States, or would have been an offence

against the state of Maryland. Every immoral act is not necessarily a common-law offence. Common-law offences are all defined; for although it is said to be lex non scripta; yet its evidences are written, in the reports of the judgments of the courts, and in the elementary treatises of the sages of the law. No such offence as this, against the United States, is known to the common law of Maryland; therefore this offence could not be tried in the state courts of Maryland.

The argument, that what would be in Maryland a common-law offence against the sovereignty of Maryland, would be here a common-law offence against the sovereignty of this district, has grown out of the same confusion of ideas. There can be no common-law offence here, but against the United States as the local sovereign; but if it be an offence against the United States, as the national sovereign, it cannot be a common-law offence. If the offence affect the treasury of the United States, if it affect the whole nation, it is an offence against the United States, as sovereign of the Union, and cannot be punished unless the offence has been defined, and its punishment prescribed by statute. The officers of the general government have no local habitation, and cannot be punished for an act done here, for which they could not be punished in any of the states. These offences depend essentially on the performance, or non-performance of the official functions of a public officer, which affect the Union at large. Our objection turns exclusively upon the quality of the act, not upon the official character merely of the defendant. The means and the turpitude of this offence, grew out of his connection with the United States as a public officer. Before the argument from the analogy of sovereign can apply, the offence must be an offence against the local sovereign of the district. The United States as the local sovereign of this district, is as distinct from the United States as the sovereign of the Union, as two independent sovereignties.

These principles are applicable to the present case. They are not opposed to the opinion heretofore given by this court, because the court then decided that those indictments did not charge official misconduct. If these indictments do not charge official misconduct, they charge no offence.

As to the $750 case, two distinct charges are made in the same count, and it is therefore bad. It charges: (1) That the defendant wrote a letter of advice, and drew a draft, and received the money from Mr. Fowler, and applied it to his own use. (2) That he obtained the requisition, &c. The intent only is averred to be the offence, the intent to acquire for his own use the money of the United States; that he pretended, &c., and procured the money to be placed in the hands of the navy agent; but no deceitful practice is averred by which the defendant got the money out of the hands of the navy agent. How could his official character be the means of effecting

the fraud, without misconduct in office? It must be a breach of his official trust. If he assumes to do an act which he has no authority to do, his office is not the means of effecting the fraud. The defendant had no authority to do what he did, and therefore the secretary of the navy, and the navy agent, could not be deceived by any pretence of such authority. They both knew the extent of his authority. His official character, therefore, could induce no confidence quoad hoc, namely, the necessity of placing this money in the hands of the navy agent. The secretary of the navy had no right to trust the assertion of the defendant. He could not be deceived, unless the defendant had a public primâ facie authority to do what he did. It is not averred that he wrote the letter as 4th auditor; but being 4th auditor. The averments of his official character and duties, therefore, are not made for the purpose of showing the means by which the deceit was practised.

As to the $300 case, it is not pretended that the defendant had authority to write the letter, and therefore it could not appear to be an official letter. If he had authority, then it was an official misdemeanor. In the first and third of these indictments, a misrepresentation is averred, but that misrepresentation could not deceive the secretary of the navy, because he had no right to look to the defendant for information upon matters of which the secretary was, or ought to have been better informed than the defendant. The pretence was too shallow to deceive. If there was no pretence, nor deceitful practice, there was no indictable fraud. Stripped of its official character, it is worse than the former one upon the same fact. Deceitful practices must be set out; the means must be effectual, and the fraud must be effected by those means.

Then as to the averments of place and time: (1) As to place. If the fraud be not carried into effect, it is not indictable. It is not a public offence unless consummated. The place must be stated, to show that the court has jurisdiction. All the acts necessary to complete the offence must be done within this county. The law of England is very strict on this point. The payment of the money in New York was necessary to complete the offence; for if Mr. Paulding had not paid the draft, the United States would not have been defrauded. 2 Hale, P. C. cc. 3–5; 1 Chit. 190–192. But it is said that in misdemeanors, the ingredients may be subdivided; and that where one of the acts constituting the offence was done in one county, the trial may be there; but it must be the final act, that which consummates the offence. The instance put is misprision of a felony committed partly in one county, and partly in another; but the misprision, which is a separate and independent offence, was committed in one county only, namely, the county in which the knowledge of the felony came to the accused. If the last act done by the present defendant was that which was done here, then he is innocent, for the offence was not complete when his last act here was done. The last act was done by this defendant in New York, by receiving, through and by his agent, Mr. Fowler, the money of the United States from Mr. Paulding, when he paid the draft. There is no election of jurisdiction. The place where the offence is consummated, fixes the jurisdiction. So if a man here, by letter procure a murder to be committed in New York by an innocent agent, he is guilty of the murder in New York, and may be tried there. 1 Hale, P. C. 190, 191, 374, 618, 652, 653, 708; Rex v. Munton, 1 Esp. 62; 1 Chit. 191, 192; U. S. v. Wright [Case No. 16,773], in this court in April, 1822. (2) As to the time. If it regard a material averment, it must be consistently stated, and an indictable offence must be shown upon the face of the indictment; if not, it is bad upon demurrer. But it is said that it must be pleaded, so as to give the prosecutor an opportunity of replying the flight of the defendant. If the defect does not appear on the face of the indictment, the defendant may avail himself of it upon the general issue. Larner's Case, in this court (not reported); U. S. v. Porter [Case No. 16,072], in this court; Adams v. Wood, 2 Cranch [6 U. S.] 336. The indictment must show the time to be within two years before the finding of the indictment; but it need not be averred, that the time was within the limitation. And this explains the case of Lee v. Clarke, 2 East, 333, where it was only decided that the averment that the act was done within six months, was unnecessary. Rex v. Stevens, 5 East, 259.

It is said that the United States cannot, upon demurrer, show the flight of the defendant. But the United States ought to have stated it in the indictment, if the indictment itself showed that the time limited for the prosecution had expired. Or they might have stated the offence to have been committed on some day within the limitation. It has been supposed that the proviso in the act of April 30, 1790, limiting the prosecution to two years, does not apply to common-law cases. But this court has decided that point in the cases before mentioned of Larner and Porter, and the law has been ever since considered as settled, and the benefit of the limitation has been allowed in many cases of common-law offences. See, also, Steph. Pl. 312.

CRANCH, Chief Judge, delivered the opinion of the majority of the court, as follows: Three new indictments have been found by the grand jury, to which the defendant has demurred. The first ground of demurrer is common to the three indictments and if available at all, is a bar to any prosecution whatever for the matters therein charged. It supposes the charge in each case to be merely for official misconduct of the defendant as 4th auditor in the treasury department of the United States, in which case it is contended by the counsel of the defendant, that it is an offence, exclusively against the United States

in their national character, in which character they have no common law; and, therefore, there can be no offence against the United States, (in that character,) which has not been defined, and its punishment prescribed. by statute. And that, as there is no statute applicable to the matters charged in these indictments, those matters are not indictable or cognizable by any court of the United States as such. That the creation of offices and officers, and their duties, are matters of exclusive federal legislation, and as the judicial power of the United States is coextensive with its legislative power, no state court can take cognizance of the malversations in office of any federal officer. That this court cannot, by virtue of any transfer of jurisdiction by Maryland to the United States, exercise any jurisdiction, which a state court in Maryland could not have exercised on the 27th of February, 1801, or on the first Monday of December, 1800, when this district became, by law, the seat of the government of the United States; and as no court in Maryland could, at that time, have had cognizance of the matters charged in these indictments, it follows that this court has no cognizance of them by virtue of any authority derived, by the United States, from Maryland, by virtue of the cession of this part of the District of Columbia. This doctrine may or may not be correct; but, if correct, it does not apply to the present cases, if the charges in these indictments be not for .official misconduct of the defendant, as an officer of the national government. .

In considering the demurrer to the former indictments against this defendant, the court was satisfied that the charges in those cases, were not for official misconduct, but for frauds at common law; and, in that respect, we see no material difference between those indictments and these. It is true that the first of these indictments avers that the defendant was fourth auditor, &c., at the time when he did the act complained of, and sets forth so much of his duty as such fourth auditor, and so much of the duty of the navy agent as was supposed necessary or proper to show how the defendant's letter and draft, of the 16th. of January, 1828, might deceive or impose upon the navy agent, so as to induce him to pay the draft; and how his pretence, that the sum of $750 was required for the use and service of the navy of the United States, for payment of arrearages, might deceive or impose upon the secretary of the navy, to induce him to increase the requisition in favor of Mr. Paulding, and to show why these officers should have given their confidence to the defendant. But this averment of his official character and duties is not an averment that the acts, with which he is charged, were committed in, or by virtue of, his office, or constituted any violation or neglect of his official duties.

It has been justly observed, that to charge that the defendant, being fourth auditor, &c.,

committed larceny, or robbery, or murder, is not to charge him with official malversation.

THE COURT is, therefore, of opinion that these indictments (for that which we have just considered appears to be the strongest case in favor of the defendant, upon this point,) do not charge the defendant with official misconduct only, but that they stand. In this respect, upon the same ground as those upon which the former opinion of this court was given; which opinion, we think, is not shaken by the argument in the present cases, but is as applicable to these as it was to those.

But it is said, that if these indictments are not for official misconduct, yet each of them is insufficient, for want of precise and explicit averments of the deceitful practices by which the frauds are supposed to have been effected, and that the frauds were effected by means of such deceitful practices.

With a view to this question, it will be necessary to examine them separately.

The first is for the $750 obtained from Mr. Paulding. After setting out the official character of the defendant, as fourth auditor, and his duties, the authority of the secretary of the navy to issue requisitions to the secretary of the treasury, and of the latter to grant warrants on the treasury of the United States, according to such requisitions, the official character of Mr. Paulding, and a part of his duties, as navy agent; and that an appropriation of $20,000 had been made by law, on the 2d of March, 1827, for the use of the navy department, for arrearages prior to the 1st of January, 1827, the indictment charges that the defendant, being fourth auditor, &c., and intending fraudulently and unjustly to obtain and acquire for himself, and for his own private use, the money of the United States, with force and arms, on the 16th of January, 1828, at Washington county, in the District of Columbia. falsely and fraudulently wrote, addressed, and caused to be sent to Mr. Paulding, navy agent in New York, a letter of that date, in the words and figures following — "Treasury Department, Fourth Auditor's Office, January 16, 1828. Sir.—I have this day drawn on you for seven hundred and fifty dollars, in favor of C. S. Fowler, on one day's sight, to meet which a remittance will be made to you by the treasurer of the United States, so soon as the requisition can pass through the forms of office, under the head of 'Arrearages prior to 1827,' of the like sum, and to this head you will be pleased to charge the draft, when paid. The draft is made at one day's sight, that time may be allowed for the remittance to reach you in due season; but should any thing occur to prevent this, you will be pleased to pay it out of any fund in your hand, and make the necessary transfer on the receipt of the treasurer's draft. I am, respectfully, your obedient servant, T. Watkins. J. K. Paulding, Navy Agent." And, on the same day, at, &c., made his draft on Mr. Paulding,

navy agent, as aforesaid, according to the advice of the said letter, in favor of C. S. Fowler, for the said sum of $750, and then and there sold and delivered it to the said Fowler, and received of him therefor the said sum of $750, and kept and disposed of the same for his own use; which draft was afterwards paid by the said navy agent, out of the moneys of the United States in his hands. The indictment further charges, in the same count, that the said J. K. Paulding, navy agent, as aforesaid, on the 16th of January, 1828, wrote, addressed, and sent to the secretary of the navy a letter, requesting him to issue a requisition, in his favor, for the sum of $12,139.12, under certain specified heads of appropriation, the head of "Arrearages" not being one of them; which letter was received by the secretary of the navy, at Washington, on the 19th of January, 1828. That the defendant then and there, being fourth auditor, &c., and intending fraudulently and unjustly to acquire for himself, and for his own private use, the money of the United States, and well knowing the premises, with force and arms, &c., on the said 19th of January, 1828, at, &c., did falsely, fraudulently, deceitfully, knowingly, and designedly apply to the secretary of the navy to add to the sum for which Mr. Paulding had requested a warrant to be issued, as aforesaid, the sum of $750, and did then and there pretend to the said Samuel L. Southard, secretary of the navy of the United States, as aforesaid, that the said sum of $750 was required for the use and service of the navy of the United States, for the payment of claims adjusted and settled under the appropriation for arrearages due by the navy department of the United States, prior to the 1st of January, 1827; and did then and there unlawfully, fraudulently, deceitfully, and designedly cause and procure to be issued by the said Samuel L. Southard, then being secretary of the navy of the United States, as aforesaid, a requisition to the treasurer of the United States, for the said additional sum of $750; and did cause and procure the said sum of $750 to be added to the said requisition of $12,139.12, which the said J. K. Paulding had requested to be issued, as aforesaid, thereby causing the said sum of $12,889.12 to be included in the said requisition, instead of the sum of $12,139.12, so required, &c., by the said J. K. Paulding, as aforesaid, (which requisition is set out in words and figures,) which said sum of $12,889.12, mentioned in the said requisition, was, in conformity thereto, by warrant under the hand of the secretary of the treasury of the United States, drawn out of the treasury thereof, and placed in the hands of the said J. K. Paulding, navy agent, as aforesaid, the said sum of $12,889.12, then and there being the property of the United States, with intent to defraud the said United States out of the said sum of $750. Whereas, in truth and in fact, he, the said T. Watkins, at the time of mak-

ing the said false pretences, well knew that the said sum of $750, in the said requisition included, was not required for the use and service of the United States; and whereas, in truth and in fact, the said T. Watkins, at the time, &c., did not intend that the said sum of $750 should be applied to the use and service of the navy of the United States, but then and there intended to defraud the United States of the same, and to convert the said sum of $750 to his own use and benefit, and did thereby defraud the United States of the said sum of $750, to the great damage of the United States, &c.

The first objection to this indictment is, that it charges two distinct offences in the same count: first, that the defendant, with force and arms, intending to acquire the public money for his own use, wrote the letter of the 16th of January, 1828, and drew, and sold, and received the money for, the draft of $750 on the navy agent, who afterwards paid it out of the moneys of the United States in his hands; secondly, that the defendant, with force and arms, intending, as aforesaid, and knowing that the navy agent had asked for a requisition for $12,139 only, on the 19th of January, 1828, applied to the secretary of the navy to add $750 to the requisition; and falsely pretended that it was for the public use and service, and caused a requisition to be issued, including the $750, which sum was, in conformity thereto, by warrant drawn from the treasury of the United States, and placed in the hands of the navy agent, and did thereby defraud the United States of the said sum of $750.

This objection, we think, cannot be sustained. It seems to the court that this count charges only one offence, the defrauding of the United States of the $750, by the means set out in the whole count. The first part of the count charges only some of the means used to accomplish the fraud; the second part states the residue, and its actual accomplishment, which is averred to have been done thereby; which word, the counsel for the defendant have justly said, refers to the whole preceding matter contained in the count.

The next objection is, that it does not appear in the count by what deceitful practices the defendant got, or could have got the money of the United States out of the hands of the navy agent; for until the money was got out of his hands, the offence, it is said, was not complete. The false pretence to the secretary, it is supposed, only shows the deceit by which the money was drawn from the treasury, and placed in the hands of the navy agent; but that was no fraud on the United States, for it was safe in his hands. But the answer to that objection is, that the getting the money out of the treasury was a necessary link in the chain of means to accomplish the fraud; and if that single link was obtained by the deceptive practices of the defendant, those deceptive practices are as ef-

fectual in constituting the offence, as if every other link in the chain had been forged by the like deception.

Another objection has been taken to this indictment. It is said that, in order to show an indictable fraud in this case, it must not only appear that the defendant drew the draft on Mr. Paulding and received the money, and that the draft was paid by Mr. Paulding out of the public moneys in his hands, but that the requisition which was obtained by false pretences, and by means of which the money was drawn out of the treasury, and placed in the hands of Mr. Paulding, should, by a proper averment, be connected with the transaction between the defendant and Mr. Paulding, in regard to the draft, which, it is supposed, is not done in this indictment; and that, as there does not appear, on the face of the indictment, any connection between the $750 drawn for and received by the defendant, and the $750 transferred from the treasury to the navy agent, it must be intended that there are two distinct sums of $750 mentioned in the indictment; and that, therefore, when it is said, in the conclusion of the indictment, that the defendant "did thereby defraud the United States of the said sum of $750," it is uncertain which of the two sums of $750 is meant; and that, therefore, the indictment is bad for uncertainty, and for not connecting the defendant's receipt of the money with the false pretences.

It has already been said, by this court, that the getting the money out of the treasury was a necessary link in the chain of means to accomplish the fraud; and that if that were done by the deceptive practices of the defendant, those deceptive practices are as effectual in constituting the offence, as if every other link of the chain had been made by the like deception. But it is now urged that the links of that chain are not connected; that the chain consists of two parts, which have never been joined; and that the false pretence is applicable to one of those parts.

The chain of facts is this: (1) The letter from the defendant to the navy agent at New York, in which he informs him that he has drawn on him, in favor of C. S. Fowler, for $750, at one day's sight, to meet which a remittance of a like sum will be made to the said navy agent, by the treasurer of the United States, as soon as the requisition can pass through the forms of office, under the head of "Arrearages prior to 1827," and that to this head he should charge the draft, when paid; and that, if the remittance should not reach him in due season, he should pay it out of any fund in his hands, and make the necessary transfer on the receipt of the treasurer's draft. (2) The draft, drawn on the same day, according to the advice of the letter. (3) The sale of the draft to Mr. Fowler. (4) The receipt of the money, by the defendant, from Mr. Fowler. (5) The payment of the draft by the navy agent out of the moneys of the United States in his hands. (6) The requisition and the treasurer's draft, in conformity with the assurance contained in the letter. (7) The false pretences by which the requisition and the treasurer's draft were obtained; and by which the 750 dollars were drawn from the treasury and placed in the hands of the navy agent. (8) The averment that the defendant did thereby defraud the United States of the said sum of 750 dollars.

We see no want of connection in this chain. The treasurer's draft, which transferred the 750 dollars from the treasury to the hands of Mr. Paulding, is as much connected with the original letter of the 16th of January, as the draft of the defendant is connected with it. They are both mentioned in that letter; and Mr. Paulding had as good a right to expect the one as the other. It is true, there are other facts mentioned in the indictment, but they are only such as were necessary to show the false pretences by which the defendant obtained that treasury draft; and do not break the connection of the material circumstances by means of which the fraud is supposed to have been effected. If the allegation respecting the treasury warrant had immediately followed the averment of the payment of the draft by Mr. Paulding, and it had been introduced by such words as these: "And the jurors aforesaid, upon their oaths aforesaid, further present that the said Tobias Watkins, in conformity with the assurance contained in the said letter of the 16th of January, 1828, afterwards, to wit, on the 19th of January, 1828, at the county of Washington aforesaid, did cause the like sum of 750 dollars to be drawn from the treasury of the United States, and placed in the hands of the said J. K. Paulding, navy agent as aforesaid, by means of a warrant issued by the secretary of the treasury of the United States," &c., and if it had been followed by the proper averment of the deceitful practices used by the defendant to obtain the warrant, we think this objection would not have been taken; yet the words "in conformity with the assurance contained in the said letter of the 16th of January, 1828," would have been only an averment of an inference of law from the facts stated. For, whether the remittance was in conformity with the assurance contained in the letter, was a mere question of law; it would, therefore, have been an immaterial averment, and would have amounted to nothing more than the law would infer from a comparison of the terms of the letter with the averment respecting the warrant. We think, therefore, that the connection between the defendant's letter of the 16th of January, 1828, and his draft, and the treasurer's remittance, is sufficiently apparent upon the face of the indictment; and that it does sufficiently appear that the 750 dollars, of which the defendant is charged with defrauding the United States, are the 750 dollars included in the requisition and warrant, which the defendant, by anticipation, perhaps, drew out of the hands of the navy agent, through the medium

of Mr. Fowler, the broker. We have said, "by anticipation, perhaps;" for it does not appear, upon the indictment, whether the treasurer's remittance reached Mr. Paulding before or after he had paid the draft. Nor is that question material; for if he paid it before he received the remittance, he paid it upon the assurance of a remittance which was afterwards actually made. In either case, therefore, he paid it out of the moneys of the United States in his hands. It seems to us, therefore, that the chain of facts and circumstances which are set forth in the indictment, as the means of effecting the supposed fraud, are sufficiently connected; and that the deceitful practices averred to have been used, by the defendant, in obtaining one of those means, (namely, the requisition,) infect with fraud the whole transaction, as it appears upon the face of the indictment.

Another objection taken to this indictment is, that the offence was not complete until the money was paid by the navy agent in New York, and that unless all the acts which constitute the fraud were committed in this county, this court has not jurisdiction of the cause. It was suggested, however, that, even if that doctrine be correct, it will apply only to the acts of the defendant himself, and not to the act of the navy agent in New York who paid the money. But to this it was answered that Mr. Fowler, in whose favor the bill was drawn, and who received the money from the navy agent in New York, was the innocent agent of the defendant, and acted under his authority in receiving the money there. Admitting this to be so, yet Mr. Fowler, with some reason, may be considered as the innocent agent of Mr. Paulding in paying the money here, in Washington; for his act was ratified by Mr. Paulding, when he accepted and paid the bill in New York; and a ratification is equivalent to an original authority, according to the maxim which the common law lawyers have drawn from the civil law, "omnis ratihabitio retrotrahitur, ac mandato æquiparatur." Dig. 50, 17, 152, 2.[6]

The discount of a bill is only the anticipation of the fund upon which the bill is drawn. The money is advanced on the credit of the bill, and in the expectation that it will be accepted and paid. If it be accepted and paid, the broker who discounted it is reimbursed. His act, in advancing the money, has been ratified; and the drawer of the bill, for whose accommodation it was discounted, has got by anticipation the very fund upon which he drew. The ratification by the drawee, of the act of the broker, relates to the time of that act, and constitutes the money advanced, the money of the drawee, at the very time of advancing it. In the present case, the defendant did not receive the money of the United States in New York; he received it at

Washington from Mr. Fowler, who advanced it on the credit of the bill; and when the navy agent in New York paid the bill, he adopted and ratified Mr. Fowler's act in advancing the money, and this ratification related to the time of the discount. It is only by a fiction of law that it can be pretended that the defendant received the money of the United States in New York, and it is not a greater fiction to suppose that Mr. Paulding, by the instrumentality of Mr. Fowler, paid the money in Washington, than that the defendant, through the same instrumentality, received it of Mr. Paulding in New York. If the defendant received Mr. Fowler's money in Washington, and afterwards received the money of the United States in New York, then he must have received the money twice, which is not pretended. Then, if he received 750 dollars only once, and if he received 750 dollars of the money of the United States, the 750 dollars which he received was the money of the United States. If the only money he received was received by him in Washington, and if he received 750 dollars of the money of the United States, then the money of the United States which he received was received by him in Washington. The argument is, at least, as strong in favor of his having received the money of the United States at Washington, as it is of his having received it at New York.

But there is another view of this subject which has been taken by the counsel for the United States, and which it may be proper for the court to notice. It is contended by them that the offence (meaning the offence charged in this indictment, which is a fraud upon the United States,) was complete when the defendant sold the draft and received the money from Mr. Fowler, and before the draft had been paid by Mr. Paulding out of the moneys of the United States in his hands; and that the defendant might have been immediately prosecuted and convicted for this offence, even if Mr. Paulding had refused to honor the draft, because the United States might have been prejudiced thereby if the draft had been paid, and that the risk which was thereby occasioned to the United States by the drawing of the bill was an actual prejudice to the United States, although that prejudice is not stated in the indictment as the injury done to the United States by the fraud; and although the injury alleged in the indictment is the defrauding of the United States, by the defendant's getting and applying to his own use 750 dollars of the money of the United States. It is said that the fraud was complete, upon somebody, when the defendant received the money from Mr. Fowler; that it is immaterial whether it was then a fraud upon the United States or upon Mr. Fowler; that it certainly was a fraud upon one or the other; and that the defendant is equally guilty whether one or the other was, or whether both were injured thereby. That the question who was injured thereby, or how injured, does not

---

[6] The Digest, 50, 17, 152, 2, extends the principle to criminal cases—"in maleficio ratihabitio mandato comparatur."

affect the question of guilt. That they are immaterial circumstances, and need not be set forth with averment of time and place. But a majority of the court is of opinion that this indictment, which is for obtaining by false pretences, or deceitful practices, 750 dollars of the money of the United States, could not have been maintained if Mr. Paulding had not paid the draft; and that until the draft was paid, the offence charged in this indictment was not complete. Upon the whole, it is the unanimous opinion of the court, that none of the objections taken to this indictment can be supported.

As to the second of these indictments, the court wishes further time for consideration.

As to the third of these indictments, (that upon the transaction with Mr. Hambleton,) the principal objection is, that it appears, upon its face, that the offence, if any, was committed more than two years before the finding of the indictment,—the time limited by the thirty-second section of the act of the 30th of April, 1790,—by which it is enacted: "That no person or persons shall be prosecuted, tried, or punished, for treason, or other capital offence aforesaid, wilful murder or forgery excepted, unless the indictment for the same shall be found by a grand jury, within three years next after the treason, or capital offence aforesaid, shall be done or committed; nor shall any person be prosecuted, tried, or punished, for any offence not capital, nor for any fine or forfeiture under any penal statute, unless the indictment or information for the same shall be found or instituted within two years from the time of committing the offence, or incurring the fine or forfeiture aforesaid. Provided that nothing herein contained shall extend to any person or persons fleeing from justice."

In answer to this objection it has been said, —(1) That it does not appear, upon the face of the indictment, at what time it was found; (2) that advantage of the limitation cannot be taken upon demurrer, because the United States would thereby be precluded from replying, according to the proviso of the act, that the defendant fled from justice within the two years; and (3) that the limitation extends only to such offences and penalties, &c., as are created by acts of congress, and not to common-law offences, because there could be none such against the United States, in its national character.

(1) The answer to the first objection is, that it will appear, from the caption of the indictment, whenever the record is made up, at what time the indictment was found; and, upon demurrer, the judgment of the court must be upon the whole record. And if, upon the whole record, it should appear to the court that the offence was committed beyond the time limited, they could not give judgment against the defendant. Thus, in Rex v. Fearnley, 1 Term R. 320, "the court said they were of opinion that this was a good objection; because, by the caption of the in-

dictment, it appeared that the quarter sessions had no jurisdiction. Upon a demurrer to an indictment, the court must look to the whole record, to see whether they are warranted in giving judgment on it." So in the cases of Rex v. Fisher, and Rex v. Saunders, 2 Strange, 865. "In the case of Fisher, judgment was arrested after verdict; and, in the case of Saunders, one indictment was quashed, being taken at an adjourned sessions. and it not appearing what day the original sessions began, to bring it within the time prescribed by the statute."

(2) To the second objection, that the defendant cannot take advantage of the limitation upon demurrer, the answer is this, that however it may be in practice, yet in theory, and by law, if judgment, upon demurrer to an indictment for a misdemeanor, be given against the defendant, it is a peremptory judgment of condemnation; and although, in practice, the court will often rather intimate its opinion than pronounce sentence, and will permit the defendant to withdraw his demurrer and plead to issue, yet upon the question, whether the defendant may avail himself, by demurrer, of a bar apparent upon the record, the court must consider what would be the legal consequence of a judgment upon the demurrer; and when we see that it may be a peremptory judgment, and that the defendant has a good defence upon the face of the record, the court cannot deprive him of the benefit of it. Pugh v. Robinson, 1 Term R. 116. We think, therefore, that the defendant has a right, upon demurrer, to avail himself of the limitation of the statute. It has been said, that the United States would thereby be precluded from replying the flight of the defendant, if such should have been the fact. But that is not the fault of the defendant; the United States have put themselves in that situation by stating the fact to have happened at a time beyond the day of limitation. They were not bound to do so, for they might have laid the day to be within the time of limitation, and have proved a different day at the trial; and if the day proved should be beyond the time of limitation, and the United States could have shown that the defendant fled within the two years after committing the offence, they might have given it in evidence; or they might have stated in the indictment the true time, and any facts which existed, and went to show that the defendant could not avail himself of the limitation.

(3) As to the third objection, that the statute does not apply to common-law offences, committed within this district, the answer is, that this court, so long ago as December term, 1812, in the case of U. S. v. Porter [Case No. 16,072], who was indicted for certain frauds at common law, decided that the limitation of the act of 1790 did apply to such cases. It is true that, in that case, it appears by the docket-entries that the defendant pleaded "not guilty, and the act of limitations;" but Mr. Key, who was counsel

for the defendant in that cause, having, upon the trial, objected to evidence of transactions which took place more than two years before the finding of the indictments, said—"We do not rely upon the special plea of the statute of limitations, but make the motion on the plea of 'not guilty.'" Mr. Jones, who was then attorney for the United States, contended, as it is now contended by the counsel for the United States, "that the act of congress does not apply to this case. It was passed in 1790, and refers only to the cases within the jurisdiction of the circuit courts of the United States, and only to crimes punishable in those courts. It does not apply to jurisdictions created subsequent to that act. What crimes and offences were then in the contemplation of the legislature? Nothing but offences created by act of congress. The circuit courts of the United States had no common-law jurisdiction. They had no cognizance of common-law offences." Mr. Key, contra, observed—"The law ought to be construed liberally, for the benefit of the accused. This case is in the very words of the statute." This court, in that case, was clearly of opinion that the act of congress of the 30th of April, 1790, § 32 (1 Stat. 119), applied to the case, and directed the jury that they could not find the defendant guilty upon that evidence. This decision of the court has been acquiesced in by the public; and the question, we believe, has never been made since.

We are, therefore, of opinion that the judgment upon the demurrer to this indictment must be for the defendant.

THRUSTON, Circuit Judge. On demurrers to two indictments, known to the bench and bar as indictments Nos. 1 and 2,—No. 1 charging the defrauding the United States of $750, and No. 2 of $300, I remarked, on Saturday last, in the course of the argument on a point which the court, at the earnest instance of the defendant's counsel, permitted them to be heard upon, because the reasons assigned by the court, in their opinion, (which was against the demurrer No. 1,) on the much agitated question of jurisdiction, were such as had not been before considered and discussed, that I had not an opportunity of full examination of the indictments, but that I had met the other two judges, and advised with them; and that, as to the one for $750, I had concurred with the court in its sufficiency, and that the demurrer ought to be overruled; but that I had, on Thursday evening, taken home with me the two indictments aforesaid, and attentively examined them, and that I was more confirmed in my belief that the court were right in their opinion, delivered in the one for $750, or No. 1, although, perhaps, my reasons for this belief were not entirely the same as those assigned in the opinion of the court. I also remarked that I was prepared, when the court gave their opinion on the said indict-ment, No. 1, but took time for further consideration on No. 2, to give my opinion as to the sufficiency of No. 2, which, I said, I deemed the most unexceptionable of the two; but I did not think proper, at the time the said opinion was pronounced, to mention my satisfaction with the said No. 2, from courtesy to the majority of the court. After a few preliminary remarks, I shall state my reasons for the opinions above suggested. An intimation was thrown out, also, on Saturday last, that I had indicated some impatience, occasioned by the protracted discussion of the cases before us. If I have done so, I was not sensible of it; and if my deportment subjected me to such suspicion, or if I unconsciously exposed myself to it, I must look for an apology in the eight or nine weeks of daily debate, of at least six hours each day, chiefly on technical points, which ought to be understood, if they can be understood at all, at least in as many days as we have consumed weeks. But we have, as I thought, with great patience listened to all that we were desired to hear; and with the more willingness, as the importance of the case has been urged with much solemnity, although I have never been able to discern any peculiar circumstances which can distinguish this case from that of others of the same grade. Fraud at common law is but a misdemeanor. This is a general term for that class of offences which are considered the least heinous; and I understand that the punishment, on conviction, is but one degree above that of the lowest offence. Pecuniary fine is considered, I believe, the lightest punishment known to the law for fraud; imprisonment may be superadded, but at the discretion of the court. If this case, then, be of any particular importance, we must search for it in extrinsic circumstances; this is forbidden ground to judges; we cannot travel out of the record, and if, in the course of judicial investigations, or from other sources, any knowledge may reach us, of facts calculated to excite, in our breasts, sympathy for the accused, we are bound by the stern mandates of duty to suppress them, while we occupy these seats.

The questions now before the court, are on the sufficiency of the two indictments. Two points have been made: (1) That offences, charged in the indictments, are not cognizable in this court; and if they are, that they are not properly charged. The question of jurisdiction results from the statement, (as it is alleged,) in both indictments, that the fraud, if any, was completed in New York, where the money was received from the navy agent, Paulding; and that, therefore, if the facts alleged, constitute a fraud, it is indictable there, and not here. The indictment, No. 1, has also been impeached on the ground that it charges two distinct offences; the one for $750 received, by the means of Fowler's draft from Paulding in New York, and another, for a like sum, from the treas-

ury, by means of the treasurer's warrant issued here on the order of the secretary of the treasury, upon the requisition of the secretary of the navy, which requisition included the false and spurious item of $750 for "arrearages prior to 1827," imposed, by false pretences, on the said secretary, to lead him to add it to Mr. Paulding's legitimate demand of $12,139.12, thereby causing falsely, and fraudulently, the said secretary to issue a requisition on the treasury department for $12,889.12, including this imposed item, instead of the first lawful amount. The indictment No. 2, has been stigmatized as wanting precision and proper averments. In support of these criticisms on the indictments, a great number of authorities were cited, chiefly from compilations and digests of modern date, which, if I had the books now before me, as in truth I have not, I should not have time to examine them with sufficient deliberation, and, therefore, must make up my opinion from the impressions received at the time the authorities were cited, from general principles of law, and the exercise of such understanding as it has pleased Providence to endue me with. But these books were, principally, as I said before, compilations and digests, which, if I understand them, are attempts to frame general rules out of particular cases, and in support of those rules, the authorities are cited in the margin; that is, reports of adjudged cases. Now, as to so much of the case before us, as relates to the form and structure of the indictments, the allegations, averments, the narrative part, if I may so call it, of a course of transactions resulting in a breach of the laws, particularly in frauds, nothing can be more fallacious than general rules. Let us consider the infinite diversity of stratagems and devices by which a fraud may be achieved. Some, like the old legitimate drama, consist of unity of time, place, and action; others, like the more modern, have a number of acts and scenes, which are shifted from place to place, and time to time, till the plot ripens and is perfected. Hence, and from the peculiar and diversified nature of the contrivances made use of to accomplish a fraud, there must be an equally diversified form and manner in the statements in an indictment. A fraud may be completed, at one time, one place, and by one act; and if A. uses a false token to B., and cheats and imposes on him, to get hold of B.'s money, this is a simple fraud, and easily charged in an indictment. But a fraud, which requires, for its accomplishment, a more extended and compound course of deceptions, partly by false representations in writing, and partly verbal, where several persons are to be deceived, before the attainment of the end, and where operations are to be carried on in several distant places; here all these various circumstances being required to be set out in an indictment, such an indictment must necessarily vary from any other indictment that was ever drawn before it; and therefore, as to its peculiar form and structure, no precedent of forms can be found to apply to it. I do not want precedents to inform me of the leading principles which must govern all indictments, that they must be certain and precise in their charges; that the quo animo must be averred, the scienter, &c.; that the negations must exclude any possible legal inference of innocence in the acts or intents of the accused, &c., and as far as such general rules and principles as these go, I will pay all due respect, and have applied them, and measured these indictments by them, and have not found them deficient. My confidence in those books, also, is much impaired by what I have seen on this trial, and what I have often seen before. I have seen book opposed to book by opposite counsel; nay, I have seen the same book used to bear on the same point by both sides, which leads me to the mention of an observation of a very learned judge on this subject, whom I had occasion to allude to once before. This distinguished chancellor of Virginia, having been rendered exceedingly impatient at the frequent reversals of his decisions by the court of appeals of Virginia, he published, as I said before, a book in vindication of his opinions, and arraigning those of the appellate court. I remember, in a certain case, the superior court had cited a precedent from Bulstrode, which pressed hard on the chancellor's decree. He did not know how to get rid of the force of this case, and therefore, belittled—if I may use the term, it has high authority for its legitimacy—the author by saying, "Ah! as for Bulstrode he is like a Swiss soldier, he will fight any side for pay." May not this be said of some of our innumerable modern bookmakers? I have often seen them (to carry on the venerable chancellor's figure) battling on both sides. I do most seriously deplore and deprecate this overwhelming inundation of books, particularly of the class just mentioned. They are good labor-saving machines to the practitioner, but they have a woful effect on the administration of justice; and I really do apprehend, that they will, if not stopped, subvert to its foundations the empire of common sense, and render the law, which is said by my Lord Coke to be the most miserable slavery if it be vague or uncertain, the most unsettled and doubtful of all human sciences. Now, to apply the form of any one indictment, (which has been attempted,) from the books to the indictments before the court, so different in the facts, intents, incidents, stratagems, and artifices, by which to test them, is like applying two vacant figures and forms, one to the other, to test their coincidence. As to those books, again; I have observed that many of the authorities cited by them do not support the rules laid down by them; whether this proceeds from misprints, or a want of understanding of the spirit of those authorities, I know not.

I will now go into the examination of the indictment No. 1, for $750, and try it, not by precedents of other forms of indictments for other offences, but by the principles I have mentioned above. This indictment is said to charge two distinct offences. Let us dissect it, and see if this be the case. (1) The first paragraph alleges that on the 16th and 19th of January, 1828, and before and after that time, Tobias Watkins was auditor of the navy department, and states his duties as such 4th auditor. (2) The second parapraph alleges that Samuel L. Southard, at the same time was secretary of the navy, and sets out his authority as such. (3) The third paragraph states. that, at the same time, J. K. Paulding was navy agent of the United States, residing in New York, and was required by law to render his accounts to the 4th auditor of the treasury department, &c. (4) The fourth paragraph states that an act of congress was passed on the 2d day of March, 1827, appropriating $20,000 for the use of the navy department, for arrearages prior to the 1st day of January, 1827. So far, it is manifest, the indictment is merely historical or narrative, but necessarily connected with the charges which follow; then comes the narrative of the fraud and deception practised on Paulding to obtain, out of the public money, the $750, commencing with the letter advising Paulding of his design to draw on him in favor of Fowler, which sum would be replaced in his hands "by a remittance to be made in due, season, so soon as a requisition can pass through the forms of office," &c., therein premeditating the remittance which the indictment, in a subsequent part, charges to have been obtained by false pretences used to the secretary of the navy. Then follows the draft in favor of Fowler, and the procuring the $750 from him, by means of the said draft, and the payment of the draft by Paulding. Now, although this transaction is stated in the form of a charge, and to be done with force and arms, &c., yet it is not the offence which constitutes the gravamen of this indictment. It might have been made, perhaps, a ground of indictment as a distinct offence per se, as in the $300 indictment, but is not so contemplated in this indictment. It is here introduced, because of its connexion with the real charge, the fraud practised upon the secretary of the navy; for it was to supply this defect in the public funds drawn out of the hands of Paulding, that the subsequent fraud on the secretary of the navy became necessary; and it is that fraud and its consequences which are the real subjects of this indictment. Then comes another narrative part of the indictment, stating the letter sent by Paulding to the secretary of the navy, dated the 16th of January, 1828, requesting a warrant to issue in his, Paulding's favor, for $12,-139.12, to be charged to certain specified appropriations at the foot of that letter, which letter is stated to have been received by the secretary, on the 19th of January, 1828.

The indictment, thus far consisting merely of narrative, I consider as introductory or introducing to the main charge, that of obtaining the public money by means of false pretences made to the secretary of the navy, and deceit and imposition practised on him. Because it professes to be, on its face, an indictment for fraudulently obtaining the public money by false pretences, and no false pretence is set out in the former part of the indictment. Now, here commences the real charge—the true gravamen of the indictment, which is, "that the said Tobias Watkins, being then and there 4th auditor of the treasury department of the United States as aforesaid, and being an evil-disposed person, and devising and intending fraudulently and unjustly to acquire for himself, and for his own private use, the money of the United States, and well knowing the premises, with force and arms, on the said nineteenth day of January, which was in the year of our Lord" 1828, "as aforesaid, at the county of Washington aforesaid, did falsely, fraudulently, deceitfully, knowingly, and designedly apply to the said Samuel L. Southard, then being secretary of the navy of the United States as aforesaid, to add to the said sum of" $12,139.12, "for which the said J. K. Paulding had requested a warrant to be issued as aforesaid, the sum of" 750 "dollars; and did then and there pretend to the said Samuel L. Southard, secretary of the navy of the United States as aforesaid, that the said sum of" 750 "dollars was required for the use and service of the navy of the United States, for the payment of claims for arrearages due by the navy department of the United States prior to the first day of January, which was in the year of our Lord" 1827, "and to cause the same to be placed in the hands of the said J. K. Paulding, navy agent as aforesaid. for the purposes aforesaid. at the same time and together with the said sum of" $12,139.12, for which "the said J. K. Paulding had requested a warrant to be issued as aforesaid." Then follows the requisition of the secretary of the navy on the secretary of the treasury, at the foot whereof are the specifications of Paulding, under the title of appropriations, in which are stated the particular services for which the money is wanted, namely: "Pay &c., navy afloat, $1,942;" "shore stations, $1,058.25;" and, after some others, comes last this $750, the specified service of which is "arrearages prior to 1827, $750." The indictment then avers "that the said sum of $12,889.12, in the said requisition mentioned," (which includes this false and spurious item of $750,) "was, in conformity with the said requisition, by warrant from the secretary of the treasury, drawn out of the treasury of the United States, and placed in the hands of the said Paulding, navy agent as aforesaid," with intent to defraud the United States out of $750. It then states, "whereas, in truth and in fact, the said T. Watkins, at the time of making the said false pretences, well knew," &c. From hence to the conclu-

sion follow the averments of the scienter, of the criminal intent, and the necessary negations; the whole of which are, to my understanding, in apt and technical form, and relate entirely to these $750 gotten from the treasury by means of the false pretences practised on the secretary of the navy, and the subsequent transactions consequent thereon, and to no other $750 whatever.

Having now taken this indictment to pieces, and examined its parts, we will put it together again and examine it as a whole. And I will premise, that as to precision in the charges, the averment of the fraudulent intents, of the false pretences, and, in short, as to all the forms required in indictments, it seems to be unimpeachable; nor has a single passage been selected and presented to the court wherein any defect of form has been suggested. Let it be examined, and shown where any such defect appears.

But the character of the offence charged has been questioned. It was urged that it was entirely official, as laid, and therefore not cognizable here. But the indictment deserves no such reproach; the charges are exclusively of a private, and not official aspect; there is no allegation of a breach of official duty. It is true, that in the three first clauses, the official titles, powers, and duties of T. Watkins, as 4th auditor, Samuel L. Southard, as secretary of the navy, and J. K. Paulding, as navy agent, are stated; but this seems necessary for the purpose of explaining and illustrating the connected links in the long chain of deceptions that were practised; because it was from the facilities derived to two of these functionaries from their official stations, and the influence of his own official station, that the defendant was able to effect his fraudulent devices, but he himself exercised no official function in the course of his fraudulent doings, although he availed himself of the official powers and faculties of the other two. What he did was not an abuse of any official authority vested in him, but was entirely in his personal and private character, though he was aided in facilitating his plans by the influence of his official station. So much as to this objection.

The next was to the frame and structure of the indictment; that it charged two distinct and independent offences in the same indictment. I think I have sufficiently answered this objection in my analysis of the instrument. I will add no more on this point.

The next and last objection there is no ground for, that the fraud was not completed within the jurisdiction of this court, but in a foreign jurisdiction, namely, New York. Now, the $750 having been obtained from the treasury by the secretary's warrant, rendered the offence complete here; for if the treasury be anywhere it is here; and where Paulding received it is of no account, nor does the indictment state where he received it. The money was also appropriated to the private use of the defendant, for it was applied to the pay-

ment of his debt to Paulding, to reimburse that sum which, by fraudulent devices, he had drawn out of his hands, and the public have sustained a loss to that amount. This indictment, in the view I have taken of it, is not liable to the objection, that the fraud was completed in a foreign jurisdiction; and if it were, I should doubt of the validity of the objection. I think the whole of the late argument on this point, as to this indictment, was totally inapplicable to it. I am, therefore, of opinion, that judgment on this indictment be for the United States.

Mr. Coxe, for the defendant, then prayed leave to withdraw the demurrer to the indictment in the 750 dollar case, and plead the general issue.

Mr. Key, for the United States, objected, contending that after argument, and after the opinion of the court delivered, the court had no discretion to suffer the demurrer to be withdrawn, and to permit the defendant to plead. 1 Chit. Cr. Pl. 437–442. See, also, Gibson's Case, 8 East, 110.

CRANCH, Chief Judge, delivered the opinion of the court (THRUSTON, Circuit Judge, dissenting). After the court had given an opinion that none of the exceptions taken to this indictment, for defrauding the United States of 750 dollars, could be sustained, and before any judgment had been rendered by the court upon the demurrer, the counsel for the defendant moved the court for leave to withdraw the demurrer and plead the general issue. To this motion the counsel for the United States objected, and prayed that peremptory judgment of condemnation should be entered against the defendant; contending that the court has no discretionary power to permit the defendant to withdraw his demurrer and plead the general issue, after the argument upon the demurrer, and after the delivery of the opinion of the court.

It seems to be certain, that if the court should now proceed to give judgment upon the demurrer, that judgment cannot be judgment of respondeas ouster, but must be judgment of condemnation. The questions then are: (1) Whether the court has a right, in its discretion, to give the defendant leave to withdraw his demurrer, and plead the general issue, after the opinion of the court has been expressed against the validity of the objections taken to the indictment? and, (2) whether the court, if it has that right, ought, under the circumstances of this case, to exercise it?

(1) Upon the first question it may be observed, that the right in civil cases is conceded, and has been often exercised. But it is said, that there is no instance in which this court has exercised it in a criminal case. This may be true, but it may be because demurrers, in criminal cases, are very rare, inasmuch as upon a motion to quash, or in arrest of judgment, the defendant may avail himself of all the matters which he could upon demurrer. But, because no criminal cases in this court

have called for the exercise of the right, it does not follow that the right does not exist; and no reason is perceived why it should not exist in criminal as well as in civil cases. On the contrary, Chitty, in his Criminal Law (vol. 1, p. 437), speaking of criminal cases, says, that "by leave a demurrer may be withdrawn." And again, in page 440, he says: "When once a demurrer is filed, the defendant cannot withdraw it without the consent of the parties on whose prosecution he is indicted; or, at least, without the permission of the court." And although he says, in page 439, that "in cases of misdemeanor no judgment of respondeas ouster is of right demandable, when an issue in law is found against the defendant, for the decision operates as conviction," yet he says, "as a matter of favor, the defendant may still be permitted to plead not guilty." That a respondeas ouster is not of right demandable, in the present case, is admitted; and if we now proceed to judgment, that judgment must be peremptory. And the law is admitted as laid down by Chitty (page 441) that, "in mere misdemeanors, if the defendant demur to the indictment, and fail in the argument, he shall not have judgment to answer over; but the decision will operate a conviction." Here the defendant does not ask the judgment of the court, upon the demurrer, that he shall answer over; but he asks leave to withdraw the demurrer, before the actual decision of the court upon it. The cases cited, which, at first view, seem to support the counsel of the United States in opposing the motion, on the ground of the want of such a discretionary power to suffer the demurrer to be withdrawn, only show that the judgment, when given upon the demurrer, must be a peremptory judgment. In civil cases, such a motion has been often made and granted, in this court; and we think we have as much right, in our discretion, to grant it in a criminal case as in a civil. Indeed, we think the reasons for it are much stronger in the former than in the latter, in proportion as a man's reputation and liberty are dearer to him than his lands or goods.

(2) The second question is, whether the court, in the exercise of its discretion, ought to grant the leave which has been asked? That a man has mistaken the law, and, therefore, mistaken his defence, does not seem, of itself, to afford a reason why a peremptory judgment of condemnation should be entered up against him; and if he had a probable ground to suppose that he was not bound to answer criminally for the act charged, but is mistaken, it seems hard that he should not be permitted to deny the fact. For although, technically speaking, he must be considered as having admitted the facts, before he could call upon the court for their opinion, whether those facts constituted a crime, yet it must be seen that such admission is only made for the purpose of raising the question of law. That the questions of law, which have arisen in this case, were im-

portant, and in some degree doubtful, and that some of them were new, at least in this court, must be apparent from the time consumed in argument by the very able counsel, and by the time which the court deemed necessary for deliberation. This, therefore, cannot be called a frivolous demurrer. It may be observed, also, that, although the judgment of the court upon the demurrer, if against the defendant, is peremptory, it is not so if against the United States; for they may send up new bills of indictment successively, until they shall have made their case perfect in form. Another circumstance is, that in this case there is no appellate court to reverse our judgment, and correct it if it should be erroneous. It also deserves consideration, that, from the known practice of this court to suffer demurrers, in civil cases, to be withdrawn after argument, and after an expression of the opinion of the court, and from the circumstances that there has been no criminal case, in this court, in which such leave has been denied, and that the reasons in favor of it, in criminal cases, were apparently as strong, at least, as in civil cases; the defendant, or his counsel, may have been led to believe that the same indulgence would be extended to criminal cases; and this belief may have been kept up during the argument of these causes, by the circumstance that the witnesses for the United States, who were to support the indictment before the petit jury, have been detained here during the whole of the arguments upon the demurrers. Whereas, if the United States had discharged those witnesses as soon as the defendant had demurred to the indictment, so that the defendant might have understood that the United States expected a peremptory judgment, the defendant might have offered to abandon his demurrer before the opinion of the court was declared, and even before the argument of counsel. It is true that the defendant might have availed himself of the same objections to the indictment upon a motion in arrest of judgment, as by demurrer; but it is not perceived how the United States would have been in any degree benefited by such a course. On the contrary, if the judgment upon the demurrer to any one of the indictments should be against the United States, it would save the expense of a jury trial upon that indictment, and the United States might send up a better.

The court is, therefore, of opinion that the leave asked by the defendant's counsel ought to be granted; provided the defendant shall waive his right of moving in arrest of judgment for any matters apparent upon the indictment.

THRUSTON, Circuit Judge, dissented, and gave his opinion orally, to the following effect, as reported by a stenographer: That he felt himself compelled to differ from a

majority of the court, in the opinion just rendered by them. That he should be well satisfied that the merits of the case should be heard, which would give the accused a fair opportunity of proving his innocence to the world, and which, by the judgment of the court, he will have; but he could not see that he had any discretion which he could exercise on this occasion. And although the majority of the court, among the reasons they assigned for granting leave to withdraw the demurrer, said that they did not see why this cannot be done in a criminal, as well as a civil case, he thought there was a very strong reason for it, and that was that the law forbade. And although he was not, perhaps, among those judges who entertain a very profound respect for all the dicta to be found in compilations and digests, yet, when they are supported by solemn decisions of courts of great dignity and authority, he felt himself bound by them. That no case could be found in which, after a demurrer was fully argued, and the opinion of the court delivered thereon, that the demurrer could be withdrawn, and the demurrant permitted to plead over. The judge then read certain passages from Chitty's Criminal Law, in support of his position. The first was 1 Chit. Cr. Law, 440: "When once a demurrer is filed, the defendant cannot withdraw it without the consent of the parties on whose prosecution he is indicted, or at least without the leave of the court." That, although this passage might seem to favor an application, in certain cases, for leave to withdraw, yet it is far from sustaining the motion in the present case. That it was very true, perhaps, that, after demurrer filed, even in a case of misdemeanor, the court, before argument, would allow the accused a locus pœnitentiæ; and not tie him down to a step which he may have taken without due deliberation. That if the court have a discretionary power, it is in this stage of the proceeding, and not after full deliberation, and after the defendant had fought every inch of ground in support of his demurrer, and found himself defeated, after one of the most obstinate and pertinacious conflicts that was, perhaps, ever witnessed in a court of justice. That he could see no substantial difference between the opinion of the court, solemnly delivered after argument; and the judgment of the court. That the judgment ought to be entered after the opinion delivered, in which case the defence would be concluded, and he understands that the majority of the court so considers it; and that, before the clerk can be directed to enter the judgment of the court on the opinion delivered, if the defendant's counsel choose to interpose a motion of this kind, it seemed to him that it should not make any difference in the principle or in the results. The judge further observed, that even if it was clear that he had a discretion to permit the demurrer to be withdrawn, under existing circumstances he should doubt the propriety of exercising it in the present case, after the defendant had rested on his demurrer with such confidence, and supported it with such obstinacy; and persisted in refusing to ask the exercise of this power in his behalf, until he had become informed of the opinion of the court. The judge, then, to sustain the remarks above made, read the following authorities: 1 Chit. Cr. Law, 442: "But in mere misdemeanors, if the defendant demur to the indictment, whether in abatement or otherwise, and fail in the argument, he shall not have judgment to answer over, but the decision will operate as a conviction." That this authority appeared, from the references, to be supported by a solemn decision of the court of king's bench, in which all the judges concurred. That the language of Lord Ellenborough, and all the judges, in that case, was so positive, and therefore the authority (in the absence of a single case against it, either in the books or in our own practice), so imperative, that he could not resist it. This case is to be found in 8 East, 112 (Rex v. Gibson). Lord Ellenborough there say: "Only one instance has been mentioned of the same privilege," (meaning the privilege asked of this court to withdraw the demurrer and to plead over), "and that it is the precedent referred to in Tremaine, on account of the magnitude of the punishment for striking another in the king's palace, being no less than the loss of the offender's hands." Grose, Justice, concludes his opinion with these words: "But it seems that in criminal cases not capital, if the defendant demur to an indictment, &c., whether in abatement or otherwise, the court will not give judgment against him to answer over, but final judgment." "All the judges of the king's bench concurred in that opinion; and he felt himself bound by such positive authorities, and therefore was obliged to dissent from the opinion of the court, and to refuse the motion." The defendant having thus had leave to withdraw the demurrer to the indictment for the 750 dollars, pleaded not guilty, and the case came on for trial upon the general issue.

Mr. Coxe, for defendant, said they would challenge two of the jurors, Mr. Mitchell and Mr. Gover.

Mr. Key, for the United States, said that the time to challenge was when the jurors were called to the book to be sworn. To which the court assented.

Mr. Key then proposed that all the jurors should be asked, as they came to the book, whether they had formed and delivered any opinion in regard to the matters charged in the indictment in this case, and cited 1 Burr's Trial, 371, 373, 414; Case of Upsher, Trials Per Pais, 136, 145; Joice v. Alexander [Case No. 7,435], in this court at December term, 1808; and U. S. v. Porter [Id. 16,072], in this court at December term, 1812.

THE COURT suggested, and the counsel on both sides assented, that the whole panel should be informed by the court that if any of them had formed and expressed any opinion respecting the matters charged in this indictment, it would be proper for them to say so when called to be sworn.

THE COURT also said, that if either side wished that any of the jurors should be specially asked the same question, when called to the book, it might be asked. A doubt was suggested whether, after having been asked, and having answered that question in the negative, the defendant would have a right to challenge for favor, and have that challenge tried by the triors.

But THE COURT intimated an opinion that the defendant might so challenge, and have the challenge so tried after the juror should have so answered the general question.

Mr. Mitchell and Mr. Gover having been called to the book, and having been asked the general question, Mr. Mitchell answered fully and decidedly in the negative; Mr. Gover said that he had, at times, been of opinion, from what he heard, that the charges might be true; but that he had no evidence, and had not made up a definite opinion, and believed himself to be impartial. They were then both challenged for favor by the defendant, and tried by the triors, (the two first of the ten jurors; for when the challenges were made, the jurors challenged were set aside until all were sworn who were not challenged.) Mr. Mitchell and Mr. Gover were then examined upon their voir dire, in the presence of the triors; and Mr. Mitchell having answered as before, the counsel for the defendant waived his challenge, and Mr. M. was sworn. But the triors, being asked if they had agreed upon their verdict, said that Mr. Gover did not stand indifferent, and he was rejected.

Mr. Southard being under examination as a witness for the United States, Mr. Key proposed to ask him the following question: "From the course of business pursued in your department in relation to ordering requisitions, would you, or would you not, have written the letter now shown to you" (Mr. Southard's letter of January 19, 1828, to Mr. Paulding). "and have ordered the requisition now shown to you to be issued, unless it had been officially represented to you, either orally or in writing, that the 750 dollars therein contained, for arrearages prior to 1827, were wanting for the service of the United States navy for claims arising under such arrearages?"

Mr. Jones, for defendant, objected to the question. If the information was official it did not come from the defendant, for he is not charged with official misconduct. The only official information which the defendant could have given would have been, that some account for arrearages had been settled by him

officially. The belief of the witness is not evidence. The facts on which that belief is founded are proper for the consideration of the jury; from which they may or may not infer the existence of the fact which the witness believes. Mr. Southard's letter of January 19, 1828, is no more than his private memorandum to refresh his memory. It is not evidence per se. The case of the books of a notary-public is an exception to the general rule. That exception is founded upon particular reasons stated by the supreme court in its decision. The book of a notary-public is a document sui generis, and is admitted upon principles which cannot be extended by analogy to any other document. Jones v. Johns [Case No. 7,471], in this court at October term, 1823. The notary's book can prove no fact but what was stated in it.

THE COURT (THRUSTON, Circuit Judge, contra) refused to permit the question to be asked.

The counsel for the United States having given in evidence the defendant's letter of the 16th of January, 1828, and having proved that the letter of Mr. Southard of the 19th to Mr. Paulding was signed at the same time with the requisition, and was copied into a letter-book to which the defendant might have had access by application to the secretary, or to the copying clerk, moved the court to permit that letter of the 19th of January, 1828, to be read in evidence to the jury; but the court refused.

MORSELL, Circuit Judge, dissented, because he thought it ought to go to the jury as part of the res gestæ.

The counsel for the United States then offered to ask Mr. Southard this question: "Did you direct the requisition to be issued, and write the letter" (of 19th of January, 1828) "now shown to you, from a conviction that the 750 dollars mentioned therein were wanting for the navy service of the United States, under that appropriation, to be sent on to Mr. Paulding?"

THE COURT (CRANCH, Chief Judge, dissenting) permitted the question to be asked.

MORSELL, Circuit Judge, concurred, for the reason before stated, namely, that the letter ought to go to the jury as part of the res gestæ.

CRANCH, Chief Judge, dissented, because he thought, and a majority of the judges had just decided, that the letter of the 19th of January could not go in evidence to the jury; and, therefore, to give evidence to the jury that that letter was written under any conviction whatever, was to give evidence to the jury of an immaterial fact.

Several other questions of admissibility of evidence were raised and decided, but they are not deemed of sufficient importance to be reported.

The jury, after argument by Mr. Swann and Mr. Key for the United States, and Mr. Coxe and Mr. Jones, for defendant, retired on Sat-

urday the 18th of July, at half past eleven o'clock, a. m., and returned at half past one, p. m., with the following verdict:

"The jurors in the case of the United States against Tobias Watkins, find him guilty of obtaining $750 in his official capacity, and of applying the same to his own private use."

Mr. Coxe, for defendant, insisted that the verdict must be received, and that it is not necessary that the jury should negative the residue of the matter charged in the indictment. The negative will be presumed. No objection of this kind has ever been sustained in a criminal case. 1 Chit. Cr. Law, 638; Hawks v. Crofton, 2 Burrows, 698; 7 Bac. Abr. 22, 25, 28; 1 Chit. 637, 647, 648.

THRUSTON, Circuit Judge, suggested that the safest course would be, to receive the verdict and hear the objections on a motion in arrest of judgment.

THE COURT (THRUSTON, Circuit Judge, dissenting) informed the jury that the court had doubts whether they could, upon the verdict which the jury has offered to return, render a final judgment, either for or against the defendant; because the jury had not found whether the money was obtained with a fraudulent intent, nor whether the money received was the money of the United States; and that if they wished to retire and reconsider their verdict in those particulars, the court would permit them to do so.

THRUSTON, Circuit Judge, was of opinion that it was a dangerous practice to interfere at all with the verdict of the jury; and that the verdict, such as it was, ought to be received, and the objections heard on a motion in arrest of judgment.

The jury retired, and soon came back with the same verdict, only adding, after the figures $750, the words "of the money of the United States," which verdict was received and recorded without objection by either party.

Mr. Coxe, for defendant, moved the court to enter up judgment for the defendant upon this verdict, and Mr. Key, for the United States, moved for a venire de novo.

In support of his motion, Mr. Key cited the following authorities: 1 Chit. Cr. Law, 646; Rex v. Huggins, 2 Ld. Raym. 1585; Woodfall's Case, 5 Burrows, 2663; Rex v. Hayes, 2 Ld. Raym. 1521; Keat's Case, Skin. 667; 2 Hawk. P. C. 47, § 9; 1 Chit. 654; Docker's Case [Case No. 3,946,] in this court.

Mr. Coxe, contra. Chitty does not say that, after a verdict has been received and recorded, venire de novo may be granted. If the jury find an immaterial verdict, and persist in it, they may be discharged, and a venire de novo awarded; but when the facts found are material, it is not a sufficient ground for a new venire, that facts enough are not found; but the court must give judgment on the facts found; and this rule applies to civil as well as criminal cases. So if the jury should be of opinion that the killing was se defendendo,

they may say so without finding as to any other of the facts, or they may find a general verdict of not guilty. The facts not found are to be considered as found for the defendant, who is to be considered as innocent until all the facts are found which constitute his guilt. If the facts found are not sufficient to authorize a judgment against the defendant, there must be judgment of acquittal. 2 Hale, 302; Rex v. Huggins, 2 Strange, 882, 887; Francis' Case, 2 Strange, 1015; Woodfall's Case, 5 Burrows, 2661, 2668; Jacob, Law Dict. 343, tit. "Verdict"; Thompson v. Musser, 1 Dall. [1 U. S.] 458; Brockway v. Kinney, 2 Johns. 210; Bank of England v. Morrice, Hardw. Cas. Temp. 219, 229; Rex v. Hayes, 2 Ld. Raym. 1518; Id., 2 Strange, 843; Witham v. Levis, 1 Wils. 55; 6 Com. Dig. 250, "Pleader," (S. 26); Rex v. Bigg, 1 Strange, 18; Marten v. Jenkin, 2 Strange, 1145; 1 Chit. 445, 647.

Mr. Key, in reply. All the cases in which a venire de novo has been refused, are capital cases, and in favorem vitæ. Huggins' Case, 2 Ld. Raym. 1580; People v. Olcott, 2 Johns. Cas. 301.

CRANCH, Chief Judge, delivered the opinion of the court (nem. con.) as follows: The jury after having been out some time, returned with the following verdict: "The jurors, in the case of the United States against Tobias Watkins, find him guilty of obtaining $750, in his official capacity, and of applying the same to his own private use."

The defendant's counsel insisted that the verdict should be received and recorded, but the counsel for the United States objected, on the ground that the verdict was imperfect. The court desired the jury to retire while the court should consider whether it was such a verdict as they could receive. After deliberation the court sent for the jury, and informed them that the court had doubts whether the court could, upon the verdict which the jury had offered to return, give a final judgment either for or against the defendant, because the jury had not found whether the money was obtained by the defendant with a fraudulent intent; nor whether the money received was the money of the United States. And that if they wished to retire and reconsider their verdict in those particulars, the court would permit them to do so. Whereupon the jury retired, and soon after returned the same verdict, with the addition of the words "of the money of the United States," after the figures $750. This verdict was then received by the court, and recorded without objection; and the jury was discharged.

The counsel for the United States have moved for a venire de novo; and the counsel for the defendant have moved the court to enter judgment for the defendant.

The questions arising upon these motions, are: (1) Whether the verdict is so imperfect that the court cannot enter up any judgment whatever upon it? (2) If any judgment can

be rendered upon this verdict, what shall it be? (3) If the court cannot render a judgment upon it, can they order a venire de novo?

The counsel for the United States contend, that the verdict is so imperfect that no judgment can be given upon it, and that a venire facias de novo ought to be awarded.

The counsel for the defendant contend, that enough is found by the jury to enable the court to render judgment for the defendant.

It is urged by the defendant's counsel: (1) That by the constitution of the United States, the defendant is not to be twice put in jeopardy. (2) That this verdict, having been received by the court and recorded, must be treated by the court as a verdict of conviction, or of acquittal; otherwise the court would not have received it, but would have kept the jury together until they had given such a verdict. (3) That the jury, by finding some of the material facts charged in the indictment, and being silent as to the others, must be considered as having found a verdict for the defendant upon the latter; and that, as they have not found, affirmatively, all the facts which are necessary to convict the defendant, he must be acquitted.

(1) As to the first ground. The 5th amendment of the constitution of the United States has these words: "Nor shall any person be subject, for the same offence, to be twice put in jeopardy of his life or limb." Without deciding whether this clause of the constitution is applicable to misdemeanors, in which there can be no jeopardy of life or limb. it may be sufficient to say, that, if this verdict be so imperfect that no judgment can be given upon it, it must be considered as no verdict; and if the jury has been discharged without a verdict, the defendant has been in no jeopardy; and if it be such a verdict as will enable the court to give a judgment upon it, the court will proceed to render the judgment, and will not award a venire de novo.

(2) The second ground is, that the court has received and recorded the verdict, and must, therefore, consider it as a verdict of conviction or acquittal; for it must be a verdict of conviction or acquittal, or it must be no verdict; and if it had been no verdict, the court would have kept the jury together until they had found one. "But," it is said, "after it has been deliberately accepted and recorded as a verdict, it must be conclusive some way;" and, in the language of one of the counsel for the defendant, "there is a complete estoppel against saying, there is no verdict." The answer to this is, that the verdict, such as it was, was received and recorded without objection by the defendant or his counsel. But no case can be found in which the court was estopped, by the receipt and recording of the verdict, from saying that the verdict was so imperfect as not to justify a judgment.

(3) But, thirdly, it is contended, that the jury by finding some of the material facts charged in the indictment, have, in effect, found for the defendant as to all the rest. It

is said, that verdicts are of three kinds, general, partial, and special. That this is not a general nor a special verdict, but is a partial verdict, inasmuch as it finds only a part of the facts charged in the indictment. Chitty, it is true (Cr. Law, vol. 1, p. 636), divides verdicts into those three classes, and defines them thus: "The verdict thus given is either general to the whole of the charge, partial as to part of it, or special, where the facts of the case alone, and the legal inference is referred to the judges." But it may well be doubted whether a verdict which finds only one or two out of many facts which are all necessary to constitute the offence. and saying nothing of the residue, is such a partial verdict as is intended to be described by Mr. Chitty. The examples which he gives are all of a different character. They all find the defendant guilty of part of the charge, and expressly acquit him of the residue. Thus, he says, in page 637, under the head of "Partial Verdict," "The jury may acquit the defendant of a part and find him guilty of the residue. Thus they may convict him upon one count of the indictment, and acquit him of the charge contained in another, or upon one part of a count capable of division, and not guilty of the other part; and on a count for composing and publishing a libel, the defendant may be found guilty of publishing only. And in general, where from the evidence it appears that the defendant has not been guilty to the extent of the charge specified, he may be found guilty as far as the evidence warrants, and be acquitted as to the residue." "And where the accusation includes an offence of an inferior degree, the jury may discharge the defendant of the higher crime. and convict him of the less atrocious. Thus, upon an indictment for burglariously stealing, the prisoner may be convicted of the theft, and acquitted of the nocturnal entry. Upon an indictment for murder, he may be convicted of manslaughter; on an indictment on the statute of stabbing, he may be acquitted of the statutable offence, and found guilty of felonious homicide; on an indictment for stealing privately from the person, he may be found guilty of larceny only; on an indictment for grand, the offence may be reduced to petit larceny; robbery may be softened into felonious theft, and petit treason lessened to murder, or any description of less atrocious homicide; and on an indictment founded on a statute, the defendant may be found guilty at common law."

These are all the examples given by Mr. Chitty; and in no one of them is it intimated that a verdict, finding some, only, of many facts necessary to constitute the offence, without negativing the residue, has been considered as a verdict of acquittal, or even as a partial verdict, within his idea of the term. This verdict, therefore, is not included in Mr. Chitty's class of partial verdicts. It certainly is not a general verdict, nor a special verdict. If it be neither of these, it cannot be a verdict.

The jury may, indeed, find a fact or facts, inconsistent with the guilt of the defendant, without undertaking to find all the facts, as in a special verdict; but, in that case, it seems probable that it would be considered by the court, and ordered to be recorded by the clerk, as a general verdict of not guilty. Thus, in the case of Hawks v. Crofton, 2 Burrows, 698, which was an action of trespass, the pleas were—not guilty, as to the vi et armis; and son assault demesne, as to the special damages. The verdict was—"guilty of the trespass within written." The question was, whether the verdict was so uncertain as to require a venire de novo. Lord Mansfield said—"That where the intention of the jury is manifest, and beyond doubt, the court will set right matters of form, and the mere act of the clerk; and I think the present case is such a clear case, that the court may here give judgment upon the substantial finding, though the clerk may have been irregular and faulty in point of form. It is very clear what the jury meant." The other judges concurred; and Mr. Justice Dennison said—"Verdicts are not to be taken strictly, like pleadings; but the court will collect the meaning of the jury, if they give such a verdict that the court can understand them." And he says that the rule laid down by Hobart, 54, was a very just rule, where he says—"But howsoever the verdict seem to stray, and conclude not formally or punctually unto the issue, so as you cannot find the words of the issue in the verdict, yet, if a verdict may be concluded out of it to the point in issue, the court will work it into form, and make it serve." So if the defendant were to plead specially, and deny the existence of one of the material facts charged, which constitute the offence, such plea would, in effect, amount to the general issue; and a verdict, finding the issue for the defendant on that single fact would, in effect, be equivalent to a general verdict on the general issue. If, therefore, upon the general issue, the jury should find the same fact for the defendant, such verdict would also, in effect, amount to a general verdict, and ought to be so entered by the clerk. So, also, a verdict in a criminal case, finding a fact which, if specially pleaded, would be a good defence, would be considered by the court, and entered as a general verdict. So, also, if the jury find a fact which is inconsistent with the guilt of the defendant. In all these cases, the intention of the jury would, in the language of Lord Mansfield, be "manifest, and beyond doubt," and the court "would set right matters of form, and the mere act of the clerk." But, in the present case, the intention of the jury is not manifest, and beyond doubt. The facts which the jury have found neither establish, nor are inconsistent with, the guilt or the innocence of the defendant, as to the crime with which he is charged. A number of cases, however, have been cited, with a view to show that when the jury has found some of the material facts against the defendant,

but not enough to convict him, all the rest are considered as having been found in his favor; and that, "from the absence of matter of conviction in the verdict, acquittal results." But all the cases cited to establish that principle, are cases of special verdict. A special verdict professes to find all the material facts which have been proved to the satisfaction of the jury, and concludes that if, upon the facts so found, the court should be of opinion that the defendant is, in law, guilty, then the jury find him guilty; but if, upon the facts thus found, the court should be of opinion that the defendant is not, in law, guilty, then they find him not guilty. If, therefore, the jury should have found only a part of the facts which are necessary to constitute the crime, the court cannot say that, in law, the defendant is guilty; and, if they cannot say he is guilty, they must, upon the same facts, say that he is not guilty. This shows the reason why, in the Case of Huggins, 2 Ld. Raym. 1585, "though search was made with the greatest diligence, yet they could not find one instance, or so much as an opinion of a judge," that a venire de novo, in a criminal case, was granted after a special verdict. But it is not said that a venire de novo could not be granted, when the verdict was neither a general nor a special, but an imperfect verdict. This verdict does not profess to be, and does not, in effect, amount to a general verdict, and does not profess to find all the facts proved, to the satisfaction of the jury; nor to refer any matter of law to the court; nor to negative any one of the material facts necessary to constitute the offence charged in the indictment; nor to find any fact inconsistent with the guilt of the defendant. This is so different from a special verdict, that it can hardly be necessary to say, that the precedents of judgments upon special verdicts are not applicable to it.

The following cases, cited by the defendant's counsel, were all upon special verdicts: Rex v. Keite, 1 Ld. Raym. 141; Rex v. Huggins, 2 Ld. Raym. 1585; Rex v. Hayes, 2 Ld. Raym. 1518; Rex v. Francis, 2 Strange, 1015; and Witham v. Lewis, 1 Wils. 55. So, also, were the following cases: Plummer's Case, J. Kelyng, 111; Green's Case and Bedell's Case, J. Kelyng, 79; and Tomson's Case, J. Kelyng, 66.

We have said, that the verdict does not find any fact inconsistent with the guilt of the defendant. It is true that the jury have found that he received the money in his official capacity. It might, perhaps, be a sufficient answer to say that the question,—What were the official powers, authority, and duty of the fourth auditor of the treasury department of the United States? is a question of law, and that he had no official authority to get the money into his own hands; that it was no part of his duty to disburse any of the money appropriated for arrearages prior to 1827; nor had he an official right to receive it. But the court is of opinion that, if by de-

ceitful practices, or false pretences, he received it, either officially, or under color of his office, with intent to appropriate it unlawfully to his own private use, it was not less a fraud than if he had not received it officially, or under color of his office. The fact, therefore, that he received it in his official capacity, is immaterial to the issue.

This verdict, therefore, is imperfect: (1) Because it does not profess to find all the material facts proved to the satisfaction of the jury, and submit the matter of law to the court, and find for or against the defendant, according as the opinion of the court should be upon the law; which would make it a special verdict. (2) Because it does not negative any one of the facts necessary to constitute the offence charged; nor find any fact inconsistent with the guilt of the defendant, which would, in effect, amount to a general verdict. (3) Because it does not find the defendant guilty of a less offence, included in the offence charged, and acquit him of the greater, as in the case of finding manslaughter upon an indictment for murder, which would bring the case within the class of partial verdicts, as it is defined by Mr. Chitty; and (4) Because it does not find all the facts necessary to constitute the offence charged in the indictment.

The court, therefore, cannot render a judgment upon it, either for or against the defendant.

The only remaining question is, whether, in such a case, the court can order a writ of venire facias de novo? This question is too clearly settled, to admit of a doubt in cases of misdemeanor. The only cases in which it has been doubted were capital cases, after a special verdict finding the prisoner not guilty, if the court should be of opinion, upon the facts found, that he was not, in law, guilty. Upon such a verdict the courts have always acquitted the prisoner, if the special verdict did not find all the facts necessary, in law, to establish his guilt; and this, because such is the express verdict of the jury. A special verdict, it is true, is at first conditional; but, when the court has decided the condition, the verdict becomes absolute. The only case in which a doubt was ever suggested, as appears from the diligent search made in Huggins' Case, was Keite's Case, 1 Ld. Raym. 141, in which Lord Holt seems to have thrown out a dictum, that if the verdict, in that case, was uncertain, no judgment could be given; but a venire de novo ought to issue. But the court was divided upon the question, whether the verdict was uncertain. Three of the judges, however, expressed an opinion, which was not contested, that, if it were so uncertain that judgment could not be given upon it, a venire de novo ought to issue. But, in regard to misdemeanors, we do not find any case in which the right of the court to issue a venire de novo, upon an imperfect verdict, has been questioned. Co. Litt. 227a, says—"A verdict, finding matter uncertainly or am-

biguously, is insufficient, and no judgment shall be given thereupon." "A verdict, that finds part of the issue, and finds nothing for the residue, is insufficient for the whole; because they have not tried the whole issue with which they were charged." 1 Chit. Cr. Law, 646—"Where the verdict is so imperfect that no judgment can be given on it, it is certain that, in case of misdemeanor, a venire de novo may be awarded." So in the case of Rex v. Dean of St. Asaph, 3 Term. R. 428, in notes, Lord Mansfield said—"If the verdict were defective, and omitted finding any thing within the province of the jury to find, no judgment could be given, and there must be a venire de novo." So in Patterson v. U. S., 2 Wheat. [15 U. S.] 225, Mr. Justice Washington, in delivering the opinion of the supreme court of the United States, said—"The rule of law is precise upon this point. A verdict is bad, if it varies from the issue in a substantial matter; or if it find only a part of that which is in issue. Whether the jury find a general or a special verdict, it is their duty to decide the very point in issue; and although the court, in which the cause is tried, may give form to a general finding, so as to make it harmonize with the issue, yet if it appear to that court, or to the appellate court, that the finding is different from the issue, or is confined to a part only of the matter in issue, no judgment can be rendered upon the verdict." In that case the judgment was reversed, and a venire facias de novo was ordered to be issued by the circuit court. So, also, in the case of People v. Olcott, 2 Johns. Cas. 301, for conspiracy. The verdict offered by the jury was—"That there was an agreement between Roe and the prisoner, to obtain money from the Bank of New York, but with intent to return it again;" the court considered it an imperfect verdict, refused to receive it, and sent the jury back several times. But the jury refusing to find any other verdict, and having been out a long time, the court discharged them without the prisoner's consent. In that case, two points were decided by the supreme court of New York: (1) That the court had a right to discharge the jury, under such circumstances, without the prisoner's consent; and, (2) that the finding was so imperfect, that, had it been received, the court could not have given judgment upon it, and would have been obliged to award a venire de novo. Chief Justice Kent, in delivering the opinion of the court, said: "The offence charged was a conspiracy to defraud the bank, and the verdict was, 'That there was an agreement between Roe and the defendant to obtain money from the bank, but with intent to return it again.' This, however, is no answer to the substance of the charge, which was the unlawful and fraudulent intent to procure money from the bank. That finding leaves the truth or falsity of the accusation in equal uncertainty. The intent afterwards to return the money might consist equally with a fraudulent or an innocent

intent to procure the money in the first instance. The finding was, therefore, so imperfect that had it been received the court could not have given judgment upon it, and would have been obliged to award a venire de novo. The jury might have found either a special verdict, stating the facts at large, and leaving the law to the court; or by a general verdict they ought to have affirmed or negatived the fraudulent intent. I am satisfied that this is no verdict of acquittal. If it had any operation it would be against the defendant; for, in answer to the indictment, the jury have found the fact that the defendant and Roe did agree together to obtain money from the bank, and they have not negatived the fraudulent intent."

Upon the whole, this court is of opinion that this verdict is so imperfect that no judgment can be rendered upon it, and that a venire facias de novo must be awarded.

. Mr. Key, for the United States, moved the court to deliver the opinion, which it had been stated by the court was, on the demurrer to the indictment for falsely altering the abstract B, prepared on the question argued before the court on that indictment, whether such alteration, in the manner and with the intent charged in that indictment, amounted to forgery at common law; the court having thought it unnecessary to deliver any opinion on that question, because they adjudged the indictment insufficient for want of the technical term "forge."

. The counsel for the .United States stated that they considered it their duty to ask the court for their opinion upon that point, because (as the court saw from the evidence given on the former trials,) there was another abstract (abstract C,) altered and erased in the same manner, and under similar circumstances; that it was their duty to send up an indictment for the alteration and erasure of this second abstract, as a forgery at common law, unless they were apprised that the court's opinion was that such an alteration of such a paper under all the circumstances, and with the. intent charged in relation to the other abstract (abstract B,) did not amount to a forgery. It was, therefore. necessary that the United States counsel should know whether such was the opinion of the court or· not, in order that they might govern themselves,· in the discharge of their duty, accordingly. Which motion to deliver now an opinion in the cause alluded to by the counsel for the United States, this court (THRUSTON, Circuit Judge, contra) overruled, because that cause has been decided, and is not now judicially before the court; and because, although one of the judges, supposing that it might be necessary in that case to give an opinion upon the question alluded to in this motion, had written an opinion which would, perhaps, have been delivered as the opinion of the court if it had been necessary, at that. time, .to. give an opinion upon that point; yet two

of the judges were not perfectly satisfied with that opinion, and were desirous of further time to consider it; and finding it to be unnecessary, refused to give the opinion for that reason, and because it would have been unnecessary to commit the court upon a very important point which might have afterwards arisen in the trial of the cause; and for the same reason the court now refuses to give an opinion upon that point.

Mr. Key, for the United States, then made the following motion, in these words: The counsel for the United States (THE COURT having declined delivering their opinion as applied for in the preceding motion,) then moved the court to instruct the grand jury upon the law in reference to the said abstract C's being such a paper as could be the subject of forgery at common law; and whether the facts and intents charged in the former indictment for the alteration of abstract B, and stated in the indictment now submitted to the court, and about to be sent up to the grand· jury for the alteration of the abstract C, amounted to forgery at common law, or not. Also to instruct them that it was the duty of the grand jury, if they found the facts and intents as charged in the indictment, to find it, notwithstanding it contained the word "forge."

THE COURT (THRUSTON, Circuit Judge, contra) refused· to instruct the grand jury as required, saying "that their reasons will appear in the opinion already given upon the motion to instruct the grand jury in a former case against this defendant; for although all the reasons for refusing it in that case do not exist in the present, yet many of them do. and, in their opinion, enough to make it their duty to overrule the motion."

The trial of the case upon the transaction with Mr. Paulding for $300 commenced on the 20th of July.

Mr. Key, for the United States, suggested that the jurors who tried the former cause should be excluded from the panel for the trial of this cause; and that as there were not twelve other jurors attending. the marshal should be directed to summon talesmen to complete the panel.

Mr. Coxe, for the defendant, objected. This is entirely a new cause; and there is no legal objection to the jurors who tried the other.

CRANCH. Chief Judge, said that he did not perceive any legal objection to the former jurors; and if there was not, there was no defect of jurors, and the court would have no authority to order talesmen; and if we did so, it might· be the ground for a new trial; that his only motive for this suggestion was that we may not be drawn into a new trial. He then suggested that jurors who were not on the former trial should be first called, and the deficiency made up by drawing from the names of the former· jury; but Mr. Coxe would not agree to· this, and THE COURT ordered all·the names of the· attending jurors

to be returned to the box, and twelve drawn out by lot, by the clerk, which was done.

The panel being called into the jury box, and one of the jurors, Mr. Haller, being called to the book to be sworn, and being asked by the counsel of the United States, "whether he had formed and expressed any opinion respecting the innocence or guilt of the defendant upon the present indictment," said he did not know what the charge was; whereupon THE COURT directed the indictment to be read in the hearing of the whole panel. The jurors were then respectively asked the same question as they came to the book to be sworn. The jurors who had been upon the former panel answered that they had formed and expressed an opinion as to the manner in which the defendant obtained the money. They were then separately challenged for favor and tried by the triors, and then each respectively was sworn as a witness to the triors, who were sworn upon each challenge. See the form of the oath in 1 Chitty, and in Harris' Entries. The following authorities were cited: Trials per Pais, 187, 189, 204; 2 Hals. [7 N. J. Law] 220, note to Zeller's Case; Anon., 1 Salk. 153; Respublica v. Dennie, 4 Yeates, 267. After two or three hours, only four jurors were sworn in chief, and the marshal was ordered to summon eight talesmen for the next morning.

Mr. Robert Beverly having been challenged for favor by the defendant's counsel, the two triors could not agree.

THE COURT (nem. con.) said, that it seems by the books that only two triors can be chosen. Every juror is presumed to be indifferent until the contrary appears; and if the party challenging for favor does not support his challenge with effect, the juror must be sworn. Mr. Beverly was then sworn in chief. Before Mr. Beverly was sworn, Mr. Stettinius, having been asked the usual question, whether he had formed and expressed any opinion respecting the guilt or innocence of the defendant upon this indictment, which was read to him, answered that he had not, and was sworn in chief without objection. After he was thus sworn and had taken his seat, he rose and informed the court that he had formed and expressed an opinion upon the matters contained in the former indictment (for $750) upon which the jury had given their verdict.

THE COURT said that as the juror was sworn, no exception could now be taken to him unless by consent.

The counsel for the defendant, Mr. Coxe, refused to consent to his being now challenged.

Mr. Key contended that this was not a challenge by either of the parties, but was a challenge by the juror himself, and therefore not within the rule. That this was good cause for a new trial, and it would not be worse to reject him, for the rejection would only be a ground for a motion for a new trial, which the court would not grant if they should be satisfied that the juror was not really prejudiced.

THE COURT (nem. con.) said, that as the juror was sworn, they could not discharge him without the consent of the defendant. Of the eight talesmen ordered and summoned, only one was sworn, and only one of seven others who were summoned in the course of the day. THE COURT ordered six more to be summoned for the next day.

Wednesday, July 22. With great difficulty five jurors were obtained this day, making eleven; and ordered one to be summoned for tomorrow.

Thursday, July 23. This day the panel was completed.

Mr. Key, for the United States, then moved the court to discharge Mr. Stettinius, one of the jurors, who had been sworn as before mentioned; or to permit the United States now to challenge him, unless the counsel for the defendant would say that he did not object to him.

CRANCH, Chief Judge, said, that when a tales is returned, the parties have a right to challenge any one of the original panel who has been formerly sworn in chief, but it must be for a cause arising after he was sworn; not for a cause existing before he was sworn, although it did not come to the knowledge of the party until after he was sworn; and that the court could not, ex mero motu, or even upon the motion of the counsel for the United States, discharge a juror who had been sworn in chief, without challenge, because the juror had disclosed to the court matter, which might be given in evidence upon a challenge. And that he understood this to be the opinion of the court; to which the other judges did not express any dissent.

In the course of the trial, Mr. Key, for the United States, prayed the court to instruct the jury "that whether the letter and draft were written and drawn by the defendant, in his private capacity or in his public capacity, if they were done ostensibly for the public service, but fraudulently, for his own private use and benefit, and the United States' agent was thereby imposed upon; and the money obtained on the draft thus applied to his private use, and the United States thus defrauded of the said $300, the jury should find the prisoner guilty on this indictment." This prayer was submitted without argument, and, on the following morning,

THE COURT (THRUSTON, Circuit Judge, absent) gave the following opinion and instruction:

THE COURT, being of opinion that the offence charged in this indictment is not charged as an official offence only, but is an offence at common law, whether committed by official means or not, the question, whether this court has jurisdiction of an offence consisting exclusively of official misconduct

of any officer of the United States, does not necessarily arise in this cause, and is not intended to be decided by the court. But THE COURT is of opinion that it has jurisdiction of any common-law offence committed in this county, by an officer of the government of the United States, of which it would have jurisdiction if committed by a person not an officer of the government of the United States, although such offence should have been committed by such officer of the government of the United States by means consisting, in part, of acts done by virtue, or by color of his office.

THE COURT, therefore, upon the motion of the counsel for the United States, instructs the jury as follows: That if the jury should be satisfied, by the evidence in this cause, that the letter and draft, in the indictment set forth, were respectively written and drawn by the defendant, in manner and form, at the time and place, and with the intent therein set forth, either in his private capacity, or in his public capacity, as fourth auditor of the treasury department of the United States, ostensibly for the public service of the United States, but fraudulently, for his own private use and benefit, with intent to defraud the United States of the sum of money in the said draft mentioned; and that the said J. K. Paulding, the navy agent named in the said indictment, was thereby deceived, and induced to believe that the said letter and draft were respectively written and drawn by the defendant for the public service of the United States, and, in consequence of being so deceived and induced to believe, did pay the said draft out of the money of the United States then in his hands; and that the defendant received the money for the said draft, as stated in the said indictment, and that all the other facts stated in the said indictment are true, as therein stated, and that the defendant did thereby defraud the United States of the said sum of $300, in the said draft mentioned, then they ought to find the defendant guilty upon this indictment.

The jury having been out thirty hours, and not being able to agree on a verdict, were discharged on Saturday evening, 25th July.

On the 3d of August, the trial of the defendant, upon the three indictments, came on, namely: (1) Upon the transaction with Mr. Paulding, for $750; (2) upon the transaction with the same, for $300; (3) upon the transaction with Mr. Harris, for $2,000; the latter being a new indictment upon the same matter as that contained in the former indictment upon the same transaction, which had been adjudged insufficient upon demurrer.

Tuesday, August 4.

THE COURT (THRUSTON, Circuit Judge, absent) gave the same instruction in the case for $300, which they had given in the former trial of the same case.

Mr. Coxe, for defendant, was about to argue the law to the jury, in opposition to the instruction which the court had just given; but

THE COURT (THRUSTON, Circuit Judge, absent) interrupted him, by saying that, according to the uniform practice of the court, the counsel are not permitted to argue the question of law to the jury, which has been submitted by both parties to the court, and by them decided, and the jury thereupon instructed. That the only way in which the jury can decide the law of a case is, by giving a general verdict, which necessarily involves the question of law as well as of fact.

Mr. Coxe observed, that he had had no opportunity of arguing, before the court the questions of law involved in that instruction.

CRANCH, Chief Judge, replied that the instruction asked by Mr. Key (meaning on the 23d of July, 1829) was understood by the court as having been submitted to the court, by the counsel for both sides, when the court adjourned; and that, on the next morning, when the court suggested to the counsel the instruction which they thought they ought to give, they had an opportunity of objecting, and arguing the law involved in the proposed instruction, which the court then said they considered as being in substance, the same as had been asked by the counsel of the United States.

Mr. Coxe said he thought it varied substantially from that which was asked; and it was only the propriety of that which was asked that he agreed to submit to the court. And that the court, by not giving that, had decided the question in his favor.

CRANCH, Chief Judge, said, that so far as the court had instructed the jury upon the questions of law involved in Mr. Key's prayer, and submitted to the court by the counsel on both sides, the court could not permit the same questions of law to be argued before the jury, in contradiction to the instruction given by the court. But if the instruction actually given exceeded the matter submitted to the court, and involved questions of law not involved in the instruction asked, he was at liberty to argue before the jury any such questions of law as were not involved in the instructions asked and submitted to the court.

Mr. Coxe replied that it was difficult to separate them, and to confine his observations to them; and contended that he had a right to argue the whole law of the case to the jury; and referred to Mr. Rodney's argument in the impeachment of Judge Chase, upon the matter of Frye's Trial. 2 Chase's Trial, 421.

THE COURT again informed him that he might argue to the jury any question of law, not submitted to and decided by the court.

MORSELL. Circuit Judge, observed that he should have no objection to withdraw the instruction, and permit Mr. Coxe to argue the law to the jury, if the counsel for the United States would withdraw their prayer until the argument should be concluded; and

CRANCH, Chief Judge, said, that if the counsel for the United States would withdraw their prayer, the court would withdraw their instruction; which was done, and Mr. Coxe proceeded to argue the law to the jury.

Mr. Key then moved the court to give the instruction which had been withdrawn; which was done.

Mr. Coxe then moved the court to instruct the jury: (1) "That if they believe that the defendant had, by law, no authority to direct the disposition of money in the hands of the navy agents, the payments made by them, of the various drafts, was unauthorized, and in their own wrong;" and, (2) "that if the jury shall believe that the fourth auditor had lawful power and authority to direct the appropriation of such money, then the navy agents were bound to pay the official drafts of the fourth auditor, and none other."

THE COURT refused these two instructions: (1) Because, to give them, would be to submit to the jury matter of law. (2) Because, if the defendant had, in law, no such authority, yet he might, by false appearances, deceive the navy agent into a belief that he had such authority, so as to induce him to pay the drafts out of the money of the United States; and although, in such case, he might, in law, pay the same in his own wrong, and without actual authority, yet it might be a fraud upon the United States. (3) Because, although the defendant might have had authority to direct the appropriation, still he might do it in such a way as to deceive the agent, or otherwise to use such deceptive practices in regard to it, as to constitute the drafts a fraud upon the United States.

Mr. Key then prayed the court to instruct the jury, that if they believed, from the evidence, that the defendant obtained the money of the United States fraudulently, and in the manner charged in the indictments, then the circumstance of the government's having since allowed a credit to the said navy agents, Paulding and Harris, for the amounts of the drafts drawn on them by the defendant, and paid by them, does not sanction those drafts by the defendant, nor exculpate him from the offences charged in the said indictments; nor does the circumstance of the officers of the government having entered the amount of these drafts as a charge upon the defendant, exculpate him from the offences charged in the said indictments;

Which instruction THE COURT gave (THRUSTON, Circuit Judge, absent), and also the following, at the prayer of the counsel for the United States: That although the drafts mentioned in these indictments were ultimately paid by the said Harris and Paulding, respectively, at Boston and New York, still, if the defendant obtained the amount of the said drafts of the said C. S. Fowler, in the city of Washington, in the manner charged in these indictments, and procured the issuing of the requisition in the manner charged, then the said ultimate payment of the said drafts in Boston and New York, respectively, does not prevent this court from having jurisdiction to try the offences charged in the said indictments.

Mr. Coxe, in arguing to the jury, cited 2 Wils. Lect. 247, as to the right of the jury to decide the law; and Mr. Key cited, upon the same point, Add. 57.

The jury, having been out an hour, returned a verdict of "guilty" upon each indictment.

Mr. Coxe, for defendant, moved in arrest of judgment, and for a new trial.

On Thursday, August 13th, 1829, the motions were argued by Mr. Coxe, for the defendant, and by Mr. Swann, for the United States.

Mr. Coxe said it was not his wish, or intention, again to present the same views which were submitted on the former arguments; but to express his sincere conviction of the legality of the grounds for which he had before contended, and to press upon the court the great importance of them, not only to the defendant, but to the nation, and to solicit a calm review of the questions which these cases present. The government of the United States is composed of three distinct branches; executive, legislative, and judicial. They are co-ordinate; and each, in its particular sphere, independent of the others. No judicial tribunal should attempt to exercise any jurisdiction over the executive department, other than that which is conferred by positive statute. This court has, on former occasions, issued injunctions against some of the officers of the treasury department to restrain them from paying money to one party which is claimed by another. In some instances they have been obeyed, in others disregarded. But when they have been respected, it has been more out of courtesy than a belief of any obligation to do so. The present head of the treasury department, expressly disavows the authority of this court to suspend any of his official acts; and, indeed, it would be hard to conceive the extent of evil which might result, if a court of justice should be authorized by its writ issued upon the ex parte affidavit of a complainant to suspend its money payments; an act which might shake the credit of the government, and destroy all confidence in its good faith. The executive department consists, not only of the president, but of the heads of departments, and the various subordinate officers, who are all

equally shielded from the action of this court, as the president himself, and for the same reasons. The 4th auditor of the treasury is one of these functionaries. He is bound to perform the duties required of him by the act of congress which creates his office, and confers his powers. He is responsible to the president, whose officer and agent he is, and to no other authority, unless made so by some act of congress. His acts are executive acts, and cannot be judicially inquired into; still less can they be subjected to examination in a state court, or under the criminal common law of a state. He cannot be subjected to the jurisdiction of any court, unless, in the exercise of his official power, he invades the rights of an individual, and thus gives him a cause of action. If, however, under any circumstances he can be made amenable to any criminal law, it must be before a tribunal created under the authority of the same government, and administering that law which furnishes to him his rule of duty; that law which creates his office, defines its duties and its powers, and limits its responsibilities.

Mr. Coxe, here cited the case of Mostyn v. Fabrigas, Cowp. 161, and Id., 11 Harg. St. Trials, 162, in which Lord Mansfield and the court decided that the question of the powers of the governor of Minorca, under the king's letters patent, could be tried only in the king's courts in England. The authority of an officer, Mr. Coxe argued, can be measured and ascertained only by reference to the law which confers it. These indictments are framed upon the common law of Maryland. By what law are we to decide whether the accused be guilty or innocent? Must we not look to the laws of the United States, to see what powers are reposed in the 4th auditor? what acts he may do, and what he may not? Must we not look to those laws to see whether such an officer exists or not; and to ascertain his duties and his responsibilities? If he has exercised no power but what those laws confer, he has transcended no authority, he has violated no duty. Can it then be contended that a Maryland court, administering the Maryland law, is obliged to look to another law to see whether an offence has or has not been committed; and, when that fact is ascertained, to consider it a crime over which it can assume jurisdiction? This prosecution, it is now settled, is to be sustained upon · the principles of the common law of Maryland alone. The only inquiry that can be made is, whether the auditor has not transcended the powers conferred upon him by the act of congress, and it seems extraordinary that the violation of an act of congress, should constitute an offence at common law, in the state of Maryland. The common law of Maryland is a unit. It contains within itself every provision that is necessary to indicate and define the offence, to provide for,

and to meet every possible aspect of it, and to prescribe the punishment. It cannot look abroad into another system of law to ascertain the guilt or innocence of actions; it must find them within itself. This common law is of unlimited antiquity. It cannot now create new offences, and affix to them new punishments. How then is it conceivable, that this common law, existing in Maryland anterior to our Revolution, can contain any provision prohibiting a violation of an act of congress when that congress itself had no existence. The federal government created the office, and congress has defined the powers of the officer. He has a control over the funds of the public in the hands of the navy agent. If he has exercised that control improperly—if he has misapplied those funds—what law has he violated? Clearly, that alone which prescribed his duties. If he has no such power, then all his acts are extra-official, and he can be regarded in no other light than a private individual, whose representations, whether written or oral, to the secretary of the navy, and the navy agents, were entitled to no consideration from them, and which they were bound to disregard. If he had such a control, it was necessarily an official control only, and his improper exercise of it could be nothing but a malversation in office. Official misconduct cannot, in any case, be the subject of criminal prosecution under our constitution. Mr. Coxe here cited the opinion of the supreme court, in the case of Marbury v. Madison, 1 Cranch [5 U. S.] 165, 170. The case of Marbury v. Madison, was that of an application to the supreme court for a mandamus to be directed to the secretary of state commanding him to deliver to the relator a commission which had been made out and signed and sealed by the president. The withholding of that commission was held to be illegal, and contrary to duty; but not, therefore, unofficial. It was held to be an infringement of the vested rights of an individual, and therefore such official act was cognizable at the instance of that individual in a court of justice. But all right to examine into the official conduct of an executive officer where no private rights were violated, is expressly disclaimed. What acts can be more purely and exclusively official and executive in their character, than the control exercised by the treasury department over the public moneys? The 4th auditor is empowered to receive, adjust, and settle the accounts of persons having claims against the navy department, and to direct the disposition of the funds in the hands of the navy agents. Should he refuse to allow an item of charge in an account presented by an individual, can this court assume jurisdiction over him, and compel him to do it? This would be to make this court a comptroller. If, in controlling these public funds, the same officer should direct the pay-

ment of an account which had been improperly allowed, can this court re-examine the allowance, and decide that he was wrong? The whole matter is referred to him, to his intelligence, to his discretion, and to his integrity—and no judicial tribunal is empowered to enter his office, and inquire into the manner in which he has performed his public duties, or directed the disposition of the public money. But that this power should be derived from the Maryland common law, seems preposterous and paradoxical. The common law of Maryland is completely within the control of the legislature of that state, and if we are to refer to it as the standard by which to judge of the conduct of an officer of the general government in the discharge of his official duties, we refer to a standard which not only can furnish us with but a very uncertain rule, but one which may be changed by the caprice, or whim, or policy of the state government. If the acts now charged against the accused be violations of that law, and triable in the courts of that state, the legislature may frame a system of statutory law. creating new offences, limiting and defining the duties of every officer of the general government, making that punishable which is now allowed, prohibiting that which is now commanded, and measuring, at their will, the penalties of disobedience. If this jurisdiction is claimed in consequence of the peculiar organization of this district, or the peculiar character of this court, it has been heretofore shown, that it must refer to some other origin than that of the common law. But the assumption of this enormous power will never be acquiesced in by the people of the United States. They will never submit to see their officers subjected to this jurisdiction, of which they have never heard, and tried by a law which they know not of; a law which they never made, and whose authority they have never recognized.

Mr. Coxe then proceeded to consider the other grounds which he supposed to be good grounds for arresting the judgment. The indictment in the case for $750, contains two sets of averments, and is uncertain and multifarious. The first sets forth the manner in which the money was drawn out of the hands of the agent by the defendant; the second, the manner in which the money of the United States was placed in the hands of the agents. It is uncertain whether the offence alleged is the fraudulent obtaining of the money of the United States, from the navy agents; or that of fraudulently placing the money in their hands. It is also uncertain as to the time and place of committing the offence. The words "then and there" may refer to different times before stated in the indictment.

Upon the motion for a new trial, Mr. Coxe contended that the verdict was against the evidence in the cause.

Mr. Swann, contrà, contended that the question of jurisdiction had been already solemnly decided by the court, in this cause, and upon very solid grounds, and he replied to the objections made to the indictments.

CRANCH, Chief Judge, delivered the opinion of the court, as follows: The defendant having been convicted upon three indictments. his counsel has made a motion in arrest of judgment, and for a new trial. The first of these indictments is that which was founded upon the draft for $750 upon Mr. Paulding, the navy agent at New York, and which the court, upon the demurrer, had decided to be good. The second is upon the draft on Mr. Paulding for $300, to which a demurrer had been heretofore entered and argued, and withdrawn at the suggestion of the court. The third is a new indictment upon a transaction with Mr. Harris, the navy agent at Boston, on which a former indictment was framed which was adjudged bad on demurrer. Upon the argument on the motion in arrest of judgment, the same exception has been taken to the jurisdiction of this court which was taken and overruled upon the demurrer. In support of the exception it is said, that in deciding upon the guilt or innocence of the defendant upon these indictments, it is necessary to inquire into the extent of his powers and duties as 4th auditor of the treasury department of the United States, and that no tribunal is competent to make that inquiry judicially but a tribunal purely and exclusively national; indeed, it seemed to be denied that any judicial tribunal whatever was competent to question his official acts, unless they violated the vested right of some individual; and that, if they affected the public only, he must be left to his superior executive officer. Upon this point the court was referred to the opinion of Lord Mansfield in the case of Mostyn v. Fabrigas, Cowp. 173, 174, and to the opinion of the supreme court of the United States in the case of Marbury v. Madison, 1 Cranch. [5 U. S.] 165, 166.

In the first case, Fabrigas, a native of Minorca, brought an action of assault and battery and false imprisonment, in England, against Mostyn, who was governor of Minorca by virtue of letters patent from the king. Lord Mansfield said: "Now if every thing committed within that dominion is triable by the courts within that dominion, yet the effect or extent of the king's letters patent, which gave the authority, can only be tried in the king's courts; for no question concerning the seigniory can be tried within the seigniory itself. Therefore, where a question respecting the seigniory arises in the proprietary governments, or between two provinces of America, or in the Isle of Man, it is cognizable by the king's courts in England only, so that, emphatically, the governor must be tried in England, to see whether he has exercised the authority delegated to him by his letters patent, legally and properly; or whether he has abused it in violation of the laws of England, and the trust reposed in him." The doctrine

established by this citation is, that the extent of the powers of the officers cannot be decided by those officers themselves, but must be decided by the courts of the king who granted the authority.

The passage cited from the opinion of the supreme court of the United States in the case of Marbury v. Madison [supra] is this: "It follows, then, that the question whether the legality of an act of the head of a department be examinable in a court of justice or not, must always depend upon the nature of that act. If some acts be examinable and others not, there must be some rule of law to guide the court in the exercise of its jurisdiction. In some instances there may be difficulty in applying the rule to particular cases; but there cannot, it is believed, be much difficulty in laying down the rule. By the constitution of the United States, the president is invested with certain important political powers, in the execution of which he is to use his own discretion, and is accountable only to his country in his political character, and to his own conscience. To aid him in the performance of these duties, he is authorized to appoint certain officers, who act by his authority, and in conformity with his orders. In such cases, their acts are his acts; and whatever opinion may be entertained of the manner in which executive discretion may be used, still there exists, and can exist, no power to control that discretion. The subjects are political. They respect the nation—not individual rights; and being intrusted to the executive, the decision of the executive is conclusive. The application of this remark will be perceived by adverting to the act of congress for establishing the department of foreign affairs. This officer, as his duties were prescribed by that act, is to conform precisely to the will of the president. He is the mere organ by whom that will is communicated. The acts of such an officer, as an officer, can never be examinable by the courts. But when the legislature proceeds to impose on that officer other duties; when he is directed peremptorily to perform certain acts; when the rights of individuals are dependent on the performance of those acts, he is, so far, the officer of the law; is amenable to the laws for his conduct; and cannot, at his discretion, sport away the vested rights of others. The conclusion from this reasoning is, that where the heads of departments are the political or confidential agents of the executive, merely to execute the will of the president, or rather to act in cases in which the executive possesses a constitutional or legal discretion, nothing can be more perfectly clear than that their acts are only politically examinable. But when a specific duty is assigned by law, and individual rights depend upon the performance of that duty, it seems equally clear that the individual who considers himself injured has a right to resort to the laws of his country for a remedy."

It seems, to this court, perfectly clear that these authorities, and the argument to be drawn from them, apply only to cases of exclusively official acts. In the present cases, the offences are not charged as official misdemeanors, nor is the official character of the defendant a necessary ingredient in any of them. It only afforded him the means of deceit by which he was enabled to effect the alleged fraud. The court having, in former stages of these prosecutions, expressed its opinion fully upon this point, does not deem it necessary to say more now than that it has seen no reason to change that opinion.

In the case for $750, it has been urged that two offences are charged in the same count, if the indictment in the case for $300 be good; for the only offence charged in the latter consists in the letter and draft, whereas the former charges not only a similar letter and draft, but a distinct fraud in obtaining a requisition. It will be observed, however, that in the case for $750, the letter and draft are not set forth with the same averments of the intent to deceive by the official appearance given to the letter, which accompany the charge in the case for $300, and which materially distinguish the indictment in that case from the former indictment upon the same transaction, which the court upon demurrer adjudged to be insufficient. The court, after reviewing its former opinion that the indictment for the $750, drawn from Mr. Paulding, does not contain two distinct charges of two distinct offences, has seen no cause to alter that opinion. The principal objection to the former indictment in the case for $300, noticed by the court in its opinion upon the demurrer in that case, was that it did not aver any deceitful practice by which the money was obtained; it only stated what might be evidence of deceitful pratice; it did not aver the facts which the jury might infer from the facts averred. The court stated, in substance, that fraud was an inference of law from certain facts, and that it was not sufficient to set forth that certain facts were done with a fraudulent intent, but that the facts themselves must be such as to justify the legal inference of fraud; "that there was no fact averred, in relation to the letter, or the draft, or the requisition, which showed any deceitful practice—any attempt to deceive any body, or to impose on any agent of the government. That the simple averment that the defendant wrote the letter is not the averment of any fact which might be inferred from the fact of his writing the letter. So in regard to the averments respecting the draft and the requisition, and the receipt and misapplication of the money, they do not amount to any inference which might be drawn from either of those facts, or from the combination of the whole. Whatever material inferences of fact might, in the opinion of the counsel for the United States, be drawn from those facts, ought to have been averred as facts; and, without such averment, those inferences cannot be taken into consideration by the court, for the same reason which would exclude

them in the case of a special verdict. In the present indictment, those inferences are drawn and averred as facts. It is averred "that the said letter thus written, and dated, and addressed, and sent from the said treasury department, and the office of the fourth auditor thereof, purported to be, and was fraudulently intended by the said Watkins, to appear as an official letter of said Watkins; and was so written, dated, addressed, and sent to deceive the said Paulding, by such appearance, and to induce him to pay the draft aforesaid out of the moneys of the United States in his hands; and the said Paulding was so deceived, and did, in consequence of such deceit, so pay the same out of the said moneys of the United States in his hands." It is also averred that the said letter was fraudulently intended, by the said Watkins, to appear, and did appear as an official letter of the said Watkins; and, as representing that the sum of money therein mentioned was to be paid for the public service of the United States, and that the draft therein mentioned was drawn on account of the public service of the United States, and to deceive the said Paulding by such appearance, and to induce him to pay the same out of the moneys of the United States in his hands; and that the said Paulding was so deceived, and paid the same out of the said moneys of the United States in his hands. The indictment then avers that the public service of the United States did not require the payment of the said sum of money in the letter and draft mentioned; and that the defendant well knew that the same was not so required. That he had no authority, and well knew he had no authority to draw the money, or to write the said letter of advice, on account of the public service of the United States, as an official letter; and avers that he wrote the letter and made the draft, ostensibly for the public service, but falsely and fraudulently, for his own use and benefit, and to deceive the said Paulding, and to defraud the United States; and that, by means of the said letter, so written, dated, addressed, and sent as aforesaid, he did unlawfully, fraudulently, and deceitfully obtain, to and for his own use and benefit, the said sum of $300 of the moneys of the United States, from and out of the hands of the said Paulding, navy agent, as aforesaid; to the great deceit, fraud, and damage of the United States, and against the peace and government thereof.

These averments, we think, supply the defects which, according to the former opinion of the court, rendered the former indictment, upon the same transaction, insufficient; and, consequently, we think the present indictment sufficient.

The third indictment is upon a transaction with Mr. Harris, the navy agent at Boston. The first count, after stating that the defendant was fourth auditor, &c.; that Mr. Harris was navy agent; that Mr. Southard was secretary of the navy; that there was an appropri-

ation, by law, of $20,000, for arrearages prior to 1827; that the secretary of the navy had signed certain blank requisitions, which he left with Mr. Hay, chief clerk of the navy department, to be filled up, in the absence of the secretary, with such sum or sums of money, and payable to such person or persons, as the public service, in relation to the navy department, might require; that the secretary of the navy was absent from Washington, on the 27th of August, 1827, and continued absent until after the 6th of September in that year; charges,—"That the defendant, being fourth auditor, as aforesaid,' and well knowing the premises, and devising and intending fraudulently and unjustly to acquire to himself and for his own private use, the money of the United States, with force and arms, on the 27th of August, 1827, at the county of Washington aforesaid, falsely, fraudulently, and deceitfully pretending that the sum of $2,000 was wanted for the service of the navy of the United States, for payment of arrearages prior to 1827, did then and there write and address to the secretary of the navy the following letter: 'Fourth Auditor's Office, 27th August, 1827. Sir—I will thank you to cause to be sent to Richard D. Harris, navy agent at Boston, two thousand dollars, under the head of 'Arrearages prior to 1827.' I am, sir, respectfully, your obedient servant, T. Watkins. Hon. Secretary of the Navy.' Which letter was addressed to Mr. Hay, the chief clerk; and by means of said pretence and letter, the defendant procured one of the blank requisitions to be filled up for $2,000, payable to the said Richard D. Harris, &c.; which sum was, in conformity with the said requisition, by warrant from the secretary of the treasury, drawn out of the treasury of the United States, and placed in the hands of the said Richard D. Harris, the navy agent, as aforesaid, with intent to defraud the United States of the said sum of money." And, after denying the truth of the pretences, it concludes with this averment—"But then and there intended to defraud the United States of the same, and to convert the same to his own proper use and benefit, and did thereby defraud the said United States of the said sum of money, and did apply and appropriate the same to his own proper use, to the great damage of the United States," &c. This count, in the opinion of the court, is clearly insufficient; because it does not aver the means by which the United States lost the money, or suffered any damage by the placing of the money in the hands of the navy agent, or were defrauded. The second count is not liable to this objection, as it sets out all the drafts by which the money was drawn out of the hands of Mr. Harris; and has all the other requisites which were deemed by the court sufficient to sustain the indictment upon the case for $750, in the transaction with Mr. Paulding.

The motion for a new trial is made upon the ground that the verdicts were against evidence; because, as it is said, there was no

evidence of the pretence to Mr. Southard, in regard to the requisition for the $750, nor to Mr. Hay, in relation to the requisition for the $2,000.

But THE COURT is of opinion that the deposition of Mr. Cottringer, and the letter of the 27th of August, 1827, contain evidence from which the jury might infer such a pretence in each case.

It was also said, that there was no evidence that Mr. Hay was chief clerk; but that fact was not controverted at the trial, and was argued upon by the counsel as a fact admitted, and not contradicted at the trial.

Upon the whole, therefore, THE COURT is of opinion that the judgment ought not to be arrested, nor a new trial granted in either of these cases.

Whereupon, after a pause,

Mr. Swann, the district attorney, observed that it was his duty to request the judgment of the court.

Mr. Coxe, for defendant, stated that he had nothing further to say.

The defendant was then brought into court, and sentenced—in the case for $750, that he pay a fine of $750, and be imprisoned three calendar months from this 14th of August, 1829, inclusive; in the case for $300, that he pay a fine of $300, and be imprisoned three calendar months next after the termination of his imprisonment upon the former sentence; and, in the case for $2,000, that he pay a fine of $2,000, and be imprisoned three calendar months next after the termination of the last preceding sentence,—making, in the whole a fine of $3,050, and nine months' imprisonment.

[NOTE. An application was subsequently made to the supreme court to award a writ of habeas corpus to the prisoner, which was issued, and the prisoner discharged; Justices Johnston and McLean dissenting. 7 Pet. (32 U. S.) 568. Upon retiring from the supreme court, the prisoner was again arrested upon three writs of capias ad satisfaciendum. During the March term, 1833, the defendant was brought into court, when his counsel moved to quash the writs of capias ad satisfaciendum, and to discharge defendant, which motion was granted, overruling the motion of the attorney of the United States to commit the defendant. Case No. 16,650.]